UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ERROL THOMAS,

                              Plaintiff,
                                                        9:13-CV-0321
v.                                                      (MAD/TWD)

F. WAUGH, LEIFELD, RONALD D. LARKIN,
CHERYL MORRIS, JOHN N. ANTONELLI,
BLY,
                              Defendants.
_____

APPEARANCES:                                  OF COUNSEL:

ERROL THOMAS
96-A-7903
Plaintiff pro se
Coxsackie Correctional Facility
Box 999
Coxsackie, NY 12051

HON. ERIC T. SCHNEIDERMAN                      LOUIS JIM, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

I.    **INTRODUCTION**

        This pro se prisoner civil rights action, in which Plaintiff claims that Defendants violated

his constitutional rights by depriving him of his religious head covering, was commenced

pursuant to 42 U.S.C. § 1983.  The matter is now before the Court for initial review of Plaintiff's

Second Amended Complaint (Dkt. No. 63) under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

Original Defendants Francine Waugh ("Waugh"), Dawn DiCairano ("DiCairano"), Berndt Leifeld ("Leifeld"), Ronald D. Larkin ("Larkin"), Cheryl Morris ("Morris"), John N. Antonelli ("Antonelli"), Richard Bly ("Bly"), and Karen Bellamy ("Bellamy") moved to dismiss Plaintiff's First Amended Complaint (Dkt. No. 26) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 47.) Plaintiff opposed the motion. (Dkt. No. 50.) In a Memorandum-Decision and Order filed on September 30, 2015, the Hon. Mae A. D'Agostino, United States District Judge, granted Defendants' motion to dismiss in part and denied it in part. (Dkt. No. 58.)

The Defendants' motion to dismiss was denied by Judge D'Agostino as to Plaintiff's claims against Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly under the free exercise clause of the First Amendment and RLUIPA. (Dkt. Nos. 53 and 58.) Plaintiff's procedural and substantive due process claims, the claims asserted against Defendants DiCairano and Bellamy, and all claims related to the proper functioning of the grievance system, were dismissed with prejudice. (Dkt. No. 58 at 11.) Plaintiff's retaliation claim against Defendant Leifeld was dismissed with leave to amend. *Id.*

## II. INITIAL SCREENING

Because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Second Amended Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such

relief." 28 U.S.C.

§ 1915(e)(2)(B)(i)-(iii).[1]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief can be granted; or . . . seeks monetary relief against a person who is immune from such relief." 28 U.S.C. § 1915A.

In reviewing a *pro se* complaint, the Court has the duty to show liberality towards *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the Plaintiff has stated "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to Plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. "Threadbare recitals of the

---

[1] To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

3

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged    but it has not "show[n] that the pleader is entitled to relief." *Id.* at 679 (quoting Federal Rule of Civil Procedure 8(a)(2)). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotations marks and alterations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

## III.    RETALIATION CLAIM IN PLAINTIFF'S FIRST AMENDED COMPLAINT

### A.    Allegations Regarding the Retaliation Claim

In his First Amended Complaint, Plaintiff alleged that Defendant Leifeld had retaliated against him for filing a grievance against Defendant DiCairano on August 7, 2012. (Dkt. No. 26 at ¶ 44.)  The allegations and documentary evidence in the First Amended Complaint relating to

Plaintiff's retaliation claim were as follows. Plaintiff alleged in his grievance that Sergeant DiCairano harassed him about his religious head covering once in June 2012 and again in July 2012, after Plaintiff had been found not guilty on March 27, 2012, of charges involving the head covering included in a March 19, 2012, Misbehavior Report. (Dkt. No. 26 at 21, 23-25, 27-28.) The evidence relied upon in finding Plaintiff not guilty of the charges in the Misbehavior Report was the testimony of the facility Rabbi that the head covering worn by Plaintiff was appropriate for a member of the Hebrew faith. *Id*. at 23.

In the June and July 2012 encounters, DiCairano had told Plaintiff that his religious head covering was not a Jewish head covering and had informed him that she wanted to take a picture of the head covering to send to Albany so that she could get the March 27, 2012, determination that the head covering was appropriate for a member of the Jewish faith changed. *Id*. at ¶¶ 34-40. After Plaintiff filed the grievance, Defendant Leifeld "in conjunction with unlawfully resolving Thomas' grievance but apart therefrom . . . ordered [Plaintiff] to take a picture wearing the religious headcovering so that Leifeld could send it to Albany to get the decision permitting [Plaintiff] to wear his religious headcovering changed."[2] *Id.* at ¶ 43.

In connection with Leifeld's allegedly unfavorable and unlawful resolution of Plaintiff's grievance against DiCairano, Leifeld sent Plaintiff a memorandum on September 26, 2012, stating "I've enclosed an edited copy of the E-mail I received from [Cheryl] Morris Director of Ministerial Services. I will not rebuttal (sic) this issue; the last conversion (sic) we had

---

[2] On appeal from the IGRC response to Plaintiff's grievance against DiCairano, the Superintendent noted that it was the facility chaplain who had referred the issue of religious head covering in the grievance to the Central Office Ministerial Services Office for determination. (Dkt. No. 26 at 32.)

pertaining to your religious head gear is final."[3] *Id.* at 40. The enclosed email stated that

Defendant Morris determined "the head gear is inappropriate for a Jew. That headgear is for a

Rasta." *Id.* at 42. Plaintiff alleges that Defendant Leifeld took these actions to retaliate against

him "for filing a grievance against Leifeld's co-worker DiCairano for harassment." *Id.* ¶ 44.

### B.     Disposition of the Retaliation Claim on Defendants' Rule 12(b)(6) Motion

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly

suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took

"adverse action" against the plaintiff    namely, action that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was

a causal connection between the protected speech and the adverse action    in other words, that

the protected conduct was a "substantial or motivating factor" in the defendants' decision to take

action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d

489, 492 (2d. Cir. 2001)).

In its Report-Recommendation on Defendants' Rule 12(b)(6) motion to dismiss

Plaintiff's First Amended Complaint, this Court found that Plaintiff had alleged facts plausibly

suggesting that he had engage in protected conduct for purposes of his retaliation claim. (Dkt.

No. 53 at 18.) The Court further found that for purposes of the motion to dismiss, it would

---

[3] Although Leifeld stated in his memorandum to Plaintiff that the email was one he had received from Morris, the email annexed to Plaintiff's First Amended Complaint and identified as the one attached to Leifeld's office memorandum of September 26, 2012, does not appear to have come from Morris inasmuch as the author of the e-mail stated therein that "I sent a (sic) e-mail to the Director of Ministerial services (Cheryl Morris) and she said the head gear is inappropriate for a Jew." (Dkt. No. 26 at 42.)

assume that denial of a grievance constituted adverse action. *Id.* However, the Court concluded

that Plaintiff had failed to allege facts plausibly suggesting a causal relationship between the

protected conduct and the adverse action. *Id.* at 19-20. The Court noted that the only possible

factor set forth in the First Amended Complaint supporting causal connection between the filing

of the grievance and the alleged adverse action was temporal proximity, and found that temporal

proximity alone was not enough to establish a causal connection. *Id.* at 19-20. *See Slattery v.*

*Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (where "timing is the only basis for

a claim of retaliation . . . an inference of retaliation does not arise.").

Judge D'Agostino adopted this Court's finding with respect to causal relationship and

recommended dismissal of the retaliation claim with leave to amend. (Dkt. No. 58 at 8-9.)

## IV. RETALIATION CLAIM IN PLAINTIFF'S SECOND AMENDED COMPLAINT

### A. New Allegations Regarding the Retaliation Claim

Plaintiff's Second Amended Complaint states that it is filed "specifically to amend

plaintiff's retaliation claim against defendant Leifeld under the Third Cause of Action [in his

First Amended Complaint]."[4] (Dkt. No. 63 at 1.) Plaintiff has included additional allegations in

support of his retaliation claim against Leifeld in his Second Amended Complaint. Plaintiff has

_____

[4] As noted above, the due process claims asserted by Plaintiff in his First Amended
Complaint were all dismissed with prejudice by Judge D'Agostino in her September 30, 2015,
Memorandum-Decision and Order. (Dkt. No. 58 at 11.) Plaintiff has nonetheless continued to
allege violation of his due process rights in his Second Amended Complaint. (Dkt. No. 63 at
¶¶ 40, 42, 49-50, 52, 58, 61.) In light of the previous dismissal of Plaintiff's procedural and
substantive due process claims with prejudice, the Court recommends that all re-alleged claims
for denial of procedural or substantive due process be stricken from the Second Amended
Complaint without effect on the rest of the pleading. *See e.g., McGann v. Collingswood Police*
*Dept.*, Civil No. 10-3458 (NHL/KMW), 2012 WL 983686 at * 4, 2012 U.S. Dist. LEXIS 38865,
at * 12-13 (D. New Jersey, March 22, 2012) (re-alleged claims previously dismissed with
prejudice stricken from plaintiff's amended complaint).

alleged that at some point after he had filed the grievance against DiCairano on August, 7, 2012, Leifeld summoned him to a meeting in the Rabbi's office and gave Plaintiff a direct order to remove his religious head covering. *Id.* at ¶ 33. At the time, Leifeld was aware of Plaintiff's protected religious activity since he had been informed of the propriety of the head covering by the Rabbi and was aware of the outcome of the Misbehavior Report on the issue. *Id.* at ¶ 34.

According to Plaintiff, after confirming the Rabbi's position that the head covering was appropriate, Leifeld, on August 23, 2012, still requested an unnecessary review of the issue by Morris, as Director of Ministerial Services, "in an obvious attempt to overturned (sic) a proper and legitimate determination of an administrative proceeding pertaining to the religious headcovering." *Id.* at ¶ 36. Plaintiff also claims that "Leifeld managed to modify plaintiff's complaint against DiCairano into an already resolved religious head covering issue whereas his role was simply to address, investigate and resolve the complaint against officer DiCairano." *Id.* at ¶ 37.

In addition, Plaintiff has alleged in his Second Amended Complaint that on March 2, 2013, subsequent to the determination by Morris that the religious head covering in issue was for Rastafarians and was improper for members of the Jewish faith, Leifeld took him to the package room and ordered him to dispose of the head covering by sending it home. *Id.* at ¶ at 41.

### B.    Analysis of the Retaliation Claim

Defendants' effort to obtain dismissal of Plaintiff's First Amendment free expression and RLUIPA claims with regard to the religious head covering issue on their Rule 12(b)(6) motion was unsuccessful. (Dkt. No. 58.) The remaining Defendants, including Leifeld, will be required to respond to those claims, although the answer deadline has been temporarily stayed by the

8

District Court in light of the filing of the Second Amended Complaint. *Id.*; Text Notice, dated December 17, 2015. The question before this Court on initial review is whether the factual allegations in Plaintiff's Second Amended Complaint are sufficient to state a claim for retaliation against Leifeld in addition to the claims asserted against him under the free exercise clause and RLUIPA. For reasons set forth herein, the Court concludes that they are not.

Even if the Court were to again assume for purposes of this motion that Leifeld's actions constituted adverse action, Plaintiff has still failed to plausibly allege that his filing a grievance against DiCairano was a "substantial or motivating factor" in Leifeld's actions for purposes of showing a causal connection on his retaliation claim. *See Holland v. Goord*, 758 F.3d 215, 225-26 (2d Cir. 2014) ("An inmate bears the burden of showing that the protected conduct was a substantial or motivating factor in the prison official['s action.]") (citation and internal quotation marks omitted).

As a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S. Dist. LEXIS 120709, at * 49 (N.D.N.Y. Aug. 29, 2014)[5] ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v. Gillespie,* 791 F. Supp. 2d at 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe correction

---

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

counselor would retaliate for a grievance in which she was not personally named). There are no allegations in the Second Amended Complaint suggesting a special relationship between DiCairano and Leifeld or any other facts from which the Court could infer that Leifeld might have cause to retaliate for a grievance against DiCairano.

In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* Temporal proximity alone is insufficient to establish an inference of retaliation. *Slattery*, 248 F.3d at 95.

The additional allegations in Plaintiff's Second Amended Complaint may tend to provide further support of temporal proximity, however, they offer nothing more to support a causal connection. While the allegations indicate that Leifeld was involved in the determination of Plaintiff's grievance against DiCairano and the inquiry to the Director of Ministerial Services regarding whether Plaintiff's head covering was appropriate for a member of the Jewish faith, they do not support an inference that his involvement was in any way retaliatory.[6] As with Plaintiff First Amended Complaint, there are no allegations in his Second Amended Complaint

---

[6] The factual allegations in the Second Amended Complaint regarding Leifeld, as with the First Amended Complaint, support Plaintiff's surviving claims against him under the free expression clause of the First Amendment and RLUIPA.

that Leifeld made any statements suggesting that he denied Plaintiff's grievance or sought an opinion from Albany on the appropriateness of Plaintiff's head covering because Plaintiff had filed a grievance against DiCairano. Furthermore, Plaintiff has conceded that the decision dismissing his grievance was affirmed. (Dkt. No. 26 at 32, 28.)

In sum, as with his First Amended Complaint, Plaintiff's Second Amended Complaint fails to plausibly allege a causal connection between his grievance against DiCairano and Leifeld's allegedly retaliatory actions. Therefore, the Court recommends that the retaliation claim in Plaintiff's Second Amended Complaint be dismissed. Because Plaintiff has already been given the opportunity to amend his retaliation claim against Leifeld, and he has again failed to state a claim or allege facts suggesting he might be able to do so given yet another opportunity to amend, the Court recommends that Plaintiff's retaliation claim against Leifeld be dismissed with prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Plaintiff's retaliation claim against Defendant Leifeld in his Second Amended Complaint (Dkt. No. 63) be **DISMISSED WITH PREJUDICE** for failure to state a claim; and it is further

**RECOMMENDED** that Plaintiff's claims in his Second Amended Complaint (Dkt. No. 63) for violation of his procedural and substantive due process rights, previously dismissed with prejudice by the District Court (Dkt. No. 58), **BE STRICKEN FROM THE SECOND AMENDED COMPLAINT WITHOUT EFFECT ON THE REST OF THE PLEADING**; and it is further

**RECOMMENDED** that Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly

**BE DIRECTED TO ANSWER** Plaintiff's claims under the free exercise clause of the First Amendment and RLUIPA in the Second Amended Complaint (Dkt. No. 63); and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: December 29, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/
ATB).    |    Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol,
Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 Plaintiff, an inmate currently in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), commenced this civil rights action,
pursuant to 42 U.S.C. § 1983, on May 31, 2011. *See*Dkt.
No. 1. The remaining claims are that Defendants violated
Plaintiff's constitutional rights under the First Amendment's
Free Exercise Clause, as well as his rights under the Religious
Land Use and Institutionalized Person's Act ("RLUIPA"),
and subsequently retaliated against him for attempting to
exercise these rights by destroying Plaintiff's mail and thus
denying him access to the courts. *See* Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July
23, 2014, Magistrate Judge Baxter recommended that the
Court grant Defendants' motion for summary judgment and
dismiss Plaintiff's complaint in its entirety. *See*Dkt. No.
210.Specifically, Magistrate Judge Baxter first found that
in relation to the December 7, 2010 incident, Defendant
Ready acted within the bounds of his employment and
according to the documentation before him and thus, his
inadvertent denial that caused Plaintiff to miss one religious
service did not substantially burden Plaintiff's free exercise

of his religion. *See id.* at 14.With regards to the March 20,
2011 incident, Magistrate Judge Baxter found that Defendant
Ellis was not responsible for the shortened duration of the
Purim celebration, and that while the delay may have been
an inconvenience, Plaintiff was still able to participate in
the service, thus satisfying the requirements of the First
Amendment and RLUIPA. *See id.* at 19–20.Magistrate Judge
Baxter also found that neither Defendant Ellis, nor Defendant
Ready engaged in the conduct mentioned above as a way
to retaliate against Plaintiff for any grievances that he had
previously filed either against them or any other correctional
officer. *See id.* at 39–40.Moreover, Magistrate Judge Baxter
found that Defendant Kupiec did not interfere with Plaintiff's
mail as a means to either retaliate against him or to deny him
access to the courts. *See id.* 35–36.Finally, Magistrate Judge
Baxter found that Plaintiff failed to establish that he suffered
an adverse action as a result of Defendant Kupiec's alleged
conduct. On August 4, 2014, the Court received objections
to the Report–Recommendation from Plaintiff. *See*Dkt. No.
211.

**II. DISCUSSION**

**A. Plaintiff's objections**

In his objection to Magistrate Judge Baxter's Report–
Recommendation, Plaintiff states that he objects to the Report
in its entirety. *See id.*Plaintiff relays his astonishment at
Magistrate Judge Baxter's choice to "excuse Def [endant]
Kupiec's conduct" and at his finding that Plaintiff's position
is "unfounded." *See id.*Plaintiff further objects to Magistrate
Judge Baxter's Report on the grounds that he looked outside
the pleadings and "only to the Defendants Affidavits" when
making his determination to grant Defendants' motion for
summary judgment. *See id.*

**B. Standard of review**

*2 A court may grant a motion for summary judgment only
if it determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such
issue warrant judgment for the movant as a matter of law.
*See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d
Cir.1994) (citations omitted). When analyzing a summary
judgment motion, the court "cannot try issues of fact; it can
only determine whether there are issues to be tried."*Id.* at 36–
37 (quotation and other citation omitted). Moreover, it is well-
settled that a party opposing a motion for summary judgment
may not simply rely on the assertions in its pleadings. *See*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations

for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge."28 U.S.C. § 636(b) (1).

## C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1;*see generally*Dkt. No. 211.Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See*Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See*Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,*Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours."Dkt. No. 202–6 at Exhibit

"A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision."*Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious

discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel.

(Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006)."Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.*Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

### 1. First Amendment

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482

U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Persons Act**
RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id* . The act defines "religious

exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex' "* ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**B. Application**

**1. December 7, 2010 Incident:**
Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings. [2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready

Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet.(*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class."(*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah.(*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ."(*Id.* at 7). Although Father Weber states that a copy of the call-out

is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility."(Weber Decl. ¶ 8)."Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day."(*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/ inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/ confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet

because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[5] and he would not even have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[6]

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *aProgram Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[7] and the fact that the building in which the religious services were actually held had the call-out,[8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[9]

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann*, No. 96 Civ. 7190, 1999 WL 825622, at * 15 (S.D.N.Y. Oct. 15, 1999)). In granting *summary judgment,* the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason."Id.* (emphasis

added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service.[10]Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

## 2. The March 20, 2011 Incident

**\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff[11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization.(*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return

for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service."Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id* .)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library.(*Id.* ¶ 11).

 **\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m."(*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and

he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

Defendants have also submitted the declaration of Rabbi Theodore Max, [13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State.(*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

 **\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49)."Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent

some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant*, and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived—plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that **he** was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

### V. *Mail/Access to Courts/Retaliation*

#### A. Legal Standards

#### 1. Mail

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/ DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351

(2d Cir.2003))."The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise."*Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112– 13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996))."The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests."*Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail."*Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown' outgoing mail can be read' without violating inmates' First Amendment rights."*Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*)An isolated incident is

generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail.' *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*)As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received.*Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

**2. Access to Courts**

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).*See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

**3. Retaliation**

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants.*Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action.*Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment."*Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371."Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred."*Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies

and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

## B. Application

### 1. Defendant Kupiec

#### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/ or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school."(*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011."(Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the defendant's [sic]—retaliation takes place."(*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18] (*Id.*)

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready."(*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed

a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

**b. Discussion**

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court

also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with."(Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec

does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action).*See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law, [30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room. [31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate

from asserting his rights. [32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

**b. Access to Courts**
Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action. [33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it."(Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent.(*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage."(*Id.* at 83). Plaintiff then reasserted that the "Court" *would have* stricken his "motion" [34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

**2. Defendants Ready and Ellis**

**\*20**  Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston. [35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts."(Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter."(Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident. [37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at \*4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated

to plaintiff from asserting his rights. [38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates. [39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

**VII. *Personal Involvement***

**A. Legal Standards**

**\*21**  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.*Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not*

include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)."(*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the

summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours."(*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary."(*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011."(*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have."(*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll

merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Slip Copy, 2014 WL 4365274

Footnotes

1    Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

2    Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

3    Father Weber is not a defendant in this action.

4    Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

5    Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk."(Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

6    Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

7    (Ready Decl. ¶¶ 5).

8    This court makes no such finding.

9    Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going."(*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

10    To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?"(Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLIUPA (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

11    Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

12    The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

13    Rabbi Max is not a defendant in this action.

14    In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ...'The Rabbi is not here so go back to the law library.'" (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived."(*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

15    Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

16    The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

17    The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II) (A)(2) (citing 7 NYCRR § 721.2).

18    The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

19    A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280.Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

20    A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While

defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at \*15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

21    A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service.(*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

22    The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing."(*Id.*) She noted that this was the "normal procedure for mail received in packages."(*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

23    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

24    Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

25    To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

26    Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

27    (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

28    It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and defendant Ready is non-existent.

29    Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

30    *Gill, supra.*

31    Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was **not** a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it,

and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

32  Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error."(*Id.*)

33  Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

34  It is not clear what "motion" would have been stricken.

35  CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

36  The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

37  In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received."(*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

38  In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

39  During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door."(*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

40  Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

41  Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

42  The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

2012 WL 983686
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Sean P. McGANN, Plaintiff,
v.
COLLINGSWOOD POLICE
DEPARTMENT, et al., Defendants.

Civil No. 10–3458 (NLH/
KMW).    |    March 22, 2012.

**Attorneys and Law Firms**

Sean P. McGann, Philadelphia, PA, pro se.

Dean R. Wittman, Esq., Matthew B. Wieliczko, Esq.,
Zeller & Wieliczko, L.L.P., Cherry Hill, NJ, for
Defendant Collingswood Police Department (Borough of
Collingswood).

Kerri E. Chewning, Esq., Archer & Greiner, P.C.,
Haddonfield, NJ, Elyse G. Cra, Esq., Shimberg & Friel, P.C.,
Cherry Hill, NJ, for Defendant Camden County Prosecutor's
Office.

Catherine Binowski, Office of Camden County Counsel,
Camden, NJ, for Defendant Camden County Correctional
Facility.

**OPINION**

HILLMAN, District Judge.

 *1 This matter comes before the Court by way of Defendant
Camden County Correctional Facility's motion [Doc. No.
44] to dismiss Plaintiff's amended complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6). Also before the
Court is Defendant Camden County Prosecutor's Office's
motion [Doc. No. 52] seeking to partially dismiss Plaintiff's
amended complaint pursuant to Rule 12(b)(6). The Court has
considered the parties' submissions and decides this matter
pursuant to Federal Rule of Civil Procedure 78.

For the reasons expressed below, Defendants' motions to
dismiss are granted.

## I. *JURISDICTION*

In this case, Plaintiff has brought federal constitutional claims
pursuant to 42 U.S.C. § 1983.[1] The Court has jurisdiction
over Plaintiff's federal claims under 28 U.S.C. § 1331.

## II. *BACKGROUND*

The Court previously set forth the detailed factual background
of this case in its Opinion dated June 28, 2011. (Op. [Doc.
No. 38] 3–7, June 28, 2011.) Accordingly, the Court sets forth
here only those facts relevant to the present motions to dismiss
Plaintiff's amended complaint.

As the Court recognized in the June 28, 2011 Opinion,
Plaintiff originally alleged Section 1983 claims generally
relating to the following incidents: (1) Plaintiff's December
22, 2006 arrest by the Collingswood Police Department[2]
for suspicion of theft; (2) a subsequent search of Plaintiff's
apartment that same day; (3) a resulting charge of official
misconduct in 2006; (4) a related stay at a behavioral
health facility; (5) Plaintiff's entry of a plea and subsequent
sentence to six months of house arrest; (6) Plaintiff's first
incarceration at Defendant Camden County Correctional
Facility ("Defendant CCCF" or "the CCCF") in the fall of
2007; (7) Plaintiff's second incarceration at Defendant CCCF
beginning in approximately February 2008; (8) a temporary
restraining order filed by Plaintiff's former girlfriend and
served on Plaintiff in 2008; and (9) alleged harassment of
Plaintiff by members of the Collingswood Police Department
when Plaintiff attempted to collect pay for unused sick time
and to obtain possession of his personal belongings seized
during the 2006 search of his apartment. (*Id.* at 3–6.)

Initially, all three Defendants moved to dismiss Plaintiff's
original complaint. By Opinion and Order dated June 28,
2011, the Court granted Defendants' motions to dismiss
based on the fact that the majority of Plaintiff's Section
1983 claims were barred by the statute of limitations.(*Id.*
at 2, 16.)With respect to the Borough of Collingswood, the
Court found that any Section 1983 claims arising from the
alleged misconduct of the Collingswood Police Department
relating to Plaintiff's December 22, 2006 arrest, the search[3]
of Plaintiff's apartment that same day, and the official
misconduct charge, accrued in or around December 2006 and
were barred by the two-year statute of limitations because
Plaintiff did not file his complaint until approximately June
or July of 2010. (*Id.* at 10.)The Court also granted the
Borough of Collingswood's motion to dismiss Plaintiff's

Section 1983 claims for failure to state a claim with regard to the allegations that members of the Collingswood Police Department harassed Plaintiff, in part, by filing multiple harassment charges against Plaintiff for attempting to collect his personal belongings. (*Id.* at 17–18.)The Court concluded that Plaintiff made only "vague allegations" regarding this purported harassment and found that Plaintiff failed to "articulate with requisite specificity and clarity in what ways he was harassed, how many times he was harassed, or whether those acts constitute[d] a violation of his legal rights."(*Id.* at 18.)

**\*2** As to Defendant Camden County Prosecutor's Office ("Defendant CCPO" or "the CCPO"), the Court similarly determined that the statute of limitations barred any Section 1983 claims by Plaintiff against the CCPO relating to the December 2006 search, Plaintiff's acceptance of a plea agreement sometime between December of 2006 and July 4, 2007, and the February 2008 violation of probation which resulted in Plaintiff's subsequent incarceration in the CCCF. (*Id.* at 10–11.)The Court concluded that Plaintiff knew of the actions of Defendant CCPO before July 2007 and in or around February 2008, respectively, and thus any causes of action under Section 1983 accrued at those times and the statute of limitations had expired by the time Plaintiff filed his complaint in June or July of 2010. (*Id.* at 11.)

Finally, with respect to Defendant CCCF, the Court noted that Plaintiff alleged facts indicating that he was incarcerated at the CCCF on two separate occasions. (*Id.* at 11– 12.)Regarding Plaintiff's allegations that he was mistreated during the course of his 2007 incarceration at the CCCF, the Court found that any violation of Plaintiff's civil rights must have occurred before Plaintiff was released on October 12, 2007, and thus the statute of limitations barred any claim arising from Plaintiff's 2007 incarceration. (*Id.*) As to Plaintiff's 2008 incarceration at the CCCF which commenced in or around February 2008, the Court concluded that "the complaint [was] devoid of any allegations that would give rise to a cause of action against [Defendant] CCCF for Plaintiff's second" incarceration there. (*Id.* at 12.)

After dismissing the majority of Plaintiff's Section 1983 claims as time-barred by the statute of limitations, the Court granted Plaintiff leave to file an amended complaint with regard to those claims that "may have arisen within two years of the filing of" Plaintiff's complaint in June or July of 2010, and allowed Plaintiff to amend with regard to two narrow lines of claims. (*Id.* at 18.)First, the Court

permitted Plaintiff to amend those allegations relating to the purported harassment Plaintiff suffered by members of the Collingswood Police Department when he attempted to retrieve his personal belongings, as well as the alleged failure of the Collingswood Police Department and Defendant CCPO to return his personal possessions from the December 2006 apartment search. (*Id.* at 19.)Second, after recognizing that Plaintiff's complaint was factually insufficient to allege a Section 1983 claim against Defendant CCCF as to Plaintiff's 2008 incarceration at the CCCF, the Court permitted Plaintiff leave to amend the factual allegations in support of that claim. (*Id.* at 12 n. 10, 18–19.)

As directed by the June 28, 2011 Opinion and Order, Plaintiff filed an amended complaint with the Court on July 26, 2011. (*See* generally Pl.'s Am. Compl. [Doc. No. 40].) Defendant CCCF now moves to dismiss Plaintiff's amended complaint pursuant to Rule 12(b)(6). Defendant CCPO also moves to partially dismiss Plaintiff's amended complaint.

### III. *DISCUSSION*

**\*3** In this case, Defendants invoke Federal Rule of Civil Procedure 12(b)(6) in seeking dismissal of Plaintiff's amended complaint. When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must accept all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."FED. R. CIV. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims[.]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n. 8, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Scheuer v. Rhoades,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions[.]' ") (citation omitted). The Third Circuit has instructed district courts to conduct a two-part analysis in deciding a motion to dismiss. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009).

First, a district court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."*Fowler,* 578 F.3d at 210–11 (citing *Iqbal,* 129

*S.Ct. at 1949)*. Second, a district court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler, 578 F.3d at 211* (citing *Iqbal, 129 S.Ct. at 1950)*. "[A] complaint must do more than allege the plaintiff's entitlement to relief." *Fowler, 578 F.3d at 211*. " '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not "show[n]"—"that the pleader is entitled to relief." ' " *Fowler, 129 S.Ct. (citing Iqbal, 129 S.Ct. at 1949)*;*see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir.2008)* ("The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (citing *Twombly, 550 U.S. at 556)*.

A court need not credit " 'bald assertions' " or " 'legal conclusions' " in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429–30 (3d Cir.1997)*. The defendant has the burden of demonstrating that no claim has been presented. *Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005)* (citing *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991)*).

**\*4** However, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."*Phillips, 515 F.3d at 245*;*see also Alston v. Parker, 363 F.3d 229, 235 (3d Cir.2004)* ("We have held that even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."); *Burrell v. DFS Servs., LLC, 753 F.Supp.2d 438, 444 (D.N.J.2010)* ("When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted.... A claim may be dismissed with prejudice, however, if amending the complaint would be futile.") (citation omitted).

## IV. *ANALYSIS*

### A. Defendant CCPO's Motion to Partially Dismiss

Defendant CCPO contends that Plaintiff's amended complaint "reiterates many of the allegations contained in the original [c]omplaint, including allegations of official misconduct and conspiracy."(Br. of Def. CCPO in Supp. of Mot. to Partially Dismiss Pl.'s Am. Compl. [Doc. No. 52] (hereinafter, "Def. CCPO's Mot. to Dismiss"), 3.) Defendant CCPO argues that pursuant to the Court's June 28, 2011 Opinion and Order, any allegations in the amended complaint regarding purported official misconduct or conspiracy on the part of Defendants must be dismissed with prejudice. (Def. CCPO's Mot. to Dismiss 4–5.) To the extent Plaintiff's amended complaint alleges theft of his personal property in accordance with the June 28, 2011 Opinion, Defendant CCPO filed an answer denying these allegations. (*Id.* at 5 n. 1;*see generally* Def. CCPO's An. [Doc. No. 51].) The docket reflects that Plaintiff did not file opposition to Defendant CCPO's motion to partially dismiss the amended complaint.

Upon review, the Court notes that in both the original complaint and the amended complaint, Plaintiff alleges that various Defendants engaged in official misconduct and conspiracy relating to the December 2006 search of his apartment. (*Compare* Pl.'s Compl. [Doc. No. 1] ¶ 6, *with* Pl.'s Am. Compl. [Doc. No. 41] ¶ 1.) However, the Court previously dismissed any claims arising from the events of December 2006 as being time-barred by the statute of limitations. (Op. [Doc. No. 38] 10–11, June 28, 2011.) Moreover, the Court recognized in the June 28, 2011 Opinion that Plaintiff had "no recourse" for "those claims that [were] time-barred by the statute of limitations[.]"(*Id.* at 18.)Accordingly, the Court grants Defendant's CCPO's motion to partially dismiss Plaintiff's complaint. Thus, to the extent Plaintiff's amended complaint re-alleges claims which the Court previously dismissed as barred by the statute of limitations, the dismissal of those claims was with prejudice as amendment would be futile and the claims are hereby stricken from Plaintiff's amended complaint. *Cf. Millman v. Subaru of Am., Inc.,* No. 07–4846, 2009 WL 197527, at \*2, 5 (granting defendant's motion to dismiss counts one and two of plaintiff's second amended complaint where plaintiff re-alleged those counts despite the court's prior dismissal with prejudice of those same counts).

### B. Defendant CCCF's Motion to Dismiss

**\*5** Defendant CCCF argues that Plaintiff's amended complaint should be dismissed with prejudice for failure to state a claim upon which relief can be granted as to Defendant CCCF because Plaintiff's amended complaint "simply contains bald assertions and legal conclusions that

[Defendant CCCF] violated [Plaintiff's] 4th Amendment rights[.]" (Br. in Supp. of Mot. to Dismiss in Lieu of Filing an Answer to Am. Compl. on Behalf of Def. CCCF [Doc. No. 44] (hereinafter, "Def. CCCF's Mot. to Dismiss"), 4.) Defendant CCCF makes three primary arguments in seeking to dismiss Plaintiff's amended complaint. First, Defendant CCCF contends that Plaintiff's claims regarding a *Terry* stop, a search of his person, and detaining Plaintiff without probable cause during his 2008 incarceration at the CCCF are "nothing more than labels and conclusions of law which clearly do not satisfy the minimum standards for pleading a cause of action."(*Id.*)

Second, Defendant CCCF asserts that Plaintiff's amended complaint fails to allege sufficient facts to sustain a Section 1983 under *Monell* because Plaintiff does not identify a challenged policy or custom that is attributable to the County, nor does Plaintiff show a causal connection between the execution of such a policy and Plaintiff's alleged injury. (*Id.* at 6.) Defendant CCCF argues that under *Monell* the CCCF cannot be held liable on the basis on the basis of respondeat superior simply for employing an alleged tortfeasor. (*Id.* at 5–6.)According to Defendant CCCF, Plaintiff's amended complaint against the CCCF fails to state a claim upon which relief can be granted because Plaintiff cannot demonstrate a municipal policy or custom existed which caused an employee to violation Plaintiff's rights. (*Id.* at 6.)

Finally, Defendant CCCF argues for a second time that Plaintiff's claims of alleged civil rights violations are barred by the statute of limitations because Plaintiff's cause of action accrued in 2007 during Plaintiff's first incarceration at the CCCF. (*Id.* at 7–8.)In making this argument, Defendant CCCF notes that in Plaintiff's original complaint, Plaintiff alleged that during the 2007 incarceration, Plaintiff learned from Corrections Officer Richard Ellis that his former girlfriend was involved in a sexual relationship with another Corrections Officer—one, Ron Maksymowicz. (*Id.* at 8;*see also* Pl.'s Compl. [Doc. No. 1] ¶ 17.) Defendant CCCF correctly points out that any claims arising from Plaintiff's 2007 incarceration at the CCCF are time-barred by the statute of limitations. (Def. CCCF's Mot. to Dismiss 8.)

With respect to the allegations in Plaintiff's amended complaint concerning Plaintiff's 2008 incarceration, Defendant CCCF asserts that Plaintiff now "coincidentally" alleges that Corrections Officer Ron Maksymowicz confronted Plaintiff in July 2008 while at the CCCF regarding Maksymowicz's sexual relationship with Plaintiff's former

girlfriend and an alleged speeding ticket. (Def. CCCF's Mot. to Dismiss 8, 8 n. 1; *see also* Pl.'s Am. Compl. ¶ 20.) According to Defendant CCCF, at this juncture, Plaintiff is only alleging that this incident occurred in July of 2008 because "his civil rights claims involving his 2007 incarceration" were dismissed. (Def. CCCF's Mot. to Dismiss 8.) Defendant CCCF also represents that this incident involves "similar conduct" as alleged in the original complaint. (*Id.*) Thus, Defendant CCCF appears to argue that Plaintiff's allegations regarding the July 2008 incident at the CCCF actually occurred in 2007 and thus are time-barred by the statute of limitations. (*Id.*)

### 1. Statute of Limitations Issue

 **\*6** Defendant CCCF's contention that Plaintiff merely alleges the July 2008 incident in order to bring his claim against Defendant CCCF within the statute of limitations warrants a closer examination of the allegations in the original complaint as compared to those in the amended complaint. With regard to Plaintiff's 2008 incarceration which commenced in approximately February of that year, Plaintiff originally alleged only the following:

> 19. On February 3, 2008 I was arrested in Philadelphia and placed in the Philadelphia Prison System for I was a Fugitive Felon for violating probation.

> 20. I was transferred to [the] Camden County Correctional Facility approximately 2 weeks later.

> 21. I was advised that the Prosecution wanted to give me 3 years in prison for violating my probation. They ultimately agreed to give me a 364 day sentence with no probation. I served 212 days of the sentence and was released in mid July 2008.

(Pl.'s Compl. ¶¶ 19–21.) It is clear from the original complaint that Plaintiff made no previous allegations regarding any alleged encounter with Corrections Officer Maksymowicz or any alleged misconduct by Officer Maksymowicz in July of 2008. In fact, Plaintiff clearly sets forth that he was released in "mid July 2008[.]" (*Id.* ¶ 21.) The only mention of Corrections Officer Maksymowicz in the original complaint alleges only that Corrections Officer Richard Ellis informed Plaintiff during his 2007 incarceration that Corrections Officer Maksymowicz was engaged in a sexual relationship with Plaintiff's former girlfriend. (*Id.* ¶ 17.)

By contrast, in the amended complaint, Plaintiff alleges for the first time that:

In July, 2008 while incarcerated in the Camden County Correctional facility, I was on my way to court when I was approached by Officer Maksymowics [sic] and he said, "Are you the ... cop that gave me a speeding ticket?" then he stated, "you do know that I am [engaged in a sexual relationship with] your girlfriend?"I did not know this officer until this incident. He did make these statements in front of other inmates, making it a danger to my safety. I was scared greatly.... I do have a witness to this incident, but I wish to keep his name confidential for now.

(Pl.'s Am. Compl. ¶ 20.) Based on this alleged incident, Plaintiff purportedly contends that "Defendant (Camden County Correctional Facility) ... clearly violated [Plaintiff's] 4th Amendment Rights ... specifically by conducting a Terry Stop, searching [Plaintiff's] person, and detaining [Plaintiff], restricting [Plaintiff's] liberty, without probable cause ... causing [Plaintiff] to feel intimidated and fearful of correctional officers."(*Id.* at 4.)

It may appear suspect to Defendant CCCF that after the Court's previous dismissal of time-barred claims, Plaintiff now alleges an incident not previously set forth in the original complaint, regarding similar facts and involving similar individuals, because these allegations effectively bring Plaintiff's Section 1983 claim within the statute of limitations regarding Plaintiff's 2008 incarceration. However, in ruling on this motion to dismiss, the Court must accept all allegations in Plaintiff's amended complaint as true and view them in the light most favorable to Plaintiff, even in the face of Defendant CCCF's suspicions. *Evancho,* 423 F.3d at 350. Accepting these factual allegations as true and viewing them in the light most favorable to Plaintiff, the Court cannot find that Plaintiff's Section 1983 claim regarding the 2008 incarceration is time-barred by the statute of limitations at this time.

**\*7** As set forth in the Court's June 28, 2011 Opinion, Plaintiff's Section 1983 claim regarding his 2008 incarceration at the CCCF is subject to a two-year statute of limitations and his claim accrued at the time Plaintiff knew or had reason to know of his injury. *See Fullman v. Pa. Dep't of Corr.,* 265 F. App'x 44, 46 (3d Cir.2008); N.J. STAT. ANN.. § 2A:14–2(a). Based on the allegations in the amended complaint, Plaintiff knew or had reason to know of his encounter with Corrections Officer Maksymowicz and any resulting violation of his rights sometime in July 2008 prior to his release from the CCCF. [4] Accordingly, any potential claim relating to Plaintiff's 2008 incarceration accrued at that

time and thus the statute of limitations on such a claim expired sometime in July of 2010.

Defendant's correctly point out that Plaintiff's original complaint in this action in the District of New Jersey was received by the Clerk of Court on July 7, 2010 and docketed on July 8, 2010. However, attached as an exhibit to Plaintiff's original complaint is an Order dated June 21, 2010 signed by the Honorable Juan Sanchez, U.S.D.J., in the Eastern District of Pennsylvania, dismissing a civil rights complaint by Plaintiff against the same Defendants in the present suit. (Ex. to Pl.'s Compl. [Doc. No. 1–1] 1.) It is apparent from the existence of Judge Sanchez's Order that Plaintiff at least attempted to bring this suit sometime prior to June 21, 2010 in the Eastern District of Pennsylvania. Moreover, Plaintiff's original complaint and its attachments as submitted in the District of New Jersey are all signed and dated by Plaintiff June 28, 2010. (*See generally* Pl.'s Compl [Doc. No. 1].) With respect to the newly amended allegations regarding Plaintiff's 2008 incarceration in the CCCF, the Court is unable to determine whether Plaintiff's claim is barred by the statute of limitations because the precise date of the incident is not alleged in the amended complaint. Thus, Defendant CCCF's motion to dismiss cannot be granted on the basis of the statute of limitations.

**2. *Failure to State a Claim for Monell Liability***

Although the record is unclear regarding whether Plaintiff's claim is time-barred, the Court need not resolve the statute of limitations issue to rule on the pending motion to dismiss because even if Plaintiff's claim was timely, Plaintiff's amended complaint fails to allege facts sufficient to support any Section 1983 claim against Defendant CCCF based on the alleged misconduct of Corrections Officer Maksymowicz in July of 2008. As Defendant CCCF correctly argues, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."*Marvel v. Cnty. of Delaware,* 397 F. App'x 785, 790 (3d Cir.2010) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

Accordingly, "there are two ways that a plaintiff can establish municipal liability under § 1983: policy or custom."*Watson v. Abington Twp.,* 478 F.3d 144, 155 (3d Cir.2007)."Under *Monell,* a plaintiff shows that a policy existed when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."*Watson,* 478 F.3d at 155 (citation and internal quotations omitted). Alternatively, "[a]

plaintiff may establish a custom ... by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. In other words, custom may be established by proving knowledge of, and acquiescence to, a practice."*Id.* at 155–56 (citation and internal quotations omitted)."In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered."*Id.* at 156.

**\*8** Here, Defendant CCCF argues, and the Court agrees, that Plaintiff has failed to meet the requirements to establish municipal liability in this case. With respect to Defendant CCCF, the allegations of Plaintiff's amended complaint, set forth above, merely identify one specific encounter between Plaintiff and Corrections Officer Maksymowicz and Plaintiff's general contention that Defendant CCCF violated Plaintiff's Fourth Amendment rights. (*See* Pl.'s Am. Compl. ¶ 20; *see also* Pl.'s Am. Compl. 4.) Even accepting these factual assertions as true and viewing them in the light most favorable to Plaintiff, the amended complaint fails to identify any policy or custom on the part of Defendant CCCF that would support a Section 1983 claim for liability under *Monell.*Moreover, the amended complaint similarly fails to demonstrate how any such policy or custom was the proximate cause of Plaintiff's alleged injuries. [5]

Accordingly, the Court grants Defendant CCCF's motion to dismiss. Therefore, Plaintiff's claims against Defendant CCCF are dismissed with prejudice, and the CCCF is terminated as a Defendant in this action.

## V. *CONCLUSION*

For the foregoing reasons, Defendant CCCF's motion to dismiss Plaintiff's amended complaint pursuant to Rule 12(b)(6) is granted. Plaintiff's claims against Defendant CCCF are dismissed with prejudice, and Defendant CCCF is terminated as a Defendant in this action. Additionally, Defendant CCPO's motion to partially dismiss Plaintiff's amended complaint is granted. Therefore, to the extent Plaintiff's amended complaint re-alleges claims which the Court previously dismissed as barred by the statute of limitations, the dismissal of those claims was with prejudice as amendment would be futile and the claims are hereby stricken from Plaintiff's amended complaint. An Order consistent with this Opinion will be entered.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 983686

Footnotes

1    As noted in the Court's June 28, 2011 Opinion, "Plaintiff does not specifically cite Section 1983, but that statute poses the proper vehicle to advance his federal claims, constitutional in nature and alleging violations to his civil rights. Therefore, the Court ... construe [s] Plaintiff's claims as Section 1983 claims."(Op. [Doc. No. 38] 2 n. 1, June 28, 2011.)

2    Although Plaintiff named the Collingswood Police Department as a Defendant in this action, the proper Defendant is the Borough of Collingswood, not the Collingswood Police Department. (Op. [Doc. No. 38] 1 n. 1, June 28, 2011.) Therefore, any reference in the remainder of this Opinion to the Collingswood Police Department or its members shall be construed to refer to the Borough of Collingswood.

3    This includes Plaintiff's allegation that members of the Collingswood Police Department planted evidence of drug-related contraband in his apartment. (Op. [Doc. No. 38] 4, June 28, 2011.)

4    Plaintiff does not allege the specific date in July of 2008 on which the alleged encounter with Corrections Officer Maksymowicz occurred. Accordingly, whether or not the statute of limitations expired before Plaintiff brought this claim is unclear.

5    On September 19, 2011, Plaintiff filed a brief in opposition to Defendant CCCF's motion to dismiss. (*See generally* Br. in Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss [Doc. No. 45].) Plaintiff's opposition was untimely, and Defendant CCCF objected to the filing of Plaintiff's late opposition and requested that the Court not considered them. (Def.'s Response [Doc. No. 46] 1.)

     By letter dated September 30, 2011, Plaintiff requested that the Court consider the September 19, 2011 opposition in ruling on the motion to dismiss because Plaintiff believed he had thirty days to oppose the motion. (*See* September 30, 2011 Letter [Doc. No. 54] 1.) Plaintiff apparently believed that he was entitled to thirty days to file his opposition based on a document entitled, "Federal Court Civil Complaint Timeline", wherein it appears to indicate a thirty day deadline for opposing a motion to dismiss. (*Id.* at 2.)

It is unclear to the Court where Plaintiff obtained this "Timeline", but the Court recognizes that given Plaintiff's pro se status, it was reasonable for Plaintiff to believe he had thirty days to file his opposition papers. Accordingly, the Court considered Plaintiff's opposition papers in ruling on the motion to dismiss.

However, nothing in Plaintiff's opposition can save Plaintiff's amended complaint from being dismissed as to Defendant CCCF. Although Plaintiff alleges more detail in his opposition regarding the purported July 2008 encounter with Corrections Officer Maksymowicz, Plaintiff's opposition similarly fails to allege a claim under *Monell.* While Plaintiff argues that Defendant CCCF knew that corrections officers have the power to arrest individuals and had a duty to keep inmates safe, these allegations are insufficient to allege a custom or practice under Monell. Moreover, Plaintiff's assertion that officials at Defendant CCCF knew of the sexual relationship between Plaintiff's former girlfriend and Officer Maksymowicz and should have "ensured that contact between" these men would not take place, also cannot serve as a basis for *Monell* liability.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.