UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

ERROL THOMAS,

                                    Plaintiff,

        v.
                                                        9:13-cv-0321
                                                        (MAD/TWD)
F. WAUGH, LEIFELD, RONALD D. LARKIN,
CHERYL MORRIS, JOHN N. ANTONELLI,
BLY,

                                    Defendants.

——————————————————————————

APPEARANCES:                                OF COUNSEL:

ERROL THOMAS
Plaintiff, *pro se*
96-A-7903
Woodbourne Correctional Facility
99 Prison Road
PO Box 1000
Woodbourne, NY 12788

HON. ERIC T. SCHNEIDERMAN                   KYLE W. STURGESS, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

## I.    INTRODUCTION

        *Pro se* Plaintiff Errol Thomas, an inmate in the custody of the New York State

Department of Corrections and Supervision ("DOCCS"), has commenced this action under 42

U.S.C. § 1983, alleging violations of his civil rights while confined at Eastern New York

Correctional Facility ("Eastern").  (Dkt. No. 1.)  The second amended complaint is the operative

pleading.  (Dkt. No. 63.)  Remaining Defendants are Corrections Officer ("C.O.") Francine

Waugh, Sergeant ("Sgt.") Berndt Leifeld, Superintendent Ronald D. Larkin, Inmate Grievance

Program ("IGP") Coordinator John Antonelli, DOCCS Assistant Commissioner Edward Bly, and

DOCCS Director of Ministerial, Family &Volunteer Services ("MFVS") Cheryl Morris. *Id.*[1]

Plaintiff's claims under the free exercise clause of the First Amendment and the Religious Land

Use and Incarcerated Persons Act ("RLUIPA"), 42 U.S.C. § 1997e *et seq*., survived the District

Court's initial review pursuant to 28 U.S.C. §§ 1915 and 1915A.  (Dkt. No. 69.)

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure ("FRCP").  (Dkt. No. 89.)  Defendants seek summary judgment on any

or all of the following grounds: (1) Plaintiff has failed to properly exhaust his administrative

remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), as to both

claims with respect to the substantive matter of his lawsuit: viz., a determination by DOCCS to

prohibit him from wearing a "tam"-style head cover as an alternative form of Jewish head

covering; (2) Defendants C.O. Waugh, Sgt. Leifeld, Superintendent Larkin, IGP Coordinator

Antonelli, and Assistant Commissioner Bly lack the requisite personal involvement to assign

them liability under § 1983 and/or RLUIPA; (3) Defendants are entitled to qualified immunity

insofar as at the time of their actions, they were acting with a reasonable belief in their

compliance with the Plaintiff's constitutional rights as understood by and reflected in case

authority at that time.  (Dkt. No. 89-9 at 7-20.[2])  Defendants further contend that, to the extent

---

[1]  By Decision and Order entered September 30, 2015, *inter alia*, Plaintiff's claims against Sgt. Dawn DiCairano and Director Karen Bellamy in the first amended complaint (Dkt. No. 26) were dismissed with prejudice.  (Dkt. No. 58.)  The Court notes "Sgt. DiCairano" is also referred to as "Sergeant DiCariano" and "Sergeant Cariano" throughout the record.  (*See, e.g.*, Dkt. Nos. 89-2, 89-4, 89-5.)

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

necessary, Plaintiff's claims for money damages under RLUIPA are not cognizable as a matter of law and Plaintiff's demands for injunctive relief are moot. *Id*. at 20-23. Plaintiff has not opposed the motion.

Defendants' motion has been referred for a Report and Recommendation by the Hon. Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3. For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    FACTUAL BACKGROUND

At all times relevant to this action, Plaintiff was a practicing and registered member of the Jewish-Hebrew faith. (Dkt. No. 63 at ¶ 16.) Plaintiff is a "non-mainland African American male . . . and wears his hair in locks." *Id*. at ¶ 18. Plaintiff wears a head covering "to express his awe and respect for God." (Dkt. No. 68 at ¶¶ 20-22.) Plaintiff believes that "[t]he failure to wear such a religious head-covering under Jewish-Hebrew tenet is to appear nude, insolent, and indecent before God." *Id*. at ¶ 23. The head covering he wears "has alternatively been referred to as a large Yarmulke, Kippah or Mitznefet." *Id*. at ¶ 21.

### A.    March 18, 2012, Misbehavior Report

On March 18, 2012, C.O. Waugh confiscated Plaintiff's head covering and issued a misbehavior report charging Plaintiff with disobeying a direct order, lying, and possessing contraband. (Dkt. No. 89-3 at ¶ 5, p. 5.) According to C.O. Waugh, she issued the "ticket" because Plaintiff was wearing a piece of headgear known as a "tam," a large knitted hat that is worn by members of the Rastafarian faith, and Plaintiff was registered with DOCCS as a member of the Jewish faith. *Id*. at ¶ 4.

3

Lieutenant Simmons, who is not a named Defendant, conducted Plaintiff's disciplinary hearing on March 20 and 27, 2012.  (Dkt. No. 89-2 at 91, 150-56.)  On March 20, 2012, Plaintiff pleaded not guilty to all charges and requested that the rabbi be called as witness.  *Id*. at 152-53.  On March 27, 2012, the facility's rabbi testified that Plaintiff's head covering, while not an "ordinary" head covering worn by members of the Jewish faith, was "adequate" and "satisfied the religious requirements for a head covering."  *Id*. at 156.  Based upon the rabbi's testimony, Lieutenant Simmons found Plaintiff not guilty and the March 18, 2012, charges were dismissed. *Id*.

The head covering was returned to Plaintiff and Lieutenant Simmons gave Plaintiff a copy of the disciplinary disposition with instructions for Plaintiff to show it to anyone who stopped him and questioned him about the head covering.  (Dkt. No. 63 at ¶ 30.)  Thereafter, Plaintiff was permitted to wear his head covering and he carried the disciplinary disposition with him at all times.  (Dkt. No. 89-2 at 95.)

Plaintiff testified he had no further issues with C.O. Waugh relating to his religious head covering.  *Id*. at 92-93.  Likewise, C.O. Waugh declares she made no further efforts to confiscate Plaintiff's tam; did not direct Plaintiff to remove his tam; and could not recall having any further interaction with Plaintiff regarding his headgear, or any other aspect of his religious affiliation and practices.  (Dkt. No. 89-3 at ¶ 6.)

Plaintiff testified he never filed a grievance regarding the March 2012, events, including C.O. Waugh's confiscation of his head covering.  (Dkt. No. 89-2 at 59-61.)

### B.    Grievance No. ECF-25118-12

On August 6, 2012, Plaintiff filed a grievance, designated ECF-25118-12, against Sgt. DiCairano "for her continuing harassment concerning [my] head covering."  *Id*. at ¶ 33; Dkt. No.

89-5 at ¶ 6; Dkt. No. 89-5 at 15.)  According to Plaintiff, he was "stopped" by Sgt. DiCairano on

June 14, 2012, because his head covering was "not a Jewish Head-covering."  (Dkt. No. 89-5 at

15.)  After Plaintiff showed Sgt. DiCairano the paperwork from the March hearing where the

religious head covering was deemed approved, DiCairano stated "that she was going to take it to

Albany."  *Id*.  On July 29, 2012, Sgt. DiCairano stopped Plaintiff again regarding his religious

head covering.  *Id*.  Sgt. DiCairano told Plaintiff "that she was going to take a picture of [his]

religious head covering and send it to Albany."  *Id*.

In his grievance, Plaintiff stated he was "tired of this continual harassment by DiCairano"

and further noted that "such harassment [wa]s not only limited to DiCairano," because he was

"stopped" on four occasions by other officers.  *Id*.[3]  However, unlike Sgt. DiCairano, "these

other officers stopped questioning [Plaintiff] when [he] presented the appropriate paperwork."

*Id*.  Plaintiff further explained:

> I am listed as being of the Hebrew Faith; I have locks, and I wear a
> religious head covering similar to a tam.  Pursuant to Directive
> 4202 (M)(2)(3), if there is a problem, it is to be resolved by the
> Chaplain.  Such has already been accomplished; so why am I still
> being harassed by this DiCairano?  More poignantly, if I just
> wanted to sport the religious head covering, I could sign up as a
> Rasta since I am Jamaican; however, my intentions are based upon
> my religious observance and the actions of DiCairano are
> interfering with such observance.
>
> The actions of DiCairano are harassing because she refuses to
> follow the chain of command and accept the decision of the
> Lieutenant and the Chaplain.  There appears to be some ulterior
> motive, unfathomable to me, for her actions and such must cease
> as infringing upon my religious freedoms.  These unknown

---

[3]  According to Plaintiff, on March 28, 2012, C.O. Miller, "stopped" Plaintiff and told him that
he needed a permit from the rabbi to wear his religious head covering.  (Dkt. No. 89-5 at 15.)  On
March 30, 2012, C.O. Bennett "stopped" Plaintiff after which Plaintiff showed the paperwork
from the disciplinary hearing.  *Id*.  On April 6, 2012, and in May 2012, C.O. Becker "stopped"
Plaintiff about the religious head covering.  *Id*. at 15-16.  Plaintiff further noted that he has also
been "stopped" by C.O. "Wagah" and C.O. Logar.  *Id*. at 16.

motives, outside the chain of command, form the basis of my
complaint for harassment[.]

*Id*. at 16.  Plaintiff requested the following relief:

That Sergeant DiCairano be admonished, suspended for several
days and perhaps demoted for actions unbecoming of an officer
bound to follow the Directives and Rules of [DOCCS].  Moreover,
DiCairano should be warned than any retaliation will not be
tolerated and will result in her immediate termination from
[DOCCS].

*Id*.  The Inmate Grievance Resolution Committee ("IGRC") investigated Plaintiff's grievance,

and on August 20, 2012, determined that the actions requested by Plaintiff were "unattainable

through IGRC."  *Id*. at 18.  The IGRC response indicated that a "photo was taken of head

covering [and] will be sent to central office for clarification."  *Id*.  Plaintiff appealed the IGRC's

determination to Superintendent Larkin.  (Dkt. No. 63 at ¶ 14.[4])  On August 21, 2012,

Superintendent Larkin issued the following decision:

IGRC investigation shows that the facility chaplain has referred
this issue of religious headwear to Central Officer Ministerial
Services Office for determination.

Grievant's headwear was not confiscated, nor has grievant been
issued a misbehavior report.  I find such direction is in compliance
with Directive 4202 Section M-2.3.

Grievant may wear headwear until such clarification can be made.

(Dkt. No. 26 at 32.[5])  On August 27, 2012, Plaintiff appealed the Superintendent's decision to

the Central Office Review Committee ("CORC"):

[Plaintiff] appeals this decision to the CORC because the entire
procedure resolving this grievance has been in error and runs afoul

---

[4]  A copy of the Superintendent's decision is attached as Exhibit G to Plaintiff's first amended
complaint.  (Dkt. No. 26 at 32.)

[5]  Plaintiff's grievance was entitled "Sgt. to Follow Direction" and assigned to class code I/16.
(*See* Dkt. No. 26 at 32.)

of the Directive for Handling Harassment grievances.  At first,
Directive 4040 requires that the grievance first be sent to the
Superintendent to assess the viability of the harassment claim.  If it
is not a bona fide [sic], then the superintendent is to remit the
grievance to the IGRC for regular resolution.  This was not done in
this case.

More poignantly, the IGRC could only have sent this grievance to
the Inspector General because, as found by the IGRC, they have no
power to resolve a claim of harassment.  If the IGRC is powerless
to invoke a sanction or penalty for harassment, what is the purpose
of the procedure utilized herein to entertain such a complaint?

Lastly, I filed this appeal for harassment by Sergeant DiCairano.
Why then am I being ordered to take a picture of my religious head
covering for submission to Albany?  This matter had already been
resolved according to the Directive 4202 (M)(2)(3), which had
formed the basis of the grievance.  Why then is the IGRC panel
insisting on further clarification?

It should be noted, that the religious head covering was confiscated
and I was given an infraction.  This is what led to the
determination by the Chaplain the this [sic] was an acceptable item
and the infraction was dismissed.  I insist that the appropriate
action be taken and the matter be sent to the Inspector General
because this institution is incapable and unwilling to discipline its
officer for insubordination.

(Dkt. No. 89-4 at 8.)  On March 6, 2013, CORC unanimously denied Plaintiff's grievance as

without merit:

Upon full hearing of the facts and circumstances in the instant
case, the action requested herein is hereby denied as without merit.
CORC upholds the determination of the Superintendent for the
reasons stated.

CORC notes from further investigation that the grievant was
allowed to retain the religious head covering in question until it
was reviewed by the Director of Ministerial, Family & Volunteer
Services.  Further, it was determined that it was not approved for
Jewish adherents, and the grievant elected to mail it out of the
facility when given disposal options on 3/2/13.

. . . With respect to the grievant's appeal, CORC asserts that the
IGP Supervisor shall review the grievance complaint and designate

7

the grievance code and title in accordance with Directive #4040.
CORC asserts that the employees' appropriate performance of their
duties and enforcement of the rules and regulations should not be
construed as harassment by the grievant.  Further, CORC has not
been presented with sufficient evidence to substantiate harassment
or malfeasance by staff.  CORC notes that the grievant may write
to whomever he wishes regarding this complaint, as long as they
are not on his Negative Correspondence and Telephone List.

*Id*. at 10.

### C.    DOCCS Directive 4202

At all times relevant to this action, Directive 4202(m) provided, in part:

1.    Inmates are permitted to wear religious headcoverings in
accordance with their religious belief and as permissible in
a correctional setting.  Some examples of approved
religious headcoverings are:

    a.    Kufi – a hemispheric head cap that can be made of
cloth, knitted or crocheted, multicolored or single
colored.  There are no color prohibitions.  The kufi
may have a peak on top.  It must fit close to the
head (hair).  A kufi has no protrusions (visor tassels,
etc.).

    b.    Yarmulke – a close-fitting skull cap that can be
made of cloth, knitted or crocheted, multicolored or
single colored.  There are no color prohibitions.

    **c.**    Tsalot-Kob – is approved religious headwear for
members of the Rastafarian religious faith.  A
Tsalot-Kob is a hemispheric head cap that can be
made of cloth, knitted or crocheted, and may be
multicolored or single colored.  Only the smallest
size is permitted.  It measures approximately 12"
long at is longest point in order to cover all locks.  It
must fit as close to the locks permit.  **Note: This
religious headwear is only authorized for
members of the Rastafarian faith.**

    d.    Fez – a brimless, cone shaped, flat-crowned hat that
usually has a tassel and usually is made of red felt.

8

  e.  Khimar – an approved cloth headcovering (not to cover the face) for female members of the Islamic faith measuring no more than 4 feet by 4 feet. It may be multicolored or single colored however no solid black, blue, gray, or orange will be permitted.

  2.  A facility Chaplain is to determine whether the inmate's practice and the headcovering itself are legitimate. If a Chaplain of the inmate's faith belief is unavailable, the Ministerial Program Coordinator responsible for the particular faith group is to make the determination. If needed, outside religious authorities will be consulted.

  3.  If there is reason to believe that an inmate is wearing a religious headcovering inappropriately, a facility Chaplain shall be asked to further investigate. The inmate shall be permitted to wear the head covering until the investigation is completed.

(Dkt. No. 89-6 at 14-16 (emphasis added).) Director Morris explains Directive 4202 was

subsequently amended in or about 2014 to eliminate the faith-specific head coverings and instead

allowed inmates to wear any of the approved head covering regardless of their designated faith.

*Id*. at ¶ 11. This accommodation, however, was allowed for individual worship only. *Id*.

  **D. Eastern Seeks Clarification from DOCCS Regarding Plaintiff's Head Covering**

  In his Declaration in support of Defendants' motion, Sgt. Leifeld, who served as a

member of the IGRC and conducted interviews with Plaintiff and Sgt. DiCairano as part of the

investigation of Grievance No. ECF-25118-12, states:

  the IGRC's investigation suggested that the question of the appropriateness of the Plaintiff's "tam" needed to be addressed, so that the Plaintiff and Eastern CF staff had some finality and clarity regarding the issue. Settling the question seemed likely to prevent further staff questioning of the Plaintiff, and additional "harassment" complaints. As a result, the IGRC also noted on its grievance determination form that the "tam" question would be addressed by DOCCS' central office in Albany. (Although such decision regarding appropriateness of specific religious items and attire are usually made by facility-level chaplains, the facility's

> own rabbi in this instance expressed a reluctance to do so and
> suggested that additional guidance should come from Albany.)  As
> a consequence, at some point in late August, I accompanied the
> Plaintiff to the ID office where photographs could be taken of the
> "tam" for Albany's review.

(Dkt. No. 89-5 at ¶ 10.[6])

In her Declaration submitted in support of Defendants' motion, Director Morris explains

MFVS "is involved in numerous aspects of prison life as a result of its role developing,

promulgating, interpreting, and administering DOCCS policy concerning religious, social, and

family opportunities and practices for inmates—including, for purposes of this lawsuit, the

interpretation of policies governing inmates' possession and use of religious items and garb."

(Dkt. No. 89-6 at ¶ 3.)

Director Morris was contacted by Senior Investigator Ed Demo, of DOCCS' Special

Operations office, in late August of 2012.  *Id*. at ¶ 6.[7]  Senior Investigator Demo had been

contacted by personnel at Eastern who were seeking clarification as to whether Plaintiff, who

professed to be of the Jewish faith, could wear a "Tsalot-Kob" in satisfaction of his religious

belief that he was required to cover his head.  *Id*.  In making her decision regarding Plaintiff's

headgear, Director Morris states:

> Pursuant to the clear direction of the Directive, I told Senior
> Investigator Demo that while the facility rabbi should have made
> the determination as to whether to permit the Plaintiff to wear his

---

[6]  Copies of the photographs taken of Plaintiff wearing his head covering are annexed to Sgt.
Leifeld's Declaration as Exhibit E.  (Dkt. No. 89-5 at 20.)

[7]  Director Morris states it was her "understanding that Eastern personnel had sought to clarify
whether the Tsalot-Kob was suitable" for Plaintiff "because the facility's own rabbi had
expressed a reluctance to make a decision in this regard and, in substance, suggested that
someone from 'Albany' should have the final say on the matter."  *Id*. at ¶ 8.  Director Morris
found the rabbi's position to be "concerning" because "rendering determinations on the
appropriateness of religious items . . . was part of his basic role with DOCCS, and any reluctance
in this regard was in a sense an abdication of his responsibility."  *Id*.

> tam, it was clear that the Plaintiff's head covering (of which I had
> received photos from the facility) was a Tsalot-Kob, and not for a
> member of the Jewish faith.  Accordingly, it should be disallowed
> for wear.

*Id*. at ¶ 10.  Despite Director Morris' determination "as to the permissibility of the Plaintiff's

wearing of a Tsalot-Kob in lieu of a yarmulke or other head covering, [she] did not specifically

direct that the Plaintiff should be required to dispose of the headgear."  *Id*. at ¶ 12.  Rather,

Director Morris "deferred to DOCCS' security personnel regarding whether the tam could be

kept by the Plaintiff, as [she] was unsure at that time of the permissible quantity of headgear to

be owned by inmates at any one time."  *Id*.

In late September of 2012, Sgt. Leifeld met with Plaintiff and the facility rabbi "to see if

there was a workable compromise solution that would permit Plaintiff to use his 'tam,' even

though MFVS' determination clarified that he had no specific entitlement to it."  *Id*.  An

agreement was reached wherein Plaintiff would be permitted to wear his tam in his cell—like

some other forms of non-religious head coverings such as "doo rags" or "head cloths" which

were permitted for wear in cells but not elsewhere in the facility—but that "upon exiting his cell,

if [Plaintiff] chose to cover his head for religious reasons, it would have to be with a head

covering that was deemed appropriate for the Jewish faith (i.e., a yarmulke)."  *Id*.

On September 26, 2012, Sgt. Leifeld sent an IGRC Memo to Plaintiff, which stated: "I've

enclosed an edited copy of the E-mail I received from Ms. Morris Director of Ministerial

Services.  I will not rebutall [sic] this issue; the last conversation we had pertaining to your

religious head gear is final."  (Dkt. No. 89-5 at 22; Dkt. No. 63 at ¶ 54.[8])

In his declaration, IGP Coordinator Antonelli explains:

---

[8]  A copy of the redacted August 23, 2012, e-mail was attached as Exhibit L to the first amended
complaint.  (Dkt. No. 26 at 41-42.)

> Once the determination was made that the Plaintiff's wearing of
> the "tam" was to be disallowed given his status as a member of the
> Jewish faith, [Director Morris of MFVS] requested input from
> myself and then-Assistant Commissioner Bly—who often advised
> DOCCS offices such as MFVS on security-related aspects of
> various inmate matters—as to whether the Plaintiff could retain
> possession of his headgear, or be made to dispose of it. . . .  It was
> determined that the Plaintiff should be directed to dispose of the
> tam.  I relayed this information to the facility, instructing Eastern
> to advise the Plaintiff about his disposal options[.]"

(Dkt. No. 89-4 at ¶ 10.[9])  Several days later, IGP Coordinator Antonelli received a copy of Form

#2068 (associated with the disposal of personal property), indicating that "Plaintiff had elected to

mail the tam out of Eastern to a relative on or about March 2, 2013."  *Id.*

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d

at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

---

[9]  A copy of IGP Coordinator Antonelli's e-mail sent March 1, 2013, which was then forwarded
to Sgt. Leifeld was attached as Exhibit M to the first amended complaint.  (Dkt. No. 26 at 43-44.)

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to

be treated as an affidavit.[10] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified

complaint is to be treated as an affidavit . . . and therefore will be considered in determining

whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment

motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will

be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."

426 F.3d 549, 554 (2d Cir. 2005).  "At the summary judgment stage, a nonmoving party must

offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id.*

(citation and internal quotation marks omitted).  "To defeat summary judgment, . . . nonmoving

parties may not rely on conclusory allegations or unsubstantiated speculation."  *Id.*  (citation and

internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon

'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111

(2d Cir. 1997) (citation omitted).  "Statements that are devoid of any specifics, but replete with

---

[10]  The Court finds that Plaintiff's second amended complaint was adequately verified under 28
U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury.  (Dkt. No. 63 at 7.)

conclusions, are insufficient to defeat a properly supported motion for summary judgment."
*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

   In determining whether a genuine issue of material fact exists, the court must resolve all
ambiguities and draw all reasonable inferences against the moving party. *Major League
Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is
proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally,
and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14
F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by
evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93
Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[11] (citing *Carey v.
Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

   When a party fails to respond to a motion for summary judgment, "[t]he fact that there
has been no [such] response . . . does not . . . mean that the motion is to be granted
automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1)
determine what material facts, if any, are undisputed in the record; and (2) assure itself that,
based on the undisputed material facts, the law indeed warrants judgment for the moving party.
*Id.*; *see also Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that
not verifying in the record the assertions in the motion for summary judgment "would derogate
the truth-finding functions of the judicial process by substituting convenience for facts").

---

[11] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).

## IV.    PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In this case, Plaintiff has failed to respond to Defendants' statement of material facts as required under L.R. 7.1(a)(3).[12]

Where a party has failed to respond to the movant's statement of material facts, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[13] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to comply with the requirements of FRCP 56(e) and L.R. 7.1.[14] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

This Circuit adheres to the view that nothing in FRCP 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a nonmovant willfully fails to respond to a properly filed summary judgment motion.

---

[12]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[13]  L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[14]  Defendants included the requisite notification of the consequences of failing to respond to a summary judgment motion in accordance with their notice of motion. (Dkt. No. 89 at 4-3.)

*Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second

Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a

party's failure to comply with local court rules," including local rules relating to requirements

regarding the submission of and response to statements of material facts on summary judgment

motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*,

258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to

Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V.    ANALYSIS

### A.    Exhaustion of Available Administrative Remedies

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted." 42

U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016). "There

is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot

be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion

requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other

wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see

also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps

that the [government] agency holds out, and doing so properly") (internal quotations omitted).

In New York State prisons, DOCCS has a well-established three-step IGP.  *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence.  *Id*. § 701.5(a)(1).  A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(I).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees.  *Id*. § 701.8.  In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor.  The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent

immediately to the superintendent for review. Under the regulations, the superintendent or his

designee shall determine immediately whether the allegations, if true, would state a "bona fide"

case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house,"

by the Inspector General's Office, or by the New York State Police Bureau of Criminal

Investigations. *Id*. An appeal of the adverse decision of the superintendent may be taken to

CORC as in the regular grievance procedure. *Id*. A similar "special" procedure is provided for

claims of discrimination against an inmate. *Id*. § 701.9.

Generally, if a prisoner has failed to properly follow each of the required steps of the

above-described grievance procedure prior to commencing litigation, he has failed to exhaust his

administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93;

*Porter*, 534 U.S. at 524.

While the PLRA mandates exhaustion of administrative remedies, it also "contains its

own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically,

section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion

requirement hinges on the availability of administrative remedies[.]") (quotations marks and

citations omitted). In the PLRA context, the Supreme Court has determined that "availability"

means that "an inmate is required to exhaust those, but only those, grievance procedures that are

capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859

(quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First,

"an administrative procedure is unavailable when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95. Plaintiff must then establish that the IGP grievance procedure was unavailable to him. *See Jones*, 549 U.S. at 216.

### 1. C.O. Waugh

The Court finds Defendants have satisfied their burden of showing that Plaintiff failed to exhaust his administrative remedies as against C.O. Waugh. Plaintiff alleges C.O. Waugh "knew that a questionable religious head [] covering was not to be confiscated until determined to be contraband and unlawful for that religious faith." (Dkt. No. 63 at ¶ 26.) Plaintiff further alleges C.O. Waugh "had no compelling interest for confiscating [his] religious head [] covering." *Id*. at ¶ 27. Plaintiff alleges on March 18, 2012, C.O. Waugh, "by confiscating [his] religious head [] covering without license or privilege, deprived [Plaintiff] of his religious freedom by exposing

[his] nakedness before God, causing [Plaintiff] to appear impudent and insolent before God, thus causing [Plaintiff] spiritual damage, and impeding his free expression of religion." *Id.* at ¶ 32.

In her Declaration in support of Defendants' motion for summary judgment, C.O. Waugh states that on March 18, 2012, she confiscated Plaintiff's tam and issued Plaintiff a misbehavior report for lying (about his religious affiliation in order to try to wear the tam), disobeying a direct order (the instruction not to wear the tam because, at the time, her understanding was that only members of the Rastafarian faith were permitted to wear a tam and Plaintiff was registered Jewish), and possession of contraband (Plaintiff's tam).  (Dkt. No. 89-3 at ¶ 5.)

On March 27, 2012, Plaintiff was found not guilty based upon the rabbi's testimony that Plaintiff head covering was appropriate for a member of the Hebrew faith.  (Dkt. No. 63 at ¶¶ 29-30.)  Thereafter, Plaintiff was permitted to wear his head covering and was instructed to show a copy of the decision "to anyone who stopped him and questioned him about the religious head [] covering."  *Id.* at ¶ 30; *see also* Dkt. No. 89-2 at 95.

During his deposition, Plaintiff admitted he never filed a grievance regarding C.O. Waugh's confiscation of his head covering in March of 2012, and testified that he had no further issues with C.O. Waugh relating to his head covering.  (Dkt. No. 89-2 at 93-94.)  C.O. Waugh avers that after learning Plaintiff was found not guilty of the charges contained in the March 18, 2012, misbehavior report, she "made no further effort to confiscate the Plaintiff's tam; did not direct the Plaintiff to remove his tam; and do[es] not recall ever having any further interactions with the Plaintiff regarding his headgear, or any other aspect of his religious affiliation and practices."  (Dkt. No. 89-3 at ¶ 6.)

Plaintiff has offered no evidence that the grievance procedure was "unavailable" to him. Further, the record evidence demonstrates that none of the exception outlined in *Ross* apply here.

There is no evidence in the record that DOCCS' grievance system was ineffective or "operated as a simple dead end." The record is devoid of any evidence that Plaintiff was prevented from utilizing the grievance and appeal process. Finally, this is not a situation where the grievance system is opaque and difficult to navigate. To the contrary, it is undisputed that Plaintiff successfully used the grievance process on unrelated matters in April of 2012, and Plaintiff appealed Grievance No. ECF-25118-12 to CORC. (Dkt. No. 89-5 at ¶ 5, 8-11, 13, 15; Dkt. No. 89-4 at 8-10.)

Based on the foregoing, the Court finds any free-exercise claims related to the confiscation of Plaintiff's head covering from March 18, 2012, through March 27, 2012, are unexhausted. Therefore, the Court recommends that C.O. Waugh be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies.

### 2. Sgt. Leifeld, Superintendent Larkin, IGP Coordinator Antonelli, Assistant Commissioner Bly, and Director Morris

Defendants argue Plaintiff's alleged prohibition against wearing a Rastafarian tam as an alternative form of Jewish head covering was *never* the source of a filed grievance by Plaintiff and, therefore, remains unexhausted. (Dkt. No. 89-9 at 11-13.) The Court disagrees and finds the information contained in Grievance No. ECF-25118-12 was sufficient to place Eastern officials on notice of Plaintiff's claims regarding his religious head covering.

The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the

21

agency's procedures." *Woodford*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89.

The record evidence demonstrates Plaintiff filed Grievance No. ECF-25118-12 on August 6, 2012, after being "stopped" by Eastern personnel and "harassed" by Sgt. DiCairano on at least six occasions after the March 27, 2012, disciplinary hearing. (Dkt. No. 89-5 at 15-16.) Specifically, Sgt. DiCairano harassed Plaintiff on June 14, 2012, by stating his head covering was "not a Jewish [h]ead [] covering" and "that she was going to take it to Albany." *Id*. at 15. Sgt. DiCairano harassed Plaintiff again on July 29, 2012, and told Plaintiff "that she was going to take a picture of [his] religious head covering and send it to Albany." *Id*.

According to Sgt. Leifeld, the IGRC's investigation "suggested that the appropriateness of the Plaintiff's 'tam' needed to be addressed, so that the Plaintiff and Eastern staff had some finality and clarity regarding the issue. Settling the question seemed likely to prevent further staff questioning of the Plaintiff, and additional 'harassment' complaints. As a result, the IGRC also noted on its grievance determination form that the 'tam' question would be addressed by DOCCS' central offices in Albany." *Id*. at ¶ 10. Plaintiff appealed the IGRC's determination to the Superintendent. *Id*. at 18. Superintendent Larkin issued the following decision:

> IGRC investigation shows that the facility chaplain has referred this issue of religious headwear to Central Officer Ministerial Services Office for determination.
>
> Grievant's headwear was not confiscated, nor has grievant been issued a misbehavior report. I find such direction is in compliance with Directive 4202 Section M-2.3.

Grievant may wear headwear until such clarification can be made.

(Dkt. No. 26 at 32.)  Plaintiff appealed to CORC, which issued its decision on March 6, 2013,

which stated, in part:

> CORC notes from further investigation that the grievant was
> allowed to retain the religious head covering in question until it
> was reviewed by the Director of Ministerial, Family & Volunteer
> Services.  Further, it was determined that it was not approved for
> Jewish adherents, and the grievant elected to mail it out of the
> facility when given disposal options on 3/2/13.

(Dkt. No. 89-4 at 8, 10.)  Plaintiff's original complaint is dated March 14, 2013, and was

received for filing on March 21, 2013.  (Dkt. No. 1 at 13.)

Since "[e]xhaustion requirements are designed . . . to give the agency a fair and full

opportunity to adjudicate . . . [a prisoner's] claims," *Woodford*, 548 U.S. at 90, the Court finds

that Plaintiff's Grievance No. ECF-25118-12 provided the requisite notice for exhaustion

purposes of Plaintiff's free-exercise claims.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175

(2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the

agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.")

(internal quotations and citations omitted)).

Therefore, the Court recommends denying summary judgment to Sgt. Leifeld,

Superintendent Larkin, IGP Coordinator Antonelli, Assistant Commissioner Bly, and Director

Morris on failure to exhaust grounds.

**B.    Personal Involvement**

"Personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v.*

*Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").  Thus, "[h]olding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement."  *Groves v. Davis*, No. 9:11–CV1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934).

To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Here, Defendants also seek dismissal of the claims asserted against C.O. Waugh, Sgt. Leifeld, Superintendent Larkin, IGP Coordinator Antonelli, and Assistant Commissioner Bly, arguing there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.  (Dkt. No. 89-9 at 15.)  However, the thrust of Defendants' arguments with respect to whether they were personally involved is aimed at whether they were in fact *responsible* for the determination

24

of whether or not Plaintiff was permitted to wear his head covering.  *Id.*  Because a personal

involvement inquiry on summary judgment examines only whether there is record evidence to

support a factfinder's conclusion that the individual under consideration was *involved* in the

alleged conduct, the Court has limited its analysis to that particular question.  *See Brandon v.*

*Schoryer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at * 10 (N.D.N.Y. Feb. 26, 2016).

### 1.     C.O. Waugh

The record evidence demonstrates Plaintiff had no further interactions with C.O. Waugh

after issuing Plaintiff the March 18, 2012, misbehavior report.  (Dkt. No. 89-2 at 92-93; Dkt. No.

89-3 at ¶ 6.)  Therefore, the Court additionally recommends granting summary judgment to C.O.

Waugh for lack of personal involvement.

### 2.     Superintendent Larkin

Defendants assert Superintendent Larkin's only participation in this action was restricted

to affirming the IGRC's determination and observing that the status of the tam was to be clarified

with DOCCS central authorities.  (Dkt. 89-9 at 15.)  Defendants contend that Superintendent

Larkin had no involvement whatsoever in the subsequent exchanges of communications with

DOCCS over the tam; the determination that was ultimately rendered to disallow the Plaintiff's

wear of it; and the implementation of that determination.  *Id.*

Generally, a superintendent's mere affirmance of an IGRC denial of a grievance has been

found insufficient to show personal involvement for purposes of liability under § 1983.  *White v.*

*Sears*, No. 9:10-CV-0721 (MAD/GHL), 2011 WL 2728443, at *8 (N.D.N.Y. June 20, 2011)

(merely denying an inmate's grievance is insufficient to establish personal involvement); *Keitt v.*

*Schun*, No. 11-CV-438, 2014 WL 347053, at *8 (W.D.N.Y. Jan. 30, 2014) (affirmance of denial

of inmate's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang*

*v. Capra*, 889 F. Supp. 2d 489, 503 (S.D.N.Y. 2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *Henry v. Lempke*, 680 F. Supp. 2d 461, 464 (W.D.N.Y. 2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement.  *But see Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983).

Because Superintendent Larkin is a supervisory official, he may be found personally liable for a constitutional violation in the event he learned of a constitutional violation through a report or appeal and failed to remedy the wrong.  *Colon*, 58 F.3d at 873.  Superintendent Larkin's decision, dated August 21, 2012, stated Plaintiff "may wear headwear until such clarification can be made."  (Dkt. No. 26 at 32.)  The record evidence demonstrates that in late August 2012, the "clarification" was made and Plaintiff was not permitted to wear his head covering outside of his cell sometime in late September 2012.  Viewing all facts and reasonable inferences in Plaintiff's favor, the Court finds a reasonable factfinder could conclude that Superintendent Larkin learned that Plaintiff was not permitted to wear his headgear as a religious head covering and failed to remedy the wrong.  Therefore, the Court recommends Defendants' motion be denied to the extent that it seeks dismissal of Plaintiff's free exercise and RLUIPA claims asserted against Superintendent Larkin for lack of personal involvement.

### 3.    IGP Coordinator Antonelli and Assistant Commissioner Bly

Defendants contend the record reveals that IGP Coordinator Antonelli and Assistant Commissioner Bly "were similarly uninvolved in the determination that forms the basis for the

Plaintiff's claims: the disallowance of his 'tam.'"  (Dkt. No. 89-9 at 15-16.)  Defendants argue

they were not tasked with, or even capable of reversing or modifying the determination which

came from MFVS, and that Plaintiff's claims against these two Defendants "appears premised

solely on the fact Defendant Antonelli communicated with Eastern on both men's behalf about

the ultimate physical disposition of the tam: viz., whether, with it disallowed for wear, the

Plaintiff could retain physical possession of it or else be made to ship it home.  *Id.*

Viewing all facts and reasonable inferences in Plaintiff's favor, the Court finds a

reasonable factfinder could conclude that IGP Coordinator Antonelli and Assistant

Commissioner Bly were involved in the alleged violations of Plaintiff's free exercise rights, i.e.,

determining Plaintiff should be required to dispose of his religious head covering.  For this

reason, the Court recommends Defendants' motion be denied to the extent that it seeks dismissal

of Plaintiff's free exercise and RLUIPA claims asserted against IGP Coordinator Antonelli and

Assistant Commissioner Bly for lack of personal involvement.

### 4.    Sgt. Leifeld

Lastly, Defendants contend Sgt. Leifeld "lacked the personal involvement necessary for §

1983 liability because—to the extent the disallowance of the Plaintiff's 'tam' was a

constitutional violation—he was involved only insofar as he carried out and enforced the

determination from MFVS, an office whose decision-making he had not authority to challenge or

refuse."  (Dkt. No. 89-9 at 16.)  The Court disagrees.

Plaintiff alleges Sgt. Leifeld "managed to modify Plaintiff's complaint against DiCairano

into an already resolved religious head covering issue . . . [and] upon his own authority" emailed

a photograph of Plaintiff's head covering to Director Morris.  (Dkt. No. 63 at 37-38.)  The record

evidence demonstrates Sgt. Leifeld worked with Plaintiff and the facility rabbi to create a

compromise solution that would permit Plaintiff some wear of his tam after the determination was made it was a Tsalot-Kob. Further, Plaintiff alleges Sgt. Leifeld "ordered" him to dispose of his "kippah" by sending it home in March 2, 2013. (Dkt. No. 63 at ¶ 40.)

In light of the foregoing, the Court finds there is sufficient evidence from which a reasonable factfinder could conclude Sgt. Leifeld was personally involved in Plaintiff's free exercise and RLUIPA claims. Therefore, the Court recommends Defendants' motion be denied to the extent that it seeks dismissal of Plaintiff's claims asserted against Sgt. Leifeld for lack of personal involvement.

### C.    Qualified Immunity

Lastly, Defendants contend they are entitled to qualified immunity "[b]ecause at the time of [their] alleged actions in 2012 there was no established right for non-Rastafarians to wear the Rastafarian 'tam' in fulfillment of their beliefs under other religious systems (such as Judaism), or because the Defendants could have reasonably believed in the lawfulness of their actions even if such right did exist[.]" (Dkt. No. 89-9 at 17.[15])

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see*

---

[15]  As to Defendants' alternative argument for qualified immunity, the Second Circuit has clarified that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful. This is so because a police officer who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful. We clarify here that the two are part of the same inquiry, not independent elements as some cases suggest." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 n.11 (2d Cir. 2009); *see also Paul v. LaValley*, ___ F. App'x ___, No. 17-1086, 2018 WL 1036730, at *2 (2d Cir. Feb. 23, 2018).

*also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit"). As an affirmative defense, the defendants bear the burden of establishing their entitlement to qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997).

The qualified immunity determination consists of two steps, which a court may consider in either order. *See Seri v. Bochicchio*, 374 F. App'x 114, 116 (2d Cir. 2010) (citation omitted). The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citations omitted). The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining if a particular right was clearly established, courts "look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citation omitted).

In determining whether the right in question in a particular case was defined with reasonable specificity, courts must avoid "framing the constitutional right at too broad a level of generality." *Redd v. Wright*, 597 F.3d 532, 536 (2d. Cir. 2010). Characterizing the right in question in a prisoner's First Amendment religion case as the right "not to be subjected to punishment . . . as a consequence of his religious beliefs," for example, is not "reasonably

specific." *Id.* On the other hand, "[t]his does not mean that there must be a factual equivalency between the case at issue and prior cases. The 'salient question' instead is whether the case law at the time in question would have put reasonable officers on 'fair warning' that their conduct violated the plaintiff's rights." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Walker v. Schult*, 717 F.3d 119, 125-26 (2d Cir. 2013) ("Courts do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks and citation omitted).

Here, the Court finds Defendants have not established they are entitled to qualified immunity at this stage. Defendants contend summary judgment is warranted because "[i]t was unclear that in 2012, a well-established and inalienable right extended to *every non-Rastafarian* inmate to wear a Rastafarian 'tam' in satisfaction of a perceived religious obligation to cover his head." (Dkt. No. 89-9 at 19.) The Court finds Defendants' characterization of the constitutional right at issue too narrow. *See Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) ("The question in not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.") (citation omitted).

It is well-established that "prison officials may not substantially burden inmates' right to religious exercise without some justification." *Salahuddin*, 467 F.3d at 275-76 ("[O]nce a prisoner shows that a prison regulation impinges on a protected right, prison officials must show that the disputed official conduct was motivated by a legitimate penological interest."). Here, the only penological objectives to which Defendants point are related to their apparent interest in institutional security which they claim justified prohibiting Plaintiff from wearing his religious

head covering.  (Dkt. No. 89-6 at ¶ 7.)  Specifically, Defendants contend that "at the time of the determination to disallow the Plaintiff's wear of the tam due to his non-Rastafarian status was made, there was special concern over the wear of tams due to their status as one of the largest head coverings permitted by DOCCS, and their susceptibility to use as a vehicle for the concealment and transport of weapons and contraband."  (Dkt. No. 89-9 at 19.)  According to Defendants, this concern was reflected in the singular treatment of the Rastafarian crown verses other forms of inmate head coverings.  *Id*.  Defendants note that other security interests, such as preventing conflicts between religious sects, have likewise justified other religious restrictions, including restrictive regulations concerning head coverings.  *Id*. at 18.  Defendants contend that these considerations "set the instant case apart" from *Barnes v. Furman*, 629 F. App'x 52 (2d Cir. 2018) (summary order).  *Id*.  The Court disagrees.  As was the case in *Barnes*, at this juncture, it is not apparent whether there was a legitimate penological reason to limit the wearing of Tsalot-Kob to inmates registered as Rastafarian.[16]  Further, looking at the record in the light most favorable to Plaintiff, a reasonable jury could conclude that it was objectively unreasonable for Defendants to believe that they were not violating Plaintiff's federally protected rights by denying Plaintiff his religious head covering.

Based on the foregoing, the Court finds questions of material fact preclude the Court from granting summary judgment to Defendants on qualified immunity grounds at this time. Therefore, the Court recommends denying Defendants' motion for summary judgment on this ground.

---

[16]  In *Barnes*, the inmate-plaintiff alleged, *inter alia*, that prison officials confiscated his religious head covering – a Tsalot-Kob – in 2007 because he was registered as Jewish and not Rastafarian, even though the plaintiff contended that a Tsalot-Kob "was more appropriate than a yarmulke because it fit over his extensive dreadlocks."  629 F. App'x at 55.

### D.    Plaintiff's Claims for Money Damages under RLUIPA

Defendants also seek dismissal of Plaintiff's claims for money damages under RLUIPA. (Dkt. No. 89-9 at 20.)  It is well established that "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citing *Sossaman v. Texas*, 131 S. Ct. 1651, 1663 (2011)).  Therefore, the Court recommends dismissing Plaintiff's claim for monetary damages under RLUIPA as a matter of law.

### E.    Plaintiff's Claims for Declaratory and Injunctive Relief

Lastly, Defendants contend Plaintiff's claims for injunctive relief should be dismissed as moot.  (Dkt. No. 89-9 at 21.)  In the second amended complaint, Plaintiff requests injunctive and declaratory relief.  (Dkt. No. 63 at ¶ 5.)  Plaintiff has since been transferred from Eastern and is presently confined at Woodbourne Correctional Facility.  (Dkt. No. 68.)  "In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin*, 467 F.3d at 272 (citations omitted).  Further, the record evidence demonstrates the DOCCS policy at issue has since been amended and Plaintiff testified he has not had any further issues regarding his religious head covering.  (Dkt. No. 89-6 at ¶ 14; Dkt. No. 89-2 at 141-43.)

Based on the foregoing, the Court recommends dismissing Plaintiff's claims for declaratory and injunctive relief as moot.  *See, e.g.*, *Pilgrim v. N.Y.S. Dep't of Corr. Servs.*, No. 9:07-CV-1001 (GLS/RFT), 2011 WL 6031929, at **2-4 (N.D.N.Y. Sept. 1, 2011) (mooting the inmate's claim for injunctive relief due to policy change); *Mitchell v. N.Y.S. Dep't of Corr. Servs.*, No. 6:06-CV-6278 (MAT), 2012 WL 6204205, at *11 (W.D.N.Y. Dec. 12, 2012) (same).

## VI.    SUMMARY AND RECOMMENDATION

Based on the findings above, it is recommended that summary judgment be granted as to C.O. Waugh and that she be dismissed from this action.  It is further recommended that summary judgment be denied as to Defendants Sgt. Leifeld, Superintendent Larkin, IGP Coordinator Antonelli, Assistant Commissioner Bly, and Director Morris.

Inasmuch as Plaintiff has since been transferred out of Eastern and the DOCCS Directive at issue has been amended, the Court recommends that Plaintiff's claims for declaratory and injunctive relief be dismissed as moot.  Further, because RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities, the Court recommends that Plaintiff's claims for money damages be dismissed as a matter of law.

Accordingly, if the District Court adopts this Report-Recommendation, only Plaintiff's First Amendment free exercise claims against Defendants Sgt. Leifeld, Superintendent Larkin, IGP Coordinator Antonelli, Assistant Commissioner Bly, and Director Morris will proceed to trial.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 89) be **GRANTED in part and DENIED in part** as follows: (1) **GRANTED** as to Defendant C.O. Waugh; (2) **DENIED** as to Defendants Sgt. Leifeld, Superintendent Larkin, IGP Coordinator Antonelli, Assistant Commissioner Bly, and Director Morris; and (3) **DENIED** as to qualified immunity; and it is further

**RECOMMENDED** that Plaintiff's claims for money damages under RLUPIA be **DISMISSED** as a matter of law; and it is further

**RECOMMENDED** that Plaintiff's claim for declaratory and injunctive relief be **DISMISSED** as moot; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[17] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  February 28, 2018
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[17]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

**Opinion**

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent inmates posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

**Opinion**

### OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

### I. BACKGROUND

#### A. Facts [1]

[1]     The following facts are drawn from Defendant's
        unopposed Local Civil Rule 56.1 Statement. (Doc.
        No. 55 ("56.1 Statement" or "56.1 Stmt.").) In
        deciding Defendant's motion for summary judgment,
        the Court has also considered Plaintiff's submission
        in opposition to summary judgment (Doc. No. 58
        ("Opp'n")), and has conducted an independent
        review of the record, notwithstanding Plaintiff's failure to
        submit a statement compliant with Local Civil Rule
        56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73

(2d. Cir. 2001) (noting that district court "may in its
discretion opt to conduct an assiduous review of the
record even when" a party has failed to comply with
Local Civil Rule 56.1 (citations and quotation marks
omitted)).

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)
Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,

the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on

the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the

existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at

the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within

the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the

Case 9:13-cv-00321-MAD-TWD   Document 91   Filed 02/28/18   Page 43 of 104
**Mena v. City of New York, Not Reported in F.Supp.3d (2016)**
2016 WL 3948100

correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies

were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]   Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

Attorneys and Law Firms

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

Opinion

### MEMORANDUM DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged

personal involvement in the August 8, 2011 assault are
*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses; and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

[1]     This is the fourth civil rights action filed by Plaintiff
        in this District. Generally, two of these actions arose
        out of Plaintiff's refusal to consent to a strip search
        and the subsequent actions taken against Plaintiff
        as a result of his refusal. *See Groves v. New York,*
        09–CV–0406, Decision and Order (N.D.N.Y. filed
        May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
        complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
        *Groves v. The State of New York,* 9:09–CV–0412,
        Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
        (Sharpe, J.) (granting defendants' motion to dismiss
        the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
        The third action alleged numerous violations of
        Plaintiff's constitutional rights during the period July
        23, 2009, and August 26, 2009, and was dismissed
        without prejudice upon Plaintiff's request in October,
        2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
        Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
        (Suddaby, J.). As a result, it does not appear that
        the current action is barred because of res judicata,
        collateral estoppel, and/or the rule against duplicative
        litigation.

### I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take

appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2    At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*
Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT
In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

3    The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard
**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008)

(McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

 **\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]     *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]     *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]     It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15– 16 (N.D.N.Y. filed Nov. 18, 2009).[7]

---

[7]      *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983

claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the

evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[9]

---

[8]  Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]  Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever

2012 WL 651919

care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt

to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008

2012 WL 651919

WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]  See also *Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]  See also *Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

 **\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on

the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and

reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request

2012 WL 651919

for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]      For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion

at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10** **ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[15] and it is further

[15]      Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED** without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize

are *sua sponte* **DISMISSED** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED** **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General,

together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1638242
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chamma K. Brandon, Plaintiff,

v.

Dr. Glen Schroyer, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)
|
Signed February 26, 2016

**Attorneys and Law Firms**

FOR PLAINTIFF: CHAMMA K. BRANDON, Pro se,
12-A-5715, Sing Sing Correctional Facility, 354 Hunter
Street, Ossining, NY 10562.

FOR DEFENDANT SCHROYER: THUILLEZ,
FORD, GOLD, BUTLER & MONROE, LLP, 20
Corporate Woods Blvd., 3rd Floor, OF COUNSEL:
KELLY M. MONROE, ESQ., MOLLY C. CASEY,
ESQ., Albany, NY 12211.

FOR REMAINING DEFENDANTS: LEMIRE,
JOHNSON & HIGGINS, LLC, P.O. Box 2485, 2534
Route 9, OF COUNSEL: BRADLEY J. STEVENS,
ESQ., Malta, NY 12020.

**Opinion**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1**  This is an action brought by *pro se* plaintiff Chamma
K. Brandon, a prison inmate formerly confined in the
Clinton County Jail ("CCJ"), pursuant to 42 U.S.C. §§
1983, 1985, and 1986, against several individuals working
at the facility alleging that they deprived him of his
civil rights during his period of incarceration there.
Plaintiff's claims fall into three groups, complaining of (1)
a one-month hiatus in a low-fat, low-cholesterol ("heart-
healthy") diet; (2) the failure to honor his religious diet
by serving him pork products; and (3) the failure to
otherwise accommodate his religious beliefs as a Muslim.
Plaintiff contends that, by their actions, defendants
violated his rights under the First, Eighth, and Fourteenth
Amendments to the United States Constitution, as well as
the Religious Land Use and Institutionalized Persons Act
of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of
the defendants, including Dr. Glen Schroyer, who is
separately represented, have moved for the entry of
summary judgment dismissing plaintiff's claims. For the
reasons set forth below, I recommend that the motions be
granted in part but otherwise denied.

*I. BACKGROUND*

Plaintiff was confined in the CCJ beginning on January
14, 2012, and again following his re-arrest on March 2,
2012, until December 28, 2012, when he was transferred
into the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").
*Dkt. No. 17 at 3,* 12–, 3. Upon his entry into the
CCJ for the first time in January 2012, Brandon was
five-feet, eleven-inches in height, weighed 250 pounds,
and was considered clinically obese. [1] *Dkt. No. 77–
6 at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges that,
while he was incarcerated at the CCJ, the defendants
(1) deprived him of constitutionally adequate medical
care by removing him from a heart-healthy diet for
one month; (2) deprived him of his rights under the
First Amendment and RLUIPA to freely exercise his
Muslim religion by (a) repeatedly providing him with
meals that contained pork products, (b) denying him the
opportunity to participate in Ramadan, and (c) denying
him access to worship space and congregate religious
services; and (3) retaliated against him by denying him
adequate medical care and depriving him of his right to
freely exercise his religion in response to grievances and
complaints he filed against them during his incarceration
at the CCJ. [2] *See generally Dkt. No. 17.* Additionally,
plaintiff's amended complaint asserts a failure-to-protect
claim against defendants Clancy and Blaise, a corrections
sergeant and a corrections officer, respectively, at the CCJ.
*Id.*

[1]       In his amended complaint, plaintiff alleges that he
          weighed 275 pounds upon his initial entry into the
          CCJ, and 225 pounds upon his transfer into the
          custody of the DOCCS. *Dkt. No. 17 at 11.* In a
          memorandum submitted in opposition to defendants'
          motions, however, plaintiff claims to have lost "about
          175 lbs to 130 lbs" while confined in the CCJ due to
          the deprivation of meals. *Dkt. No. 93–2 at 62.*

2    A more precise description of the claims asserted against the defendants is included below in Part II. of this report.

A. *Plaintiff's Diet*

**\*2**  When he first arrived at the CCJ, Brandon reported that he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen.[3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

3    The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1 at 40.*

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[4] *Dkt. No. 17 at 8–9, 52; Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60– 62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

4    In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75– 6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

*Interrogatory No. 15:*
Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?
*Answer to Interrogatory No. 15:*
The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.
*Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No. 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3**  In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No. 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No. 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

5    Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13*. Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68*, and again, half of the document cannot be deciphered.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. *Dkt. No. 17 at 13,* 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse [6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

6    Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14*. It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93–4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No.*

*17 at 12; Dkt. No. 83 at 6,* his initial booking intake record does not reflect any religious designation. [7] *Dkt. No. 77–6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet. [8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

7    The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

8    Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff

was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

9    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012.[10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

10    Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

B. *Other Religious Accommodation*
Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19,

2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

C. *Assault by a Fellow Inmate*
**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets [sic] see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| *Defendant* | *Position* |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |

| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |

County of Clinton. [11]

[11] Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
| --- | --- |
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |

| | |
|---|---|
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also*

*Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

### 1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton

infliction of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by

'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.; see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26,* 62, 63; *Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need –an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions.

*Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products.[12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g., Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007) (Hurd, J., *adopting report and recommendation by* Peebles, M.J.).[13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an

attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

12    Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I have not analyzed that claim in the context of defendant Schroyer's motion.

13    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. *Conspiracy*

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden, 580 F.3d 106, 109 (2d Cir. 2009)* ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

### 1. *RLUIPA* [14]

14    While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013),* I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord, 758 F.3d 215, 224 (2d Cir. 2014).* While plaintiff ordinarily could pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher, No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015)* (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011)* ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

### 2. *Conspiracy*

**\*10**  Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously listed diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clancy furthered the conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer.[15] *Id.*

---

[15]   To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants

Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason aside from plaintiff's commissary purchases. *Dkt. No. 7710 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard

2016 WL 1638242

did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

**\*11** With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom he spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." [16] *Little v. City of N.Y., 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007).* Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

[16]   The doctrine is rooted in the Sherman Antitrust Act, *15 U.S.C. § 1,* and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth., 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)*

Although plaintiff's amended complaint mentions, in passing, *42 U.S.C. § 1985,* there is no record evidence to support a conspiracy claim against the defendants under *section 1985(3).* To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott, 463 U.S. 825, 835 (1983); Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).* "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi, 18 F.3d at 193.* A plaintiff asserting a claim under *section 1985(3)* need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 427 (2d Cir. 1995)* (quotation marks omitted).

**\*12** In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

### 3. Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Woodford v. Ngo, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); Hargrove v. Riley, No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. Pettus v. McCoy, No. 04–CV– 0471, 2006 WL 2639369, at \*1 (N.D.N.Y.

Sept. 13, 2006) (McAvoy, J.); see also Woodford, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95; accord, Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007).[17]

> [17] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. Macias, 495 F.3d at 43 (quoting Johnson v. Testman, 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)).

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. Dkt. No. 77–14 at 3. In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. Id. At that point the corrections officer must make an attempt to resolve the grievance informally. Id. If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. Id. In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). Id. If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. See Ruggerio v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

**\*13** The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ.[18] Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170. None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation

by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivaties [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

18    Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y., 380 F.3d 680, 686 (2d Cir. 2004); see also Macias, 495 F.3d at 41.* Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.* In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No. 93–2 at 40.* There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No. 17 at 19.* This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See Singh v. Lynch, 460 Fed.Appx. 45, 4748 (2d Cir. 2012)* ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone,* No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison,* 2007 WL 2789473, at *6.

4. *Personal Involvement*

**\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g.,* Dkt. No. 77–19 at 24 ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

#### a. *Defendant Bedard*

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. Dkt. No. 77–11 at 4. In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen have on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

#### b. *Defendant Blaise*

**\*15** There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time. [19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See* Dkt. No. 93–2 at 54 ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

[19]    Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff

may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

### c. *Defendant Clancy*

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17.* As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. *Defendant Perry*

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23.* Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164.* Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21.* In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he filed a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171.* In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." *Dkt. No. 77–16 at 2.* In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93–2 at 58.* The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92,* 139. Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

#### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton,* No. 14–CV–2444, 2015 WL 8919463, at *5 (D.S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim,

I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

#### b. *Plaintiff's Free Exercise Claim ( Regarding his Religious Dietary Restrictions) Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17** While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden [, however,] remains with the prisoner to 'show that these penological concerns

were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

20    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v. Strada,* 249 Fed.Appx. 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious

meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify*, 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do not give rise to a First Amendment claim." (citing cases)); *Evans v. Albany Cnty. Corr. Facility*, No. 05–CV–1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally de minimis); *Odom v. Dixion*, No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an opportunity to file a second motion for summary judgment specific to this remaining claim.

### IV. *SUMMARY AND RECOMMENDATION*
A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend

Case 9:13-cv-00321-MAD-TWD   Document 91   Filed 02/28/18   Page 71 of 104
**Brandon v. Schroyer, Not Reported in F.Supp.3d (2016)**
2016 WL 1638242

that cause of action survive defendant Schroyer's motion but he be permitted to file a second motion for summary judgment addressing it. Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (*Dkt. No. 75*) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1638242

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2728443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George WHITE, Plaintiff,

v.

L. SEARS, Doctor Cholom, Doctor
Ali, and Nurse Montroy, Defendants.

No. 9:10–CV–0721 (MAD/GHL).
|
June 20, 2011.

George White [1], Locus Grove, VA, pro se.

[1]   Plaintiff has been released from incarceration. Dkt. No. 19; 12/6/10 Text Entry.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Christina L. Roberts–Ryba, Esq., of Counsel, Albany, NY, for Defendants.

**Attorneys and Law Firms**

George White, Locus Grove, VA, pro se.

Christina L. Roberts–Ryba, New York State Attorney General, Albany, NY, for Defendants.

**Opinion**

### *REPORT–RECOMMENDATION–ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff George White alleges that he was denied adequate medical care in deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights under the United States Constitution. Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 16. The Court granted Plaintiff two extensions of time in which to submit a response. Dkt. Nos. 17, 18, 19, Text Order 10/28/10. No response was submitted. Defendants also submitted a supplemental request to dismiss. Dkt. No. 20. For the reasons that follow, I recommend that Defendants' motion to dismiss and supplemental request to dismiss be granted. In addition, I recommend that Plaintiff be permitted leave to amend his complaint.

## I. BACKGROUND

### A. Summary of the Complaint

The complaint and the documents [2] attached to Plaintiff's complaint provide the following:

[2]   When determining whether a complaint fails to state a claim, a court may review exhibits attached to the complaint and any documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)).

On May 8, 2007, prior to being incarcerated, Plaintiff injured his right shoulder and arm at work when a glass window fell on his arm, severing tendons. Dkt. No. 1–2 at 29. Plaintiff underwent surgery and physical therapy. Dkt. No. 1–2.

On June 4, 2008, Baburao Doddapaneni, M.D., recommended that based on her year-long observation, Plaintiff required "symptomatic treatments" two times per week during exacerbations of his symptoms. Dkt. No. 1–2 at 3. She indicated that his prognosis was "guarded" and that he had a "permanent disability." *Id.* at 4.

On July 18, 2008, Plaintiff was sentenced to a period of 2½ to 5 years of incarceration after pleading guilty to committing burglary. Dkt. No. 1 at ¶ 11; Dkt. No. 1–1 at 10. The sentencing judge noted on Plaintiff's commitment papers that medical attention was required. *Id.;* Dkt. No. 1–1 at 10.

### 1. Allegations Regarding Dr. Cholom and Dr. Ali

On July 28, 2008, at Ogdensburg Correctional Facility ("Ogdensburg C.F."), Dr. Cholom and Dr. Ali began treating Plaintiff for his right shoulder and arm issues. Dkt. No. 1 at ¶ 12. After eight physical therapy sessions, Dr. Cholom and Dr. Ali concluded that Plaintiff no longer needed to attend physical therapy. *Id.* at ¶ 31.

In addition, Dr. Cholom prescribed Naproxen[3] to Plaintiff for pain relief. Dkt. No. 1 at ¶ 39. Plaintiff claims that this medication is known to cause internal bleeding. *Id.* Plaintiff alleges that this medication caused him to experience stomach pain. *Id.*

[3]       Naproxen is a nonsteroidal anti-inflammatory drug used to relieve inflammation, swelling, stiffness, and joint pain. *The PDR Pocket Guide to Prescription Drugs* 914 (7th ed.2005).

On February 23, 2010, Plaintiff filed an inmate grievance. Dkt. No. 1–1 at 1–2. In the grievance, he stated the following:

> I have chronic ongoing medical problems with my right shoulder and arm. I have a court ordered medical required[.] [T]he medical staff here at Ogdensburg CF have neglected to continue my [physical therapy] or schedule a specialist consult. My injury is getting worse everyday[.] [I]t's to the point where I can bar[ely] lift the arm or use it without pain.

**\*2** Dkt. No. 1–1 at 2.

On March 9, 2010, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance be denied. Dkt. No. 1–1 at 5. On March 17, 2010, the Superintendent concurred with the recommendation of the IGRC. Dkt. No. 1–1 at 2. On May 12, 2010, the Central Office Review Committee ("CORC") upheld the determination of the Superintendent. Dkt. No. 1–2 at 31.

Plaintiff also stated that in the interim, on or about April 13, 2010, he filed another grievance "with similar (but not the same) concerns involving his medical conditions." Dkt. No. 1 at ¶ 51 (citing Dkt. No. 1–2 at 30). The IGRC recommended that the grievance be denied. *Id.*

### 2. Allegations Regarding Nurse Montroy

First, Plaintiff appears to allege that in response to the initial grievance, Nurse Montroy reviewed his medical records and incorrectly concluded that his grievance was unfounded. Dkt. No. 1 at ¶ 18.

Second, Plaintiff alleges that on April 5, 2010, he "dropped a sick call slip to inform [a] physician that the medication prescribed [sic] w[as] causing stomach problems." Dkt. No. 1 at ¶ 40. In response, Plaintiff saw Nurse Montroy, who "simply told [P]laintiff to stop taking" the medication. *Id.* Plaintiff also informed Nurse Montroy that he was experiencing shoulder pain. *Id.* at ¶ 45. Plaintiff claims that Nurse Montroy "once again told [P]laintiff that he was scheduled to see a doctor;" however Plaintiff has been waiting for more than two months to see a doctor. *Id.* at ¶ 40.

### 3. Allegations Regarding Defendant Superintendent L. Sears

Plaintiff has named Superintendent L. Sears, who was the superintendent of the facility at the relevant time, as a defendant. Dkt. No. 1 at ¶ 4. Plaintiff alleges that Defendant Sears denied Plaintiff's grievance. *Id.* at ¶ 51.

### B. Defendants' Response

Defendants argue that the deliberate indifference claim should be dismissed against Dr. Cholom, Dr. Ali, and Nurse Montroy because Plaintiff fails to meet the standard for deliberate indifference. Dkt. No. 16–2. Defendants also argue that the Court should dismiss Superintendent Sears because Plaintiff failed to allege his personal involvement, which is required in order to succeed on a § 1983 claim. *Id.*

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ─── U.S. ───, ───, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court

to draw on its judicial experience and common sense....
[W]here the well-pleaded facts do not permit the court to
infer more than the mere possibility of misconduct, the
complaint has alleged—but it has not shown—that the
pleader is entitled to relief." *Id.* at 1950 (internal citation
and punctuation omitted).

**\*3** "In reviewing a complaint for dismissal under Rule
12(b)(6), the court must accept the material facts alleged
in the complaint as true and construe all reasonable
inferences in the plaintiff's favor ." *Hernandez v. Coughlin,
18 F.3d 133, 136 (2d Cir.1994)* (citation omitted). Courts
are "obligated to construe a *pro se* complaint liberally."
*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However,
"the tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to
legal conclusions. Threadbare recitals of the elements of a
cause of action, supported by mere conclusory statements,
do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Where a *pro se* complaint fails to state a cause of action,
the court *generally* "should not dismiss without granting
leave to amend at least once when a liberal reading of
the complaint gives any indication that a valid claim
might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112
(2d Cir.2000) (internal quotation and citation omitted).
Of course, an opportunity to amend is not required
where the plaintiff has already amended the complaint.
*See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16
F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to
amend where plaintiff had already amended complaint
once). In addition, an opportunity to amend is not
required where "the problem with [the plaintiff's] causes of
action is substantive" such that "better pleading will not
cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## III. ANALYSIS

### A. Eighth Amendment

Plaintiff alleges that Dr. Cholom, Dr. Ali, and Nurse
Montroy insufficiently treated his condition despite
having copies of reports from his prior physician and
despite the notation made on his sentencing report that
medical attention was required. Dkt. No. 1 at ¶¶ 24, 31,
35, 45. Plaintiff also alleges that Dr. Cholom and Dr.
Ali improperly discontinued physical therapy and denied
Plaintiff access to medical specialists. *Id.* at ¶ 13.

As noted, Defendants argue that Plaintiff has made
an insufficient showing of an Eighth Amendment claim
against Dr. Cholom, Dr. Ali, and Nurse Montroy. Dkt.
No. 16–2 at 2–4.

The Eighth Amendment to the United States Constitution
prohibits "cruel and unusual" punishments. The word
"punishment" refers not only to deprivations imposed as a
sanction for criminal wrongdoing, but also to deprivations
suffered during imprisonment. *Estelle v. Gamble,* 429
U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
Punishment is "cruel and unusual" if it involves the
unnecessary and wanton infliction of pain or if it is
incompatible with "the evolving standards of decency that
mark the progress of a maturing society." *Estelle,* 429
U.S. at 102. Thus, the Eighth Amendment imposes on
jail officials the duty to "provide humane conditions of
confinement" for prisoners. *Farmer v. Brennan,* 511 U.S.
825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In
fulfilling this duty, prison officials must ensure, among
other things, that inmates receive adequate medical care.
*Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S.
517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*4** There are two elements to a prisoner's claim that
prison officials violated his Eighth Amendment right to
receive medical care: "the plaintiff must show that she or
he had a serious medical condition and that it was met with
deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63,
72 (2d Cir.2009) (citation and punctuation omitted). "The
objective 'medical need' element measures the severity of
the alleged deprivation, while the subjective 'deliberate
indifference' element ensures that the defendant prison
official acted with a sufficiently culpable state of mind."
*Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

Medical mistreatment rises to the level of deliberate
indifference only when it "involves culpable recklessness,
*i.e.,* an act or a failure to act ... that evinces 'a conscious
disregard of a substantial risk of serious harm.'% 7D'
*Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,*
511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811
(1994)). Thus, to establish deliberate indifference, an
inmate must prove that (1) a prison medical care provider
was aware of facts from which the inference could be
drawn that the inmate had a serious medical need; and
(2) the medical care provider actually drew that inference.
*Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–
703. The inmate then must establish that the provider

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    3

consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.") However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

### 1. Serious Medical Conditions

Regarding the objective component, the complaint alleges that Dr. Cholom, Dr. Ali, and Nurse Montroy provided Plaintiff with inadequate or no medical care after learning of Plaintiff's arm and shoulder pain, and liberally construing the complaint, after Nurse Montroy learned of Plaintiff's "stomach problems." Dkt. No. 1. Defendants failed to address whether Plaintiff's shoulder, arm, and stomach problems are serious medical conditions.

**\*5** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. This "inquiry must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

### a. Right Shoulder and Arm

As noted, prior to incarceration, Plaintiff injured his right shoulder and arm when a glass window fell on his arm, severing tendons and requiring surgery and further treatment. Dkt. No. 1–2 at 29. His physician found that Plaintiff's prognosis was guarded and that he had a permanent disability, and recommended that he continue to receive physical therapy. Dkt. No. 1–2.

Once at Ogdensburg C.F., Plaintiff was seen by Dr. Cholom and Dr. Ali, who referred Plaintiff to physical therapy, which he attended in 2008 and 2009. Dkt. No. 1; Dkt. No. 1–1 at 9. Dr. Cholom also prescribed a pain reliever. Dkt. No. 1 at ¶ 39. Nurse Montroy indicated that the physical therapist reported that Plaintiff's symptoms had decreased and his condition was much improved. *Id.* She also indicated that Plaintiff saw a doctor on twelve occasions from July 9, 2009, to February 25, 2010, and that an x-ray showed that the services of an orthopedist were not required. [4] *Id.*

[4]  Plaintiff claims that he never underwent x-ray testing while at Ogdensburg C.F. Dkt. No. 1 at ¶ 15.

However, Plaintiff alleges that once physical therapy was discontinued, he experienced "excruciating pain," tightening of the muscles, and loss of range-of-motion. Dkt. No. 1 at ¶ 5; *see* ¶¶ 27, 37. Plaintiff claims that he has become "lame with a lot of discomfort" and that he experienced severe pain in his shoulder and collarbone as a result of having to wait for more than two months to see a physician. *Id.* at ¶¶ 28, 34, 36, 40. Plaintiff asserts that his condition also was exacerbated by the work he performed as part of the "lawns and ground crew" and as a gym porter. *Id.* at ¶¶ 48, 49.

In light of the foregoing, I find that Plaintiff's arm and shoulder pain was a serious medical condition. [5] Plaintiff complained to Dr. Cholom, Dr. Ali, and Nurse Montroy about his shoulder and arm pain. *See* Dkt. No. 1 at ¶¶ 12, 39, 45. He attended "numerous" physical therapy sessions. Dkt. No. 1–1 at 9. Later, he was prescribed pain medication, which he continued to take despite resulting stomach problems. Dkt. No. 1 at ¶ 39.

[5]  *See Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and]

reduced mobility" in the shoulder are sufficient to raise a material issue of fact as to a serious medical need); *Goros v. Cent. Office Review Comm.,* No. 03 Civ. 407, 2006 WL 2794415, at *6 (N.D.N.Y. Sept. 26, 2006) (plaintiff's allegations of "worsening pain" in his left shoulder and legs may establish a sufficiently serious medical need); *Guarneri v. Bates,* 05 Civ. 444(GLS)(DRH), 2008 WL 686809, at *5 (N.D.N.Y. Mar. 10, 2008) (shoulder injury constitutes a serious medical need where plaintiff contends that his alleged rotator cuff tear left him in severe pain and that he could not move his arm).

**b. Stomach Pain**

**\*6**  Plaintiff states that he "is having *a lot* of pain in his stomach due to [his] medication," yet he continues to take the medication because "it is the only relief" he can find for his shoulder and arm pain and because he is unable to change medications until a physician will see him. Dkt. No. 1 at ¶¶ 39, 40 (emphasis added). Liberally construing the complaint, I find that Plaintiff has alleged a serious medical condition.[6] Plaintiff alleged that he experiences "a lot" of pain in his stomach, which suggests that this condition is somewhat urgent or serious.

[6]  *See Pender v. McClellan,* No. 94–CV–413S, 1996 WL 343253, at *4 (W.D.N.Y. Feb.5, 1996) (dismissing Eighth Amendment claims based on stomach pain when there was *no* allegation that plaintiff's condition was urgent or otherwise serious).

**2. Deliberate Indifference**

Plaintiff alleges that Dr. Cholom, Dr. Ali, and Nurse Montroy were aware that Plaintiff had a serious medical need, but refused to provide sufficient medical treatment. Dkt. No. 1. Defendants argue that Plaintiff "has not alleged or established that [D]efendants were 'aware of facts from which the inference could be drawn' that a substantial risk of serious harm existed,' nor did [D]efendants draw the inference and ignore it." Dkt. No. 16–2 at 3 (citation omitted).

Plaintiff has failed to establish that Dr. Cholom, Dr. Ali, and Nurse Montroy acted with deliberate indifference in treating Plaintiff's right shoulder, arm, and stomach pain. Dr. Cholom and Dr. Ali saw Plaintiff and referred him to physical therapy. Dkt. No. 1 at ¶ 12. Nurse Montroy noted that Plaintiff's physical therapist indicated that Plaintiff's condition improved. Dkt. No. 1–1 at 9. Nurse Montroy also indicated that Plaintiff was seen by a

doctor on twelve different occasions from July 9, 2009, to February 25, 2010. *Id.* In addition, Dr. Ali prescribed pain medication to Plaintiff and upon Plaintiff's subsequent complaints of resulting stomach pain, Nurse Montroy saw Plaintiff and advised him to discontinue taking the medication. Dkt. No. 1 at ¶ 39, 40. Rather than showing a "conscious disregard" to Plaintiff's serious medical needs, the record demonstrates that medical staff appropriately responded to Plaintiff's complaints. Even if prescribed treatments were not successful in alleviating Plaintiff's pain, it cannot be said that Dr. Cholom, Dr. Ali, and Nurse Montroy acted with deliberate indifference. *See Williams v. Koenigsmann,* No. 03 Civ. 5267, 2004 WL 315279, at *6 (S.D.N.Y. Feb. 18, 2004).

Although Plaintiff disagrees with judgments made by Dr. Cholom, Dr. Ali, and Nurse Montroy, "mere disagreement over proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703.

The complaint also indicates that Plaintiff has been waiting to see a physician for more than two months. Dkt. No. 1 at ¶ 36. This delay does not rise to the level of an Eighth Amendment violation as a "delay in medical treatment does not necessarily invoke the Eighth Amendment." *Morrison v. Mamis,* No. 08 Civ. 4302(PAC)(AJP), 2008 WL 5451639, at *7 n. 19 (S.D.N.Y. Dec. 18, 2008) (Peck, M.J.). Delayed treatment amounts to deliberate indifference when "officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Id.* (citing *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), (published in full-text format at 1999 U.S.App. LEXIS 22955, at *5, 1999 WL 753142, at *2 (2d Cir. Sept.17, 1999)). Here, any delay in treatment does not rise to the level of deliberate indifference. In fact, when Plaintiff "dropped his sick call slip," Nurse Montroy responded to Plaintiff's concerns. Dkt. No. 1 at ¶¶ 39, 40.

**\*7**  To the extent that Plaintiff claims that Dr. Cholom erred by prescribing Naproxen because this medication is known to cause internal bleeding, Dkt. No. 1 at ¶ 39, this accusation is speculative and unsupported. Without more, it cannot be said that Dr. Ali's actions

amounted to deliberate indifference. *See Bryant v. Wright,* No. 09 Civ. 2456, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010)* ("The mere fact that the generic medication has 'side effects,' ... is certainly insufficient to state a deliberate indifference claim ..."). Moreover, "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." *Wright,* 694 F.Supp.2d at 160 (citing cases).

Accordingly, I recommend that the deliberate indifference claims against Dr. Cholom, Dr. Ali, and Nurse Montroy be dismissed.

### 2. Personal Involvement

Defendants argue that Superintendent Sears should be dismissed because Plaintiff fails to set forth specific allegations against him. Dkt. No. 16–2 at 4–5. Defendants argue that "it appears that [D]efendant Sears is being sued solely because he is the Superintendent of Ogdensburg." *Id.* at 5.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (*i.e.,* under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been

grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*8** Here, Plaintiff simply states that Superintendent Sears was the superintendent of the facility at the relevant time, and that he denied Plaintiff's grievance. Dkt. No. 1 at ¶¶ 4, 51.

To the extent that Superintendent Sears is named as a defendant simply because he allegedly was the superintendent during the relevant time, as noted, supervisory officials may not be held liable merely because they held a position of authority. *Black,* 76 F.3d at 74.

To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement. *See Hatzfeld v. Eagen,* No. 9:08–CV–283 (LES/DRH), 2010 WL 5579883, at *5 (N.D.N.Y. Dec.10, 2010)* (Homer, M.J.) ("Merely denying a prisoner's grievance 'is insufficient to establish personal involvement.' ") (quoting *Mercer v. Benson,* No. 08–cv–537 (DNH/DRH), 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009)* (Homer, M .J.) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). There are no allegations that Superintendent Sears did anything more than concur with the conclusion of the IGRC. Therefore, Plaintiff has failed to establish personal involvement. *Joyner,* 195 F.Supp.2d at 506 (finding no personal involvement where the complaint "merely states that [the superintendent] affirmed the denial of [the plaintiff's] grievance"). Moreover, it is not alleged that Superintendent Sears is a doctor, or that he personally provided (or was capable of providing) Plaintiff with medical care. Further, there are no allegations that Superintendent Sears created an unconstitutional policy or custom, or was grossly negligent in supervising others. Thus, Plaintiff has failed to establish personal involvement.

I note that Plaintiff claims that the Program Committee at the facility assigned Plaintiff to work on the "lawn and grounds crew" and as a "gym porter," which exacerbated his condition. Dkt. No. 1 at ¶¶ 48, 49. There is no indication that Superintendent Sears was involved in the decisions of the Program Committee. Therefore,

Superintendent Sears cannot be deemed personally involved in the decisions of the Program Committee.

Accordingly, I recommend that the claims against Defendant Sears be dismissed due to his lack of personal involvement.

### 3. Leave to Amend

As noted, where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, Plaintiff has not yet amended his complaint. Moreover, nothing on the face of the complaint suggests that amendment would be futile. Therefore, I recommend that Plaintiff be granted leave to amend.

**\*9 ACCORDINGLY,** it is

**RECOMMENDED,** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be *GRANTED;* and it is further

**RECOMMENDED,** that Defendants' supplemental request to dismiss (Dkt. No. 20) be *GRANTED;* and it is further

**RECOMMENDED,** that Plaintiff may file an amended complaint *within thirty (30) days* of the filing date of any Order adopting this Report and Recommendation; and it is further

**RECOMMENDED,** that if Plaintiff fails to timely file an amended complaint, the Clerk enter judgment dismissing this action without further order of this Court due to Plaintiff's failure to comply with the terms of any Order adopting this Report and Recommendation; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only decisions cited herein on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 2728443

---

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Keitt v. Schun, Not Reported in F.Supp.3d (2014)
Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 79 of 104
2014 WL 347053

2014 WL 347053
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Devin KEITT, Plaintiff,
v.
A. SCHUN, et al., Defendants.

No. 11–CV–438.
|
Jan. 30, 2014.

**Attorneys and Law Firms**

Stormville, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

**Opinion**

DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The above-referenced case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B). Defendants filed an unopposed motion to dismiss plaintiff's amended complaint pursuant to 28 U.S.C. § 1915A and Rules 12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure. Defendants also moved for a stay of all proceedings pending resolution of the motion to dismiss. On September 19, 2013, Magistrate Judge McCarthy issued a Report and Recommendation recommending that the motion to dismiss be granted in part and denied in part, and ordered that the motion for a stay be granted.

On October 9, 2013 plaintiff filed objections to those portions of the Report and Recommendation which recommended that certain of his claims be dismissed. Defendants filed a reply on October 30, 2013. The Court deemed the matter submitted without oral argument.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon *de novo* review, and after reviewing the submissions

of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, defendants' motion to dismiss the amended complaint is denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but is otherwise granted.

The matter is referred back to Magistrate Judge McCarthy for further proceedings.

SO ORDERED.

**REPORT, RECOMMENDATION, ORDER**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including preparation of a Report and Recommendation on dispositive motions [18].[1] Before me is defendants' unopposed motion [39] to dismiss the Amended Complaint pursuant to 28 U.S.C. § 1915A and Fed.R.Civ.P. ("Rules") 12(b)(1), (2), and (6), and for a stay of all proceedings pending resolution of the motion.[2] For the following reasons, I recommend that the motion to dismiss be granted in part and denied in part, and order that the motion for a stay is granted.

[1]    Bracketed references are to the CM/ECF docket entries.

[2]    Although defendants move to dismiss the Amended Complaint [29] pursuant to Rules 12(b)(1) and (b)(2), they do not argue that either subject-matter or personal jurisdiction are lacking.

**BACKGROUND**

Plaintiff, an inmate in the custody of the New York State Department of Correction and Community Supervision ("DOCCS") commenced this action *pro se* by Complaint filed May 20, 2011[1]. Defendants initially moved to dismiss the Complaint [14], and plaintiff responded by cross-moving [21] for leave to file an Amended Complaint

seeking to add two new defendants. At a conference held on July 5, 2012, I denied plaintiff's motion for leave to amend [21] "as moot, since plaintiff [could] amend as of right", and defendants' motion to dismiss the Complaint [14] was withdrawn, without prejudice to their right to move against the Amended Complaint. July 6, 2012 Text Order [28]. Plaintiff filed an Amended Complaint [29] on July 11, 2012.

**\*2** Plaintiff's Amended Complaint centers on the medical treatment he received while incarcerated at Attica Correctional Facility. According to plaintiff, a bullet is lodged in his head, causing him to suffer "chronic" and "substantial pain" that hinders his ability to sleep or engage in physical activity. Amended Complaint [29], ¶¶ 17, 19. A pain management specialist who treated plaintiff in December of 2004 for his complaints that Tylenol and Motrin were causing gastrointestinal distress, including "blood in [his] underwear" (*id.,* ¶ 20), prescribed certain pain relievers, including Ultracet, "Morin", Neurontin, and Pepcid. *Id.* ¶ 21, p. 33 of 43. At the two facilities where he was housed prior to being transferred to Attica, plaintiff was prescribed the recommended medications. *Id.,* ¶¶ 22–23.

However, when he arrived at Attica on October 19, 2010, plaintiff was examined by defendant Schunh, [3] a "medical provider", who informed him that she was "not going to give pain medication for migraine headache" and was "withdraw[ing][the] treatment that was prescribed by [the] pain management [specialist]". *Id.,* ¶ 24. [4] Instead, she offered him Tylenol and Motrin, despite "being aware that ... [it] causes [him] '*distress'* ". *Id.,* ¶ 37 (emphasis in original). When plaintiff requested a second opinion, defendant Schunh told him that "she doesn't care who else Plaintiff speaks to about issue.... [S]he's going to make sure as long as plaintiff is in the facility, none of her co-workers is going to go against her". *Id.,* ¶ 26.

[3]    Whereas the Amended Complaint identifies this individual as "Schun", it's spelled "Schunh" by defendants.

[4]    Where the full names of the defendants are not contained in the record, I have identified them by their surnames.

Plaintiff repeats these allegations against several doctors at Attica, including Dr. Evans, who examined him on November 19, 2010 (*id.,* ¶ 41), Jadow Rao, M.D., who

examined him on December 9, 2010 (*id.,* ¶ 64), and Dr. Kowski, who examined him on December 1, 2011 (*id.,* ¶ 83). He also alleges that he informed defendants Nurse Administrator Killinger, Superintendent Mark Bradt, and DOCCS's Commissioner Brian Fischer, that he was intentionally being denied treatment that was prescribed by a pain management specialist, but that they failed to remedy the wrong. *Id.,* ¶¶ 101–108, 115, 122–132, 137–154.

Plaintiff alleges that he was denied pain medication "because of the color of his skin" (*id.,* ¶ 30), and as a penalty for "exercising the right of free speech" (*id.,* ¶¶ 32, 48, 75, 94, 108, 126, 155). He alleges that he "is a member of racial minority[.] The defendant intended to discriminate on the basis of race[.] This discrimination concerned the rights to make and enforce contacts to sue both parties; give evidence and the full [*sic* ] and equal benefits of all laws and proceedings for security of persons and property." *Id.,* ¶¶ 56, 74, 93, 107, 127, 154. He also alleges that defendants "carried out a malicious retaliation against [him] because of the color of his skin. *Id.,* ¶¶ 73, 92, 106, 125, 153. According to plaintiff, defendants collectively

**\*3** "conspired to deprive [him] of the equal protection of the laws or privileges and immunities under the laws with avert act in furtherances[*sic* ] of the conspiracy and injury to the privilege of a citizen of the United States; some racial or perhaps otherwise class-based, invious [*sic* ] discriminatory animus." *Id.,* ¶¶ 31, 60, 79, 105.

Plaintiff's action is brought pursuant to "42 U.S.C. § 1981, 1983, 1985, 1986, 1988, civil rights first, eighth, fourteenth amendment, Discrimination, deliberate indifference, equal protection, failure to protect, and due process, cruel and unusual punishment." *Id.,* ¶ 1. [5] Each of the defendants are named in their individual and official capacities (*id.,* ¶¶ 16, 40, 63, 82, 100, 122, 137), and plaintiff seeks compensatory and punitive damages (*id.,* ¶ 157).

[5]    Plaintiff's "Section 1988 claim for attorney's fees ... fails because the statute is not an independent cause of action". *Reid v. Toyota Motor Credit Corp.,* 2013 WL 3776201, *2 (S.D.N.Y.2013).*

After defendants filed this motion, I appointed Attorney James Greco to represent plaintiff and set a briefing schedule on the motion to dismiss, giving plaintiff until November 30, 2012 to respond. October 3, 2012 Text

Keitt v. Schun, Not Reported in F.Supp.3d (2014)
Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 81 of 104
2014 WL 347053

Order [44]. To date, no response or motion for an extension of the November 30, 2012 deadline has been filed. Nevertheless, I "cannot grant a motion to dismiss solely on the ground that it is unopposed. Rather, where a Rule 12(b) motion has not been opposed, this Court must review the merits of the motion and determine whether the movant has carried its burden." *Foster v. Phillips,* 2005 WL 2978686, *3 (S.D.N.Y.2005). *See McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal"). [6]

[6]    Under 28 U.S.C. § 1915A(a), a district court "shall review ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and it "shall" dismiss the complaint (or any portion thereof) if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted." *Id.* § 1915A(b)(1). Since Section 1915A's third ground for dismissal—legal sufficiency—is identical to the dismissal standard under Federal Rule of Civil Procedure 12(b)(6)" *McGhie v. Main,* 2011 WL 4852268, *1 (E.D.N.Y.2011), I have addressed defendants' motion only under the Rule 12(b)(6) standard.

## ANALYSIS

### A. Motion to Dismiss

#### 1. 42 U.S.C. § 1981

Defendants argue that plaintiff's 42 U.S.C. § 1981 claim must be dismissed because plaintiff "fails to allege any contract right ... nor any infringement on his ability to give evidence, nor a causal link between the defendants' actions and the plaintiff's race." Defendants' Memorandum of Law [40], p. 10. I agree.

42 U.S.C. § 1981 provides that "[a]ll persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens". 42 U.S.C. § 1981(a). "The essential elements of the claim are actions that were racially motivated and purposefully discriminatory." *Dove v. Fordham University,* 56 F.Supp.2d 330, 338 (S.D.N.Y.1999), *aff'd,*

210 F.3d 354 (2d Cir.2000) (Summary Order). In pleading a claim arising under § 1981, "[c]onclusory or naked allegations will not suffice .... Fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required." *Id.*

Plaintiff's conclusory allegations parroting the language of § 1981, which fail to include fact-specific conduct linking defendants' alleged deliberate indifference to his race, are insufficient to state a claim. Coupled with the absence of specific facts supporting his claim that defendants' conduct was racially motivated, plaintiff offers other reasons for the conduct that he experienced, including retaliation, and is equivocal as to whether this conduct was motivated by race, alleging that "some racial or perhaps otherwise class-based, invious [*sic* ] discriminatory animus" was to blame. Amended Complaint [29], ¶¶ 31, 60, 79, 105. [7] Since "a complaint that sets forth other possible motives for the alleged conduct, and does not contain specific facts supporting a claim of racial animus, contradicts a claim of racial discrimination", *Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC,* 2013 WL 417406, *9 (S.D.N.Y.2013), I recommend that this claim be dismissed.

[7]    Although not raised by defendants, it is questionable whether plaintiff's § 1981 claim is viable in its current form. "Plaintiff cannot assert a claim under 42 U.S.C. § 1981 because 42 U.S.C. § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.... Defendants here are state actors. Therefore, Plaintiff's claims cannot be raised under 42 U.S.C. § 1981." *Hughes v. Butt,* 2009 WL 3122952, *11 (N.D.N.Y.2009) (citing *Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). *See Wynder v. McMahon,* 2013 WL 1759968, *5 (E.D.N.Y.2013) ("When a plaintiff alleges § 1981 and § 1983 claims for the same conduct, a court may dismiss the § 1981 claim or deem it merged with the § 1983 claim; the result, in practice, is the same"). "Courts have interpreted this prohibition to extend to actions against individual defendants in their individual capacities." *Rehman v. State University of New York at Stony Brook,* 596 F.Supp.2d 643, 654 (E.D.N.Y.2009).

#### 2. Equal Protection

*4    Defendants argue that plaintiff's conclusory allegations of racial discrimination likewise fail to state

an equal protection claim. Defendants' Memorandum of Law [40], pp. 10–11. I agree.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race ." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "In order to plead a facially valid equal protection claim, however, plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right." *Nash v. McGinnis,* 585 F.Supp.2d 455, 462 (W.D.N.Y.2008) (Larimer, J.). "Conclusory allegations of disparate treatment or plaintiff's personal belief of discriminatory intent is insufficient." *Id.*

Here, plaintiff only sets forth conclusory allegations of discriminatory intent. He also fails to allege that he was treated differently from other similarly situated inmates. Therefore, I recommend that this claim be dismissed.

### 3. Conspiracy

Defendants argue that this claim must be dismissed because the Amended Complaint "is devoid of any factual allegations that plausibly suggest a meeting of the minds or agreement between any of the defendants". Defendants' Memorandum of Law [40], p. 15. I agree.

"In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003), *cert. denied,* 540 U.S. 1110, 124 S.Ct. 1077, 157 L.Ed.2d 897 (2004). [8] "To survive a motion to dismiss, plaintiff must include some facts in his complaint tending to show that defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated his rights, privileges, or immunities secured by the Constitution or federal courts." *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 295 (S.D.N.Y.2005). At best, plaintiff alleges that Schunh stated that her co-workers would not "go against her". Amended Complaint [29], ¶ 26. However, he has "not alleged, except in the most conclusory fashion, that any such meeting of the minds

occurred among any or all of the defendants." *Webb,* 340 F.3d at 111.

| 8 | "The plaintiffs' [conspiracy] claim under 42 U.S.C. § 1983, ... should actually be stated as a claim under Section 1985, which applies specifically to conspiracies." *Webb,* 340 F.3d at 110. |

"As for the § 1986 claim, no such claim lies unless there is a viable conspiracy claim under § 1985." *Abdi v. Brookhaven Science Associates, LLC,* 447 F.Supp.2d 221, 227 (E.D.N.Y.2006). Therefore, I recommend that plaintiff's §§ 1985 and 1986 conspiracy claims be dismissed.

### 4. Retaliation

Defendants argue that this claim is "nonsensical" since his grievance, which was filed *after* the termination of his pain medication, could not have prompted the decision to terminate his pain medication. Defendants' Memorandum of Law [40], p. 17.[9] I agree. To establish retaliation, "the plaintiff must prove that the alleged retaliatory action would not have been taken but for his having exercised his constitutional rights." *Andino v. Fischer,* 698 F.Supp.2d 362, 382 (S.D.N.Y.2010). Here, the challenged action occurred prior to his grievance, so it clearly could not have been taken in response to his grievance. [10] Although plaintiff's claim against defendant Schunh is also premised on her retaliation arising from his request for a second opinion (Amended Complaint [29], ¶ 32), this too, occurred after she had decided to terminate his pain medications. Therefore, I recommend that this claim be dismissed.

| 9 | It appears that plaintiff's grievance was not filed until December 16, 2010. Amended Complaint [29], p. 31 of 43. This was after he was seen by Schunh, Dr. Evans and Dr. Rao. |

| 10 | If plaintiff's claim is that defendants continued to deprive him of pain medication after he filed his grievance in retaliation for that grievance, that is not evident from the allegations of the Amended Complaint as it is currently pled. |

### 5. Due Process

**\*5** Defendants argue that other than plaintiff's conclusory claim that plaintiff was denied due process (Amended Complaint [29], ¶ 1), he "fails to complain about either a procedural or substantive due process

violation." Defendants' Memorandum of Law [40], p. 18.
I agree, and recommend that this claim be dismissed.

**6. Deliberate Indifference**

Defendants argues that "[a]s the very exhibits plaintiff
relies upon demonstrate, he was actually continued on
Ultram and then weaned off of it. Thereafter, he was
prescribed a non-prescription pain reliever with food.
That he preferred a prescription narcotic at a higher dose
does not make for a claim of constitutional dimension".
Defendants' Memorandum of Law [40], p. 14. I disagree.

In order to establish a violation of the Eighth Amendment
arising out of inadequate medical treatment, plaintiff must
prove that defendants acted with "deliberate indifference
to [his] serious medical needs". *Estelle v. Gamble,* 429
U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The
"deliberate indifference" standard has both objective and
subjective components. *Hathaway v. Coughlin,* 37 F.3d
63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115
S.Ct. 1108, 130 L.Ed.2d 1074 (1995). To satisfy the
objective component, the alleged medical need must be
"sufficiently serious." *Id.* A "sufficiently serious" medical
need is "a condition of urgency, one that may produce
death, degeneration, or extreme pain." *Id.* "Factors that
have been considered include the existence of an injury
that a reasonable doctor or patient would find important
and worthy of comment or treatment; the presence of a
medical condition that significantly affects an individual's
daily activities; or the existence of chronic and substantial
pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d
Cir.1998).

To satisfy the subjective component, plaintiff must show
that the defendant officials acted with a "sufficiently
culpable state of mind" in depriving him of adequate
medical treatment. *Hathaway v. Coughlin,* 99 F.3d
550, 553 (2d Cir.1996). "The subjective element of
deliberate indifference 'entails something more than mere
negligence ... [but] something less than acts or omissions
for the very purpose of causing harm or with knowledge
that harm will result.' " *Id. See also Hernandez v.
Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,*
543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005)
(likening the necessary state of mind to "the equivalent of
criminal recklessness"). In order to be found "sufficiently
culpable," the official must "know[ ] of and disregard[ ] an
excessive risk to inmate health or safety; [he] must both be
aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must
also draw the inference." *Farmer v. Brennan,* 511 U.S. 825,
837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

"[D]isagreements over treatment do not rise to the
level of a Constitutional violation", *Graham v. Gibson,*
2007 WL 3541613, *5 (W.D.N.Y.2007) (Siragusa, J.),
as "[t]he Constitution does not require that an inmate
receive a particular course of treatment". *Tafari v. Stein,*
2009 WL 331378, *7 (W.D.N.Y.), *recon. denied,* 2009
WL 1322317, 2009 WL 1579530 (W.D.N.Y.2009) (Scott,
M .J.). Consequently, "a prison doctor *who relies on his
medical judgment* to modify or disagree with an outside
specialist's recommendation of how to treat an inmate is
not said to act with deliberate indifference." *Williams v.
Smith,* 2009 WL 2431948, *9 (S.D.N.Y.), *recon. denied,*
2009 WL 5103230 (S.D.N.Y.2009) (emphasis added).

**\*6** Accepting plaintiff's allegations as true for
purposes of this motion, they plainly establish that
defendants' decisions in discontinuing plaintiff's prior
pain medications were not based on medical judgments.
I also disagree that plaintiff's claims are belied by the
medical records he attaches to his Amended Complaint.
While these records demonstrate that he was weaned
from Ultram (Amended Complaint [29], p. 32 of 43),
they do not undermine his claim that this medication was
ultimately discontinued in favor of Motrin, a medication
plaintiff alleges defendants knew caused him "distress".
*Id.,* ¶ 37. Therefore, I recommend that this claim not be
dismissed.

**7. Failure to Protect**

Defendants argue that "[w]hile such a claim generally
arises in the context of an attack by another
inmate, [they] assume that plaintiff's sweeping claim
is based on the same medical indifference assertions".
Defendants' Memorandum of Law [40], p. 19. Thus,
they argue that "like the plaintiff's Eighth Amendment
medical indifference claim, plaintiff's 'failure to protect'
claim should be dismissed as well." *Id.* Defendants'
Memorandum of Law [40], p. 19.

However, since I have recommended that plaintiff's
deliberate indifference claim not be dismissed, I likewise
recommend that plaintiff's failure to protect claim not be
dismissed.

**8. Personal Involvement**

Defendants argue that there is insufficient personal involvement alleged to support the claims against Nurse Administrator Killinger, Superintendent Bradt, and Commissioner Fischer. Defendants' Memorandum of Law [40], pp. 19–20. [11]

11    I have analyzed defendants' remaining arguments in light of the claims that I have recommended not be dismissed.

Prior to *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), it had been well settled that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). However, in *Iqbal,* the Supreme Court clouded this issue when it rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution", concluding that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

Since *Iqbal,* some districts courts have determined that not all five of *Colon's* categories of conduct that may give rise to supervisory liability remain viable. *See e.g., Spear v. Hugles,* 2009 WL 2176725, *2 (S.D.N.Y.2009) ("only the first and third *Colon* factors have survived the Supreme Court's decision in *Iqbal" ); Bellamy v. Mount Vernon Hospital,* 2009 WL 1835939, *6 (S.D.N.Y.2009), *aff'd,* 387 Fed. Appx. 55 (2d Cir.2010) (Summary Order) ("The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin.* Iqbal's active conduct standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal's* muster") [12]; *Bryant v. County of Monroe,* 2010 WL 4877799, *3 (W.D.N.Y.2010) (Siragusa, J .) ("The Court ... is persuaded by the analysis of ... Iqbal ... in *Bellamy" ).* [13]

12    "[T]he *Iqbal* issue was not raised on appeal" in *Bellamy. Stresing v. Agostinoni,* 2012 WL 2405240, *4 (W.D.N.Y.2012) (Skretny, J).

13    Adding to the uncertainty, "[t]he Second Circuit has not yet addressed which, if any, of the *Colon* categories survive *Iqbal ." Jamison v. Fischer,* 2012 WL 4767173, *4 (S.D.N.Y.2012). *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) ("Although the Supreme Court's decision in *Ashcroft v. Iqbal* ... may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach *Iqbal's* impact on *Colon* in this case").

**\*7** However, I agree "with the apparent majority view that where, as here, the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." *Shepherd v. Powers,* 2012 WL 4477241, *10 (S.D.N.Y.2012).

**a. Nurse Administrator Killinger**

Plaintiff alleges that on April 18, 201, he sent Nurse Administrator Killinger a letter complaining about the intentional interference with his pain medication. Amended Complaint [29], ¶ 101. The Amended Complaint attaches an April 19, 2011 response from Nurse Administrator Killinger stating "You are scheduled to see a medical clinician to assess your medical concerns". *Id.,* p. 39 of 43.

"The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, *4 (S.D.N.Y.2009). Nevertheless, "[a] supervisor's detailed, specific response to a plaintiff's complaint" may suffice to establish personal involvement. *Mateo v. Fischer,* 682 F.Supp.2d 423, 430–31 (S.D.N.Y.2010); *see Rosario v. Fischer,* 2012 WL 4044901, *5 (S.D.N.Y.), adopted* 2012 WL 6681695 (S.D.N.Y.2012) ("a pro forma response to a letter or grievance" does not

amount to personal involvement); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226 (W.D.N.Y.2006) (Larimer, J.) ("in general personal involvement will not be found unless 'the supervisor's response is detailed and specific' ").

Nurse Administrator Killinger's generalized response to plaintiff's complaint is not sufficient to establish personal involvement. *See Mateo,* 682 F.Supp.2d at 430–31. Beyond this, plaintiff only generally alleges that Nurse Administrator Killinger was informed of the violation through "grievances, appeal, [and] letters". Amended Complaint [29], ¶ 115. However, "the naked assertion ... that he complained to Defendants ... that he was being deprived of reasonable and adequate ... care ... is simply too lacking in factual detail to show that Plaintiff is entitled to relief.... Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints." *Jean–Laurent v. Lane,* 2013 WL 600213, *16 (N.D.N.Y.), *adopted* 2013 WL 5999893 (N.D.N.Y.2013).

Moreover, "where the personal involvement of a defendant in a Section 1983 violation is premised upon a claim of conspiracy, '[i]t is incumbent on a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights.' " *Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009), (*quoting Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990)). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Nurse Administrator Killinger be dismissed.

**b. Superintendent Bradt**

**\*8** Although the Amended Complaint [29] generally alleges that Superintendent Bradt was informed of the violations through "grievances [,] appeal[, and] letters" (Amended Complaint [29], ¶ 132), the only specific communication identified is Superintendent Bradt's January 6, 2011 denial of plaintiff's grievance concerning the termination of his pain medication. *Id.,* ¶ 135, p. 41 of 43. However, "[t]he fact that [the] Superintendent ... affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement". *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). *See Ramos v. Wright,* 2011 WL 2462482, *6 (N.D.N.Y.2011),

*adopted* 2011 WL 2462472 (N.D.N.Y.2011) (dismissing claims against superintendent on personal involvement grounds where "[p]laintiff's sole factual allegation against Defendant Superintendent Smith, [was] that he affirmed the resolution of Plaintiff's institutional grievance and indicated that Plaintiff was receiving adequate medical attention"); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (Larimer, J.) ("To the extent that [Superintendent] Lempke may have, in the course of his official duties, denied or affirmed the denial of certain grievances filed by the plaintiff, 'the denial of [a] plaintiff's grievance—[where that] is all that is alleged against him-is insufficient to establish personal involvement [in a constitutional violation]' by a prison superintendent"); *Ramsey v. Goord,* 2005 WL 2000144, *8 (W.D.N.Y.2005) (Skretny, J.) ("the fact that a prison official in the prison chain of command affirms the denial of an inmate's grievance is not enough to establish the requisite personal involvement of that official"); *Vogelfang v. Capra,* 2012 WL 832440, *7 (S.D.N.Y.2012) ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights"); *White v. Sears,* 2011 WL 2728443, *8 (N.D.N.Y.2011), *adopted* 2011 WL 2728431 (N.D.N.Y.2011) ("To the extent that Superintendent Sears is named as a defendant because he denied Plaintiff's grievance, the denial of Plaintiff's grievance is insufficient to establish personal involvement"). [14] Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Superintendent Bradt be dismissed.

14     *Compare with McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make [the defendant deputy superintendent for administration] liable for the conduct complained of", where the defendant was responsible for the prison's medical program and "allegations of improperly denied medical treatment come to [his] attention ..., his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility").

**c. Commissioner Fischer**

Without identifying any specific grievances, plaintiff alleges that he "sent grievances" to Commissioner Fischer. Amended Complaint [29], ¶ 138. However, there is no

allegation that Commissioner Fischer ever responded to these grievances. "The law is clear ... that a prison official's mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983." *Hidalgo v. Kikendall,* 2009 WL 2176334, *4 (S.D.N.Y.2009). Thus, "[t]he receipt of a prisoner's letter of grievance by a DOCS Commissioner who delegates to other prison officials the task of responding to such complaints is insufficient to establish the Commissioner's personal involvement ." *Spavone v. Fischer,* 2012 WL 360289, *5 (S.D.N.Y.2012). Therefore, I recommend that the remaining deliberate indifference/failure to protect claims against Commissioner Fischer be dismissed.

### 9. Official Capacity Claims

**\*9** Defendants argue that plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. I agree. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983). Therefore, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's official capacity claims.

### 10. Qualified Immunity

Defendants argue that they are entitled to qualified immunity "[g]iven that the ... Eighth Amendment is not violated when an inmate does no receive medication of his choosing ..., defendants had every reason to believe their actions were lawful." Defendants' Memorandum of Law [40], p. 22. I disagree.

Under the qualified immunity doctrine "a defendant is not liable if he did not violate clearly established law or it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). "Thus, government officials are entitled to qualified immunity at the dismissal stage only where it appears on the face of a plaintiff's complaint that they did not violate clearly established rights of which they should have known." *Richardson v. Department of Corrections of N.Y.S.,* 2011 WL 4091491, *4 (S.D.N.Y.2011), *recon. denied,* 2012 WL 76910 (S.D.N.Y.2012). "Usually, the defense of qualified immunity cannot support the grant of a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon which

relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This case is no different.

It is undisputed that the right to be free from deliberate indifference to serious medical needs was clearly established throughout the period of the alleged deliberate indifference. "At this early procedural juncture, accepting plaintiff's allegations as true and drawing all inferences in his favor, I am unable to say that it was objectively reasonable for the defendants to conclude that their actions did not violate plaintiff's clearly established right to be free from deliberate medical indifference." *Taylor v. Goord,* 2010 WL 3825661, *11 (N.D.N.Y.), adopted, 2010 WL 3825656 (N.D.N.Y.2010). *See Briel v. Fields,* 2013 WL 1833248, *4 (E.D.N.Y.2013).

### B. Motion to Stay

Defendants move to stay all proceedings until resolution of their motion to dismiss. Defendants' Notice of Motion [39]. Although there appears to have been no proceedings in this action since the filing of defendants' motion to dismiss, to the extent plaintiff seeks to move forward with discovery while any objections to this Report, Recommendation and Order are pending, a stay is granted.

### CONCLUSION

For these reasons, defendants' motion [39] is granted to the extent it seeks a stay, and I recommend that their motion to dismiss the Amended Complaint be denied to the extent it seeks to dismiss the deliberate indifference/failure to protect claims against defendants Schunh, Dr. Evans, Dr. Rao and Dr. Kowski, in their individual capacities, but otherwise be granted.

**\*10** Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation, and Order must be filed with the clerk of this court by October 7, 2013 (applying the time frames set forth in Rules 6(a)(1) (C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ...

supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 347053

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 88 of 104

Pilgrim v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2011 WL 6031929

2011 WL 6031929
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Prince PILGRIM, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; Brian Fischer,
Commissioner of New York State Department
of Correctional Services, Defendants.

Civ. No. 9:07–CV–1001 (GLS/RFT).
|
Sept. 1, 2011.

**Attorneys and Law Firms**

Prince Pilgrim, Attica, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**Opinion**

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** Prince Pilgrim, a New York state prison inmate
proceeding *pro se* and *in forma pauperis,* commenced
this action pursuant to 42 U.S.C. § 1983 and the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"). Dkt. No. 1, Compl. On April 20, 2009,
Defendants filed a Motion for Summary Judgment
(Dkt. No. 36), which Plaintiff opposed (Dkt. No. 47).
On March 18, 2010, this Court issued a Report and
Recommendation granting Defendants' Motion in part
and denying it in part. Dkt. No. 50. Over objections
by both party opponents (Dkt. Nos. 55 & 56), on
September 17, 2010, the Honorable Gary L. Sharpe,
United States District Judge, adopted the Report and
Recommendation in its entirety. Dkt. No. 57, Order.
Pursuant to this Order, the claims against Defendant
Dale Artus, the Superintendent of Clinton Correctional
Facility, were dismissed for lack of personal involvement,
and, alternatively, as being without merit. *See* Dkt. No.

50 at pp. 9–18. Judge Sharpe found, however, that a
question of fact existed as to whether Plaintiff's claim
that his rights under the RLUIPA and First Amendment
were violated. In light of Plaintiff's *pro se* status, and
in the interest of judicial economy, the New York State
Department of Correctional Services ("DOCS") [1] and
DOCS Commissioner Brian Fischer were substituted as
proper Defendants solely to Plaintiff's RLUIPA and First
Amendment claims. *Id.* at pp. 26–27. Consideration of
the remedy prescribed by the RLUIPA, [2] the Eleventh
Amendment, and the affirmative defense of qualified
immunity demanded that Plaintiff's claims against these
Defendants be limited to non-monetary equitable relief,
only. *See id.* at pp. 27–31.

[1]    The Court is aware that, on April 1, 2011, New
York State Department of Correctional Services and
Parole merged together into one agency now entitled
New York State Department of Corrections and
Community Supervision ("NYSDOCCS"). In order
to maintain consistency with our previous Report
and Recommendation substituting Defendants in this
instant action, we will continue to refer to this specific
Defendant as DOCS.

[2]    The Supreme Court recently had occasion to consider
the question of what relief is available under a
RLUIPA cause of action. *See Sossamon v. Texas,*
U.S. ——, U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d
700 (2011). The Supreme Court found, as we did in
our previous Report and Recommendation on this
matter, that RLUIPA does not expose the States to
private suits for money damages. Thus, our prior
finding of the same remains valid.

Defendants now bring a Motion to Dismiss for Lack of
Subject Matter Jurisdiction pursuant to Federal Rule of
Civil Procedure 12(b)(1). Dkt. No. 69. Plaintiff opposes
the Motion. Dkt. No. 73. For the reasons that follow,
we recommend that Defendants' Motion be **granted** and
Plaintiff's Complaint be **dismissed** in its entirety.

## I. BACKGROUND

For a complete recitation of the factual background of this
case, we refer to this Court's Report and Recommendation
addressing former Defendant Artus' Motion for Summary
Judgment. *See* Dkt. No. 50. In short, Plaintiff claims
that while he was an inmate at Clinton Correctional
Facility, his constitutional and statutory rights were

Case 9:13-cv-00321-MAD-TWD   Document 91   Filed 02/28/18   Page 89 of 104

Pilgrim v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2011 WL 6031929

violated, including the right to freely exercise his religion. Plaintiff, a registered Nation of Islam ("NOI") member, [3] complains that misbehavior reports were issued against him because, undisputedly, Plaintiff was wearing his hair in dreadlocks in violation of a DOCS' policy prohibiting this hairstyle except for members of the Rastafarian faith. The crux of Plaintiff's Complaint, as it currently stands, is that the discipline he received was unlawful under RLUIPA and the First Amendment because DOCS Directive 4914 regarding acceptable inmate hair styles violates his right to freely exercise his religion.

[3]     While NOI dogma does not require their members to wear dreadlocks, Plaintiff asserts that he wears his hair in that style pursuant to his own personal faith and personal interpretations of the Qu'ran and the Bible. Dkt. No. 47–1, Pl.'s Decl., dated Aug. 31, 2009, at ¶ 43. The record before us shows that Plaintiff has been growing dreadlocks since approximately 1993, and there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs. *See* Dkt. No. 36–3, Pl.'s Dep., dated Feb. 19, 2009, at p. 12; *see also* Dkt. No. 50 at pp. 19–20.

## II. DISCUSSION

### A. Standard of Review

**\*2** "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing FED. R. CIV. P. 12(b)(1)). Federal courts are "duty-bound ... to address the issue of subject matter jurisdiction at the outset." *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 929 (2d Cir.1998). In contemplating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Court must "accept as true all material factual allegations in the complaint[,]" though "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) & *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002) (citations omitted); *see also Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005). Furthermore, because Plaintiff brings this action *pro se,* his submissions should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (*per curium* ) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

### B. Mootness

Defendants contend that, as a result of complaints made by non-Rastafarian inmates who wished to maintain dreadlock hairstyles, such as Plaintiff, and "guidance from certain judicial decisions which raised questions about whether the prohibition against non-Rastarian inmates maintaining dreadlocks might violate RLUIPA or the First Amendment," on September 2, 2010, DOCS issued a new version of Directive 4914 which "supersedes and replaces former Directive 4914." Dkt. No. 69–3, Defs.' Mem. of Law, at pp. 2–3 (citing, *inter alia, Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar.9, 2007) & Dkt. No. 69–1, Brian Fischer Decl., dated Dec. 23, 2010, at ¶ 6). Diverging from the old Directive, the new Directive expressly states that "[t]he dreadlocked hairstyle is allowed," and makes no limitation to specific religious designations. Dkt. No. 69–2, Ex. C, New Directive No. 4914, dated Sept. 2, 2010, at III(B) (2). Therefore, as Defendants argue, Plaintiff's claims for prospective equitable relief under the First Amendment and RLUIPA are moot given the adoption of a new version of Directive 4914. We agree.

Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to issues which present an actual "case or controversy." *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Linares v. Barkley,* 2010 WL 4962998, at \*2 (N.D.N.Y. Oct.8, 2010). A case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (internal quotation marks and citations omitted); *Lavin v. United States,* 299 F.3d 123, 128 (2d Cir.2002). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer

Case 9:13-cv-00321-MAD-TWD Document 91 Filed 02/28/18 Page 90 of 104

Pilgrim v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2011 WL 6031929

needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983); *see also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated.") (internal citation omitted).

**\*3** If a court determines an action is moot, it may still entertain such action if it is one that is "capable of repetition, yet evading review." *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 594 n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). An otherwise moot claim is "capable of repetition" if 1) the duration of the challenged condition was too limited in duration to permit litigation prior to its cessation, and 2) if there is a reasonable expectation that the plaintiff will be subject to the same action again. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). A federal court may also entertain a claim if collateral consequences would ensue from denial of the relief sought on mootness grounds. *Werber v. United States,* 149 F.3d 172, 176 (2d Cir.1998).

Here, Defendants, on their own accord, reconsidered and effected a change in their prison regulations and rules regarding acceptable inmate hairstyles. This change to Directive 4914 would seemingly grant Plaintiff exactly the relief he seeks—the ability to wear his hair in dreadlocks as his personal dogma demands, without being subject to disciplinary action. However, a defendant's voluntary cessation of the contested policy must be scrutinized carefully by the courts. See *Smith v. New York State Dep't of Corr. Servs.,* 2010 WL 1192057, at \*5 (S.D.N.Y. Mar.1, 2010) (citing *New York State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 91–92 (2d Cir.1998)).

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* the Supreme Court stated that a defendant's voluntary cessation of a challenged practice may not necessarily deprive a federal court of its power to determine the legality of the practice, and that the "standard ... announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent[.]" 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). "[A] party 'claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' " *Seidemann v. Bowen,* 499 F.3d 119, 128–29 (2d Cir.2007) (quoting *Laidlaw,* 528 U.S. at 190). However, "mere

speculation that the parties will be involved in a dispute over the same issue does not rise to the level of a reasonable expectation or demonstrated probability of recurrence." *Van Wie v. Pataki,* 267 F.3d 109, 115 (2d Cir.2001) (internal quotation omitted).

Defendants have met their heavy burden of demonstrating that DOCS's practice of allowing only members of certain religious sects, such as those of the Rastafarian faith, to maintain dreadlock hairstyles, and punishing noncompliance with their Directive, has ceased, and there is no reasonable probability that such a practice will recur. The voluntary change occurred in the form of a new, superceding Directive, and as "[t]his change in policy is embodied in an official prison document ... it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Tawwab v. Metz,* 554 F.2d 22, 24 (2d Cir.1977) (internal quotation omitted). Additionally, there is authority stating that a government entity's representation that their complained-about conduct has been discontinued is entitled to some deference in determining whether a suit seeking prospective equitable relief against that conduct has been mooted. *Lamar Adver. of Penn, LLC v. Town of Orchard Park, New York,* 356 F.3d 365, 376–77 (2d Cir.2004). Defendants represent that all inmates and correctional services staff have been notified of the change in Directive 4914, and prior Central Office Review Committee ("CORC") decisions interpreting and enforcing the old Directive are "no longer valid." Fischer Decl. at ¶ 13. Defendants further enounce that DOCS has no intention of reinstating the former Directive, and that Plaintiff, specifically, is able under the new Directive to maintain his dreadlocks without the risk of being disciplined, "regardless of his non-Rastafarian religious designation." *Id.* at ¶¶ 14–15. As it seems that Defendants utilized the proper procedures and process to revise their regulation on inmate hairstyles, there is no reason to impute DOCS with the intention to raise the old Directive from the dead. See *Granite State Outdoor Adver., Inc. v. Town of Orange, Connecticut,* 303 F.3d 450, 451–52 (2d Cir.2002).

**\*4** Despite the fact that, as of September 2, 2010, he has been able to maintain his dreadlocks without the risk of being disciplined by correction officers, Plaintiff remains unsatisfied. In his Response in Opposition to Defendants' Motion to Dismiss, Plaintiff argues Defendants' voluntary cessation of the complained-about practice does not

Case 9:13-cv-00321-MAD-TWD Document 91 Filed 02/28/18 Page 91 of 104

Pilgrim v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2011 WL 6031929

moot his request for equitable relief because the new Directive remains "extreme[ly] vague" and does not include the explicit representation that dreadlocks are allowed "regardless of religious designation." *See* Dkt. No. 73, Pl. Resp. This Court is not persuaded by that argument. Prior to the changes, Directive 4914 and CORC decisions interpreting the old Directive expressly provided that only inmates of the Rastafarian faith could wear their hair in dreadlocks. *See* Fischer Decl. at ¶ 4 (citing Dkt. No. 69–2, Exs. A, Former Directive No. 4914 & B, CORC Decisions). That limitation has been removed and now the Directive states, quite plainly, that "[t]he dreadlock hairstyle is allowed." *See* Dkt. No. 69–2, Ex. C, New Directive No. 4914. This declaration is unambiguous and direct and makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). While Plaintiff may prefer some express recognition that members of the NOI are allowed to wear dreadlocks, the effect of the new Directive 4914 grants Plaintiff precisely the change he seeks. [4]

[4]     Perhaps a part of Plaintiff's demand for an explicit statement that the ability to maintain dreadlocks regardless of religious designation stems from the fact that the former Directive 4914 was silent as to whether the dreadlock hairstyle was permissible, and it was relevant CORC determinations, which have the effect of directives, that ruled only inmates of the Rastafarian religion could wear dreadlocks. *See* Dkt. No. 69–2, Exs. A, Former Directive No. 4914 & B, CORC Decisions. However, it would be quite a stretch of interpretation to imagine a future CORC decision that could read some sort of religious limitation into the now expressly-provided sentence that "[t]he dreadlocked hairstyle is allowed." *See id.* at Ex. C, New Directive No. 4914.

Therefore, because there is no reasonable expectation that Plaintiff will be subject to discipline for maintaining a dreadlock hairstyle regardless of his non-Rastafarian faith due to the new Directive, Plaintiff's claims for equitable relief, [5] in their entirety, are moot. As previously noted, Plaintiff's relief is limited to non-monetary equitable relief only, pursuant to Judge Sharpe's decision and the law of the case doctrine. [6] Accordingly, we recommend Plaintiff's complaint be **dismissed** in its entirety for want of subject matter jurisdiction.

[5]     To the extent that Plaintiff is requesting some type of declaratory judgment, *see* Pl.'s Resp. at p. 10, those claims are moot as well. *See Fox v. Bd. of Trustees of the State Univ. of New York,* 42 F.3d 135, 140 (2d Cir.1994) (requesting a declaratory judgment does not excuse the subject matter requirement of an active case or controversy). To the extent that Plaintiff is seeking retrospective relief, such as expungement of past misbehavior reports, those claims are barred. It is well settled that "injunctive relief is not appropriate for past injuries," *see Nation Magazine v. U.S. Dep't of Defense,* 762 F.Supp. 1558, 1570 (S.D.N.Y.1991), even when the Eleventh Amendment limits injunctive relief to be the only available remedy, *see Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ("[T]he Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law. We have refused to extend [that] reasoning ..., however, to claims for retrospective relief.") (internal citations omitted).

[6]     The law of the case doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996) (quoting *Dilaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir.1992)).

### III. CONCLUSION

For the reasons

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 69) be **GRANTED** and Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* FED. R. CIV. P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6031929

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 93 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

2012 WL 6204205
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Dontie S. MITCHELL, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; et al., Defendants.

No. 6:06–CV–6278(MAT).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Dontie S. Mitchell, Attica, NY, pro se.

Gary M. Levine, Emil J. Bove, Jr., New York State Office
of the Attorney General, Rochester, NY, for Defendants.

**Opinion**

### DECISION AND ORDER

MICHAEL A. TELESCA, District Judge.

### I. Introduction

**\*1** Plaintiff Dontie S. Mitchell ("Mitchell" or "Plaintiff")
commenced this action *pro se* pursuant to 42 U.S.C. §
1983. In a Decision and Order entered September 28,
2011 (Dkt # 100), the Court (Siragusa, D.J.) granted
in part, and denied in part, Mitchell's motion to file a
Second Amended Complaint (Dkt # 62). This matter was
transferred to the undersigned on October 26, 2012. (Dkt
# 146). Presently pending are Defendants' Motion for
Summary Judgment (Dkt # 111) and Mitchell's Cross–
Motions for Summary Judgment (Dkt 121, 142). Also
pending are motions for joinder brought by various other
DOCCS' inmates seeking to intervene in the present
action, as well as Plaintiff's motions for reconsideration
and for permission to further amend the Second Amended
Complaint.

For the reasons discussed below, Defendants' Motion
for Summary Judgment is granted, and Mitchell's
Cross–Motions for Summary Judgment are denied. The
remaining pending motions denied with prejudice as
moot.

### II. Background

#### A. Facts

Plaintiff's supporting allegations cover a number of
disparate topics. To avoid unnecessary repetition, the
facts pertinent to the alleged constitutional violations will
be set forth below in the sections addressing Plaintiff's
specific claims.

#### B. Claims Asserted in the Second Amended Complaint

Plaintiff's Second Amended Complaint includes the
following eleven claims: (1) DOCCS' inmate grievance
program is unconstitutional and inadequate; (2) DOCCS'
officials and employees misuse the disciplinary program
in an arbitrary and unconstitutional manner; (3)
the environment at DOCCS facilities is unsafe and
psychologically damaging; (4) corrections officials
engaged in the abusive and excessive use of mechanical
restraints on Plaintiff while he was incarcerated at
Southport Correctional Facility ("Southport"); (5) the
mailroom clerk at Southport arbitrarily censored inmate
mail, photos, and publications; (6) DOCCS failed to
accommodate the religious diet of members of the Nation
of Islam ("NOI"); (7) DOCCS failed to provide religious
festival meals to members of the NOI; (8) DOCCS'
Prison Rules 105.13 and 105.14, which prohibit gangs
and unauthorized organizations, are unconstitutional;
(9) DOCCS' grooming policy concerning dreadlocks is
unconstitutional; (10) DOCCS has an unconstitutional
policy of limiting the number of times an inmate who
is a registered member of one religion can attend the
congregational services of other faiths; and (11) DOCCS'
policy of serving soy-based foods violates the Eighth
Amendment.

### III. General Legal Principles

#### A. Motions to Dismiss Under F.R.C.P. 12(b)(6) and
#### Motions for Summary Judgment Under F.R.C.P. 56

Defendants cite both Rule 12(b)(6) and Rule 56(c) in
support of their motion to dismiss. Because Defendants
have filed an Answer to the Complaint, it appears that
this motion is more appropriately made pursuant to Rule
12(c). The Court need not decide the issue because in
deciding a Rule 12(c) motion, the same standard as that
applicable to a motion under Rule 12(b)(6) is applied.
*Desiano v. Warner–Lambert & Co.,* 467 F.3d 85, 89 (2d

Case 9:13-cv-00321-MAD-TWD Document 91 Filed 02/28/18 Page 94 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

Cir.2006). A dismissal motion may be treated as one for summary judgment if all parties are "given reasonable opportunity to present all material made pertinent to such a motion." Fed.R.Civ.P. 12(b)(6). *E.g., Carione v. United States,* 368 F.Supp.2d 186, 190 (E.D.N.Y.2005). In determining whether to convert a motion to dismiss into one for summary judgment, the "essential inquiry" is "whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." *Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir.1990) (internal quotations omitted). Here, Defendants provided Mitchell with notice of the consequences of failing to respond to a motion for summary judgment pursuant to *Irby v. New York City Transit Auth.,* 262 F.3d 412, 413 (2d Cir.2001), and Mitchell cross-moved for summary judgment. Accordingly, the Court is satisfied that Mitchell was fully apprised of the potential that Defendants' motion would be converted.

**\*2** Rule 12 (b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly,* 550 U.S. at 570. The Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *E.g., Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007); *Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" FED. R. CIV. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**B.** **42 U.S.C. § 1983**
In order to state a claim under 42 U.S.C. § 1983, the plaintiff must establish the following elements: (1) conduct attributable at least in part to a person acting under color of state law, and (2) deprivation, as the result of the challenged conduct, of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). To bring a § 1983 claim against a prison official, a plaintiff must allege that individual's personal involvement; it is not enough to assert that the defendant is a "link in the prison chain of command." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (quotation omitted); *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**IV. Discussion**

**A. Claim One: Commissioner Fischer oversees an unconstitutional and inadequate grievance program.**
**\*3** Plaintiff charges that DOCCS' Commissioner Brian Fischer is liable for overseeing what he describes as an unconstitutional and inadequate inmate grievance program. This claim must be dismissed because inmates have no constitutional right to file a grievance. *E.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 349 (N.D.N.Y.2010) ("While the First Amendment guarantees the right of access to courts, grievance programs [such as DOCCS'] were undertaken voluntarily and have no legal basis in the Constitution. Therefore these programs are not considered constitutional rights.") (citing *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713, at \*3–4 (S.D.N.Y. Mar.29, 2001) ("While there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, *e.g., Bill*

Case 9:13-cv-00321-MAD-TWD   Document 91   Filed 02/28/18   Page 95 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

*Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citation omitted)); *Odoom v. Poirier,* No. 99 Civ. 4933(GBD), 2004 WL 2884409, at *10 (S.D.N.Y. Dec.10, 2004) ("While the filing of grievances is constitutionally protected, the manner in which grievance investigations are conducted do not create a protected liberty interest.") (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (finding that because "[p]rison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment," claims that corrections officers failed to properly address plaintiff's grievances by conducting a thorough investigation to plaintiff's satisfaction must be dismissed).

**B. Claim Two: DOCCS' officials and employees misuse the disciplinary program in an arbitrary and unconstitutional manner.**

Mitchell asserts that DOCCS' disciplinary program "violates the rights of the plaintiffs [sic] to be free from cruel and unusual punishment and excessive fines and penalties, and due to due process of law under the Fifth, Eight [sic], and Fourteenth Amendment...." Second Am. Compl., ¶ 86. Mitchell alleges that Commissioner Fischer, along with the Superintendents and Deputy Superintendents of all DOCCS' facilities, are liable for the program's shortcomings. Mitchell contends that the "systemic misuse" of DOCCS' disciplinary program causes severe psychological and emotional distress within prisoners and ultimately leads to security and safety issues within DOCCS' facilities.

Conclusory allegations concerning Plaintiff's personal beliefs and opinions are insufficient to state a cognizable constitutional claim. *See Alfaro Motors, Inc. v. Ward,* ("[A]llegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983."); *see also Digges v. Helm,* No. 9:09cv201, 2010 WL 3386427, at *5–6 (E.D.Tex. May 28, 2010) ("In Claim Three, Digges makes the bare allegation that '[t]he administrative grievance procedures in the ... (TDCJ) are wholly unconstitutional,' unsupported by any allegation of facts.... Digges again makes a bare allegation

that '[t]he disciplinary hearing process in the TDCJ is unconstitutional and devoid of the fundamental right to due process.'.... [H]is allegations are simply broad statements encompassing the entire system, to which he can hardly attest, and he provides no specific facts in support."), *report and recommendation adopted,* 2010 WL 3386412 (E.D.Tex. Aug.25, 2010). Accordingly, Claim Two does not provide a basis for relief.

**C. Claim Three: DOCCS' facilities are physically unsafe and psychologically damaging.**

***4** Mitchell asserts that "[s]taff harassment of prisoners and unprofessionalism, and the wanton use of excessive force and the wanton physical and emotional abuse of prisoners by staff members, is rampant within DOCS facilities; thus creating an unconstitutionally unsafe and psychologically damaging environment, not only for prisoners but for staff members as well." Second Am. Compl., ¶ 87. Mitchell states that Commissioner Fischer, and the successors of any Superintendent or Deputy Superintendent, are liable for the actions of former Commissioner Goord and the previous Superintendents and Deputy Superintendents. *Id.,* ¶ 116.

Most of Mitchell's allegations under this cause of action are general in nature. The only specific incidents of harassment alleged are as follows: Mitchell was "physically mishandled" by a guard during a pat frisk at Sing Sing in 2001; also in 2001, Mitchell witnessed guards at Upstate physically assault his cellmate, who was in mechanical restraints; Mitchell, along with other new prisoners, was "hassled" by a guard in D–Block at Attica in 2002; one guard at Clinton, on an unspecified date, issued an unspecified threat against Mitchell after a pat frisk; one guard at Clinton, on an unspecified date, "harassed and ridiculed Mitchell about his broken glasses." Second Am. Compl., ¶¶ 103–107.

All of these incidents are outside of the three-year statute of limitations applicable to actions brought under 42 U.S.C. § 1983. *E.g., Edmonson v. Coughlin,* 21 F.Supp.2d 242, 246 (W.D.N.Y.1998). Moreover, none of them states a colorable constitutional claim. Mitchell, himself, has not alleged physical injury, and it is well-settled that claims of verbal harassment, without more, are not actionable under § 1983. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called [plaintiff] names also did not allege any appreciable injury and was properly dismissed.").

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 96 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

#### D. Claim Four: The use of mechanical restraints for "Level One" inmates at Southport during recreation and visits is unconstitutional.

Mitchell states that Southport employs a "Progressive Inmate Movement System" to classify inmates according to their disciplinary records. Second Am. Compl., ¶ 117. "Level I" prisoners are "forced to remain in mechanical restraints during recreation and visitation. *Id.* Mechanical restraints are removed only for "Level II" and "Level III" prisoners during these times. *Id.,* ¶ 121. Inmates transferred into Southport are automatically placed in Level I, the most restrictive level of confinement, for at least a thirty-day adjustment period. *Dumpson v. Goord,* 2011 WL 4345760, at *1 (W.D.N.Y. Sept.15, 2011) (Siragusa, D.J.) (citation to record omitted).

Mitchell states that he was forced to remain in mechanical restraints during recreation approximately 35 to 40 times from while placed in the Level I category during the orientation period upon his arrival at Southport in 2002, 2004, 2006, 2008, and 2010. *Id.,* ¶ 123. In addition, Mitchell alleges that from 2002 to 2010, "different security staff" placed mechanical restraints on him in an "excessively tight" manner to the point that the metal bit or pinched his skin, causing discomfort. *Id.,* ¶ 124. Mitchell also alleges that being in the exercise yard in mechanical restraints poses a danger of physical harm due to not being able to catch one's balance or break one's fall when walking on icy surfaces. He asserts that he hurt his hip in such a fall. In addition, in 2006, when he was being transported from Elmira to Southport, Mitchell alleges that Southport guards placed mechanical restraints on him so tightly that it caused him to have an anxiety attack, and it took several requests before the guards finally loosened the restraints. *Id.,* ¶ 127.

**\*5** The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, *see Rhodes v. Chapman,* 452 U.S. 337, 344–45, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), prohibits the infliction of "cruel and unusual punishments" on inmates, US. Const. amend. VIII. This prohibition includes the infliction of "unnecessary and wanton" pain on an inmate. *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). To validly assert an Eighth Amendment claim for excessive use of force, an inmate must prove two components, one subjective and the other objective. *Hudson v. McMillan,* 503 U.S. 1, 7–

8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "The subjective element is that the defendant must have had the necessary level of culpability, shown by actions characterized by 'wantonness[,]' " *Blyden,* 186 F.3d at 262 (quotation omitted), while "[t]he objective element is that the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment protection [,]" *id.* (citation omitted). The Eighth Amendment also guarantees some opportunity for exercise to prison inmates. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) (citation omitted).

The Court finds that the allegations summarized above fail, as a matter of law, to state a claim under the Eighth Amendment as they lack both required elements-objectively serious harm to Mitchell and a wantonly reckless mental state by the unnamed defendants. Mitchell asserts that he was caused "discomfort" by the metal pinching his skin. Although he fell once while in restraints, he admits he did not suffer a significant injury. With regard to the subjective elements, there are no allegations that prison officials "maliciously and sadistically use[d] [the mechanical restraints] to cause harm," *Hudson,* 503 U.S. at 9. Mitchell admits that when he complained about the too-tight restraints causing him to have an anxiety attack, the Southport guards ultimately acceded to his request to loosen the restraints.

With regard to a possible restriction-of-exercise claim under the Eighth Amendment, Mitchell's allegations likewise do not raise a triable issue of fact. He "does not assert that physical exercise was made impossible or that the additional restraints themselves imposed any constitutionally cognizable discomfort." *Brown v. Coughlin,* No. 93–CV–633, 1995 WL 643349, at *3 (W.D.N.Y. Oct.13, 1995) (granting summary judgment on Eighth Amendment claim); *accord, e.g., Dumpson v. Goord,* 2011 WL 4345760, at *1; *Dabney v. McGinnis,* No. 97–CV–489A, 2006 WL 1285625, at *5–6 (W.D.N.Y. May 9, 2006).

#### E. Claim Five: The mailroom clerk at Southport interferes with inmate correspondence.

Mitchell asserts that the senior mailroom clerk employed at Southport, K. Washburn, routinely opens outgoing prisoner mail and reads incoming prisoner mail without authorization. *See* Second Am. Compl., ¶ 131. He alleges that on several occasions in 2004, Washburn opened mail

Case 9:13-cv-00321-MAD-TWD Document 91 Filed 02/28/18 Page 97 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

sent to him to the Maoist International Movement ("MIM") on the "pretext that it was business mail." *Id.,* ¶ 132. Mitchell contends that the MIM does not charge inmates for subscriptions and therefore is not a business organization.

**\*6** In addition, Mitchell contends, on two occasions in 2006, Washburn allegedly confiscated several sheets of two publications sent to him. The confiscation was based upon a DOCCS' policy that prisoners cannot receive more than five pages of photocopied or printed materials at one time. Consequently, Mitchell was forced to mail out the confiscated sheets at his own expense, "causing him grief frustration, and anger." *Id.,* ¶¶ 140–41.

Mitchell generally accuses DOCCS officials of illegally preluding inmates from receiving books, such as *The Art of War, The Art of Seduction,* and *Blood In My Eye,* that he opines do not necessarily violate the standards of 7 N.Y.C.R.R. § 712.2(i). [1] Mitchell asserts that these books are disallowed because they are popular with inmates and express views with which DOCCS' officials disagree. *Id.,* ¶ 147. He also alleges that "[p]laintiffs often must have their hip hop related magazines ... redacted" based upon DOCCS' misinterpretation of certain gestures as gang-related. *Id.,* ¶ 145.

[1] Pursuant to this regulation, DOCCS "reserves the right to deny the inmate publications which may be held noninciteful or nonadvocative, as the case may be, during the media review process, but which actually result in violence or disobedience after entrance into a facility, as is clearly set forth in paragraphs (h)(3) [precluding information that depicts or describes methods of escape from correctional facilities] (6) [precluding information that depicts or describe techniquess or methods for rioting and/or information instructive in hostage or riot negotiation techniques] of this section. Such items shall be referred to the Facility Media Review Committee, and if appealed, referred to the Central Office Media Review Committee, for decision." 7 N.Y.C.R.R. § 712.2(2)(i).

In general, a prison official's interference with an inmate's mail implicates the First Amendment right to free speech, and interference with an inmate's legal mail also implicates the First Amendment right to access to courts. An inmate has the First Amendment right to "the free flow of incoming and outgoing mail." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (quotation omitted). "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail." *Id.* (quotation omitted). A regulation limiting an inmate's right to send and receive mail " 'is valid if it is reasonably related to legitimate penological interests.' " *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

The regulation at issue here is set forth in 7 N.Y.C.R.R. § 720.4, "Incoming Mail." Section 720.4(a)(2) of 7 N.Y.C.R.R. provides that *"[a]ll incoming general correspondence* will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband. The inmate's presence is not required during the inspection of incoming general correspondence." *Id.* (emphasis supplied). Section 720.4(c) of 7 N.Y.C.R.R. pertains specifically to printed or photocopied materials received by an inmate:

(2) A limit of five pages of printed or photocopied materials (an individual newspaper clipping will be considered one page) may be received within a piece of regular correspondence (except as provided in paragraph (3) of this subdivision)....

(3) Not to exceed once every four months, an inmate may make a written request to the superintendent to receive in excess of five pages of printed or photocopied legal papers specifically related to the inmate's current legal matter ... within a piece of regular correspondence. The inmate shall make the request in advance, specifically identifying the legal papers, including the approximate number of pages, and state why they cannot be obtained via the facility law library or privileged correspondence.... If approved, the piece of correspondence must be received within 30 days thereafter....

**\*7** 7 N.Y.C.R.R. § 720.4(c)(2)-(3).

With regard to the allegations regarding Washburn's allegedly improper opening of his personal mail to the MIM, Mitchell has not demonstrated that it was in violation of 7 N.Y.C.R.R. § 720.4, or that he suffered any actual injury as the result of the alleged tampering. *See Moore v. Gardner,* 199 F.Supp.2d 17, 27 (W.D.N.Y.2002) (dismissing inmate's claims based upon tampering with personal and legal mail where inmate

Case 9:13-cv-00321-MAD-TWD   Document 91   Filed 02/28/18   Page 98 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

failed to demonstrate that suffered any resultant actual injury).

With regard to the confiscation of the pages in excess of the five permitted sheets of printed material, Mitchell does not dispute that he was in violation of the prison directive in question, 7 N.Y.C.R.R. § 720.4(c)(2). *See Moore,* 199 F.Supp.2d at 26 (rejecting inmate's claim that mail was illegally confiscated where it was "clear that the particular document was confiscated because plaintiff had violated the prison's directives" against using another inmate's return address).

Finally, with regard to his claim that DOCCS and its agents "have disallowed prisoners from receiving or possessing" certain books and have improperly redacted magazines due to concerns over gang-related material, Mitchell has not alleged that he personally was prevented from receiving or possessing any of the books listed or any other book, or that he his hip hop literature was improperly redacted. Thus, he has failed to allege any actual injury. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ( "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.") (citation omitted). This claim accordingly must be dismissed.

**F. Claim Six: DOCCS fails to accommodate the religious diet of inmate-members of the NOI in violation of the First Amendment, the RLUIPA,[2] and the Equal Protection Clause.**

[2]    The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.*

Mitchell, a member of the NOI, contends that DOCCS violates his rights under the First Amendment and the RLUIPA by serving soy beans, tuna fish, collard greens, sweet potatoes, white bread, baked foods, corn bread, hot cakes with syrup, and white rice. The issue of whether the diet served by DOCCS is appropriate for members of the NOI has been determined previously in favor of DOCCS. *See, e.g., Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 345 (W.D.N.Y.2000) (citing, *inter alia, Green v. Coughlin,* No. 88–CV–214 (N.D.N.Y. Oct. 11, 1991); *Abdul–Malik v. Goord,* No. 96 CIV. 1021(DLC), 1997 WL 83402, at *1 (S.D.N.Y. Feb.27, 1997) (holding, after a bench trial, that "the RAM [Religious Alternatives Menu][3] menu provides a nutritionally adequate diet for

an inmate who eats from that menu exclusively.... All that is required for a prison diet not to burden an inmate's free exercise of religion is 'the provision of a diet sufficient to sustain the prisoner in good health without violating [his religion's] dietary laws.' The RAM diet is sufficient to sustain prisoners in good health and its consumption does not require any violation of the tenets of Islam.") (quoting *Kahane v. Carlson,* 527 F.2d 492, 496 (2d Cir.1975)).

[3]    The "RAM was designed to accommodate the needs of many religious groups who have special dietary requirements, including Muslims, Hindus, Seventh Day Adventists, Buddhists and Rastafarians. In addition, RAM accommodates the medical needs of some inmates, such as those with allergies to fish, eggs or dairy products, and those who wish a lower fat diet. RAM is a nutritionally adequate alternative to the regular menu. RAM was designed so that it could be served in the same fashion and at the same time as the regular menu. There is no dispute that a Muslim inmate can eat the food on the RAM menu without violating the tenets of Islam." *Abdul–Malik v. Goord,* 1997 WL 83402, at *3.

**\*8** In *Allah v. Kelly,* No. 96–CV–7323CJS(H) (W.D.N.Y. Apr. 19, 1999) (Report and Recommendation adopted on January 27, 2000), the Court (Siragusa D.J./Heckman, D.J.) rejected the same claims raised by Mitchell here. *See id.,* No. 96–CV–323CJS(H), slip op. at 9 (after comparing the foods offered in the RAM menu with the dietary requirements described by Elijah Muhammad in "How to Eat to Live," the authority cited by Mitchell here, finding that DOCCS' accommodation of the plaintiff Allah's religious diet was reasonable and nutritionally adequate, and that the exercise of his religion was not substantially burdened).

Mitchell's claim that DOCCS accommodates the dietary laws of inmates of the Jewish faith but not those of the NOI in violation of the Equal Protection Clause likewise is without merit. *See Simmons v. Robinson,* No. 07 Civ. 7383(DAB)(DFE), 2010 WL 5538412, at *13 (S.D.N.Y. Jan. 28, 2010) (rejecting claim that DOCCS violated the equal protection rights of Muslim inmates by failing to provide them with a halal diet equivalent to the kosher diet that Jewish inmates at Green Haven Correctional Facility receive) (citing *Majid v. Fischer,* 07 Civ. 4585(NRB), 2009 U.S. Dist. LEXIS 71616, at *14–30 (S.D.N.Y. July 31, 2009)).

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 99 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

### G. Claim Seven: Plaintiff was denied two religious festival meals in violation of his rights under the First Amendment and the RLUIPA.

Mitchell, a practicing Muslim and registered member of the NOI, asserts that he was denied the opportunity to observe the two EID festival meals, held after Ramadan, thereby violating his rights under the First Amendment and the RLUIPA. On November 20, 2004, Mitchell was keeplocked at Auburn Correctional Facility, no EID festival meal was provided to him because "Defendant John Doe # 1 in E–Block ... failed to notify the messhall to add Mitchell to the NOI feed up list...." Second Am. Compl., ¶ 170. On January 26, 2005, Mitchell was confined at Southport and unable to attend the group EID meal. Mitchell claims that although he notified the Intake Sergeant, and received a personal confirmation from NOI Chaplain Conners that he would place Mitchell on the NOI feed up list, he never received the EID meal because of "Defendant John Doe # 2." *Id.,* ¶ 172.

Defendants argue that the claims pertaining to the festival meals should be dismissed because Mitchell has failed to name either of the John Doe defendants, and the three-year statute of limitations has long since expired. The Court agrees. *See Abreu v. City of N.Y.,* 657 F.Supp.2d 357, 363 (E.D.N.Y.2009) (Inmate was required to substitute named parties for the three unknown "John Doe" correction officers in his § 1983 complaint prior to the expiration of the three-year statute of limitations applicable to § 1983 claims brought in New York; at no point prior to the expiration of the limitations period, and indeed, at no time subsequent to it, either, did inmate seek to amend his pleading to substitute named parties for the placeholder John Doe defendants, and there was no indication that inmate ever even attempted to ascertain from the City defendants the identities of these unknown individuals).

### H. Claim Eight: Prison Rules 105.13 and 105.14 are unconstitutional.

 **\*9** Mitchell challenges the constitutionality, as applied to him, of DOCCS' Prison Rules (prohibiting gang-related activities and materials), and 105.14 (prohibiting unauthorized activities and materials). *See* Second Am. Compl., ¶¶ 175–186. This claim stems from an incident on June 16, 2009, in which Mitchell was charged with possessing a typewritten document titled, "Body and Soul of UFD," and for possessing published literature

regarding the "New Afrikan Ujamaa Dynasty." *Id.,* ¶¶ 178, 182. After a hearing, Mitchell was found guilty of violating Prison Rule 105.14, but not Rule 105.13. He also was found guilty of a different prison rule, Possession of Contraband, the application of which he does not challenge. He was sentenced with seven days in keeplock for both rules violations. Mitchell states that Prison Rules 105.13 and 105.14, as applied to him, violate his First Amendment rights. Because Mitchell was acquitted of violating Prison Rule 105.13, the only rule at issue here is 105.14.

In prison, an inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Thus, a prison regulation or practice limiting prisoners' incoming mail is valid if it is " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. at 89). Prison officials are not required to show with certainty that any particular correspondence would have adverse consequences. *Procunier v. Martinez,* 416 U.S. 396, 414, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Instead, prison administrators are given "[s]ome latitude in anticipating the probable consequences of allowing a certain speech" in and out of a prison environment. *Id.* Courts owe "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (citations omitted).

While all justifiable inferences must be drawn in the inmate's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. *Beard v. Banks,* 548 U.S. 521, 530, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (citing *Overton,* 539 U.S. at 132). Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. *Banks,* 548 U.S. at 530.

Prison Rule 105.14 provides in pertinent part as follows:

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 100 of 104

2012 WL 6204205

An inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or possess printed or handwritten material relating to an unauthorized organization where such material advocates either expressly or by clear implication, violence based upon race, religion, sex, sexual orientation, creed, law enforcement status or violence or acts of disobedience against department employees or that could facilitate organizational activity within the institution by an unauthorized organization.

**\*10** Note: For purposes of this rule an unauthorized organization is any organization which has not been approved by the deputy commissioner for program services. Printed or handwritten material that could facilitate organizational activity includes, but is not limited to, a membership roster, organizational chart, constitution or by-laws....

7 N.Y.C.R.R. § 270.2 (Institutional Rules of Conduct). Media Review Directive 4572 clarifies that

As noted above, Mitchell possessed information from the New Afrikan Ujamaa Dynasty, which, according to their website, "is a mass organization for the betterment of New Afrikan people.... The Ujamaa is part of the New Afrikan Liberation Movement led by the New Afrikan Maoist Party." [4] The organization's constitution indicates that the UFD (Ujamaa Field Dynasty) "shall be an independent subdivision of the Ujamaa Dynasty for youths, young adults and ex-lumpens [sic]. It shall have its own constitution and be lead by its own leadership but shall uphold this Constitution and the Program of the Ujamaa Dynasty." [5]

[4]    According to their website, "[t]he New Afrikan Ujamaa Dynasty is a mass organization for the betterment of New Afrikan people.... The Ujamaa is part of the New Afrikan Liberation Movement led by the New Afrikan Maoist Party." The organization's constitution indicates that the UFD "shall be an independent subdivision of the Ujamaa Dynasty for youths, young adults and ex-lumpens [sic]. It shall have its own constitution and be lead by its own leadership but shall uphold this Constitution and the Program of the Ujamaa Dynasty." http://ujamaadynasty.wordpre ss.com/2009/05/26/announcing-new-afrikan-ujamaa-dynasty-website.

[5]    http://ujamaadynasty.wordpress.com/2011/05/17/ufd-constitution/.

Even if application of the *Turner v. Safley* factors were to favor Mitchell, summary judgment for Defendants is warranted here on qualified immunity grounds because it was not clearly established, as of the time of the alleged violation, whether prison rules restricting possession and use of materials published by the New Afrikan Liberation Movement, UFD, and related entities, were invalid under the First Amendment. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 812, 818, 172 L.Ed.2d 565 (2009), modified *Saucier* by holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases". *Id.*

Here, the Court need not decide whether the facts show a constitutional violation because even if it were eventually determined that the rules were constitutionally infirm as applied to Plaintiff, it was not clearly established, as of the time of the confiscation in 2009, whether prisons rules restricting possession and use by inmates of the New Afrikan Ujamaa Dynasty/UFD materials were invalid under the First Amendment. *See Neree v. O'Hara,* No. 9:09–CV–802 (MAD/ATB), 2011 WL 3841551, at \*7 (N.D.N.Y. July 20, 2011) ("The court finds that the defendants who applied the amended DOCS policies with respect to UCC [Uniform Commercial Code] materials in connection with the three disciplinary hearings against

Case 9:13-cv-00321-MAD-TWD    Document 91    Filed 02/28/18    Page 101 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

plaintiff are entitled to qualified immunity, to the extent plaintiff claims those policies were invalid under the First Amendment.... [I]n the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed the issue, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment.").

### I. Claim Nine: DOCCS' grooming policy is unconstitutional.

**\*11** Mitchell contends that DOCCS' grooming policy, which prohibits inmates from wearing their hair in dreadlocks unless they are registered members of the Rastafarian religion, violates inmates' rights to "freedom of expression" under the First Amendment and discriminates against African–Americans. Mitchell himself was not forced to cut his hair and does not wish to wear dreadlocks. As he does not appear to have suffered any actual injury due to the application of this policy, he lacks standing to challenge it. In any event, Defendants point out, the issue is now moot, as DOCCS has amended the applicable Inmate Grooming Standard, Directive 4914(III)(B)(2). *See Amaker v. Goord,* No. 06–CV–490A SR, 2012 WL 4718661, at *8 (W.D.N.Y. Aug.16, 2012)* ("Directive 4914, which regulates Inmate Grooming Standards, was modified on September 2, 2010 to allow the 'dreadlock hairstyle.' ") (citation to record omitted).

### J. Claim Ten: DOCCS' policy regarding attendance of religious services is unconstitutional.

Mitchell contends that DOCCS violates the First Amendment and the RLUIPA by allowing inmates to attend the services of a religion with which they are not registered only three times a year. Second Am. Compl., ¶ 199. Mitchell, who is a registered member of the NOI, states that he is aggrieved by this policy because he "desires to study all religions and attend their services," *id.,* ¶ 201, any time he chooses.

While inmates are not stripped of their constitutional rights simply by virtue of their imprisonment, *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), including their right to religious freedom, *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), they retain only those rights consistent with legitimate penological objectives,

*Giano v. Senkowski,* 54 F.3d at 1053. "[R]easonable limitations on the accommodation of religious practices necessary to achieve those objectives are permitted[,]" and "[r]egistration is one such limitation." *Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir.1997). "[P]rison officials are not required to accommodate an inmate's religious demands without regard to whether or not the inmate is actually a member of the religion." *Id.* (citing *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (summary judgment appropriate where inmate failed to prove that he sincerely held any religious belief mandating use of Tarot cards)). As the Second Circuit has explained, "[r]egistration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times." *Jackson–Bey,* 115 F.3d at 1097.

Here, Plaintiff is not entirely foreclosed from studying other religions, as he concedes he is able to attend the congregational services of a religion with which he is not registered three times a year. In addition, there are alternative means of studying other religious faiths, such as by reading their literature. Notably, he has not alleged that DOCCS has infringed upon *his* sincerely held religious beliefs by denying him participation in the congregational services of the religion in which he professes to believe, but rather that DOCCS does not permit him to participate whenever he chooses in other religions. He has come forward with no caselaw supporting the proposition that prison inmates are constitutionally entitled to attend congregational services of any and all religions whenever they wish. In short, this claim fails to state a constitutional violation.

### K. Claim Eleven: DOCCS' service of soy-based foods violates the Eighth Amendment.

**\*12** Mitchell contends that DOCCS' inclusion of soy-based foods in the diet provided to prisoners violates the Eighth Amendment's proscription against cruel and unusual punishment because the medical literature establishes that soy causes cancer and leads to emasculation. This claim is patently frivolous. *See Martin v. Scott,* 156 F.3d 578, 579–80 (5th Cir.1998) (*per curiam* ) ("Martin's claim that he was subjected to cruel and unusual punishment is frivolous. The conditions complained of by Martin, including his contention that he was subjected to cruel and unusual punishment when he became ill after being fed Vita–Pro a soy-based meat

Case 9:13-cv-00321-MAD-TWD Document 91 Filed 02/28/18 Page 102 of 104

Mitchell v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2012 WL 6204205

substitute-simply do not rise to the level of cruel and unusual punishment.") (citing *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (holding that the inmate must show that the risk of which he complains is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk")).

**V. Conclusion**

Defendants' motion for summary judgment (Dkt # 111) dismissing the Second Amended Complaint is granted, and Plaintiff's Second Amended Complaint is dismissed in its entirety with prejudice. Plaintiff's Cross–Motions for Summary Judgment (Dkt121, 142) are denied with prejudice.

In light of the Court's dismissal of Plaintiff's Second Amendment Complaint, the following motions are dismissed, with prejudice, as moot: Motion for Joinder by Raul Matamoros (Dkt # 64); Motion for Joinder by Shawn Sutton (Dkt # 95); Motion for Joinder filed by Josue Deliser (Dkt # 96); Motion for Joinder by Jason O. Thompson (Dkt # 132); Motion for Joinder by Aaron Isaiah Young (Dkt # 133); Motion for Joinder by Robert Denis (Dkt # 134); Motion to Join as a Party by Melundae Teasley (Dkt # 136); Motion for Joinder by James Towner (Dkt # 139); Motion for Joinder

by Jamie Lamphear (Dkt152, 162); Plaintiff's Motion to File Amended Complaint (Dkt # 150); Plaintiff's Fourth Motion to Amend Complaint (Dkt # 153); Plaintiff's Motion for Reconsideration (Dkt # 155) of Order (Dkt # 144) Denying Injunctive Relief; Motion for Reconsideration (Dkt # 156) of Order (Dkt # 145) Denying Motion to Compel and for Miscellaneous Relief; Motion for Joinder by Donald Adams (Dkt # 160); Motion for Joinder by Michael Shaw (Dkt # 161); Motion for Joinder by Leonard Hinton (Dkt # 165); Request for a Preliminary Injunction by Leonard Hinton dated December 13, 2012 (not docketed); Motion for Joinder by R. Guice dated November 18, 2012 (not docketed); Motion for Joinder by Junior Wilson postmarked November 19, 2012 (not docketed); Motion for Joinder by Hadji S. Hill received November 21, 2012 (not docketed); and Plaintiff's Motion for Miscellaneous Relief, Including Appointment of Counsel and Class Certification (Dkt # 166).

The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6204205

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1036730
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Shondell Paul, Plaintiff-Appellant,
v.
Thomas LaValley, Superintendent,
Clinton Correctional Facility, Stephen
Brown, Deputy Superintendent, Clinton
Correctional Facility, Defendants-Appellees. *

| * | The Clerk of Court is directed to amend the caption as set forth above. |

17-1086
|
February 23, 2018

Appeal from a judgment of the United States District
Court for the Northern District of New York (Suddaby,
C.J.; Peebles, M.J.).

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Shondell Paul, pro se,
Comstock, NY.

FOR DEFENDANTS-APPELLEES: Barbara D.
Underwood, Solicitor General, Andrew Bing, Deputy
Solicitor General, Frederick A. Brodie, Assistant Solicitor
General, of counsel, for Eric T. Schneiderman, Attorney
General of the State of New York, New York, NY.

PRESENT: ROBERT A. KATZMANN, Chief Judge,
ROSEMARY S. POOLER, CHRISTOPHER F.
DRONEY, Circuit Judges.

**Opinion**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **VACATED** and the case
is **REMANDED** for further proceedings.

Appellant Shondell Paul, proceeding pro se, appeals
from a judgment granting qualified immunity
to Superintendent Thomas LaValley and Deputy
Superintendent of Security Stephen Brown in Paul's suit
brought under 42 U.S.C. § 1983. At the relevant times,
Paul was a prisoner in a Special Housing Unit at Clinton
Correctional Facility ("Clinton") in Dannemora, New
York. When Paul first arrived at the facility, he was
provided with long underwear for use during the one
hour of daily outdoor exercise. However, Clinton later
stopped issuing the long underwear. Paul complained to
LaValley and Brown that, without the long underwear or
other winter items, the standard clothing provided was
inadequate to protect him from the harsh winter weather,
which precluded him from participating in daily exercise.
His complaints went unheeded. The defendants moved for
summary judgment, both on the merits and on qualified
immunity. The magistrate judge recommended denying
the motion. The district court adopted the majority of
the magistrate judge's report and recommendation, but
concluded that the defendants were entitled to qualified
immunity. This appeal follows. We assume the parties'
familiarity with the underlying facts, the procedural
history of the case, and the issues on appeal.

We review a district court's grant of summary judgment
de novo, "resolv[ing] all ambiguities and draw[ing] all
inferences against the moving party." Garcia v. Hartford
Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013) (per curiam).
"Summary judgment is proper only when, construing
the evidence in the light most favorable to the non-movant,
'there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law.'
" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011)
(quoting Fed. R. Civ. P. 56(a)).

"Qualified immunity shields federal and state officials
from money damages unless a plaintiff pleads facts
showing (1) that the official violated a statutory or

constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defendants bear the burden of establishing their entitlement to qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

To prevail on a conditions-of-confinement claim, an inmate must show that he suffered a sufficiently serious deprivation and that prison officials acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner suffers a sufficiently serious deprivation when prison officials fail to furnish him with "life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Accordingly, we have agreed with other Circuits that "some opportunity for exercise must be afforded to prisoners," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985), and we have held that this right was clearly established for qualified immunity purposes by no later than 1985, *Williams v. Greifinger*, 97 F.3d 699, 703–04 (2d Cir. 1996). Upon review, we conclude that the magistrate judge and the district court correctly concluded that Paul disputed material issues of fact concerning the merits of his claim and that the right at issue was clearly established, and we therefore reject Appellees' alternative bases for affirming the district court's judgment.

**\*2** The district court nonetheless granted immunity to the defendants based on its conclusion that it was objectively reasonable for the defendants to believe that they may lawfully deny long underwear to Paul. *Paul v. LaValley*, No. 9:13-cv-1040 (GTS/DEP), 2017 WL 1167308, at \*4–6 (N.D.N.Y. Mar. 28, 2017). However,

once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful. This is so because a police officer who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful. We clarify here that the two are part of the same inquiry, not independent elements as some cases suggested.

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 n.11 (2d Cir. 2009); *see also Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011) ("The focus ... remains on whether, at the time of the alleged conduct, the right was clearly established, *rendering it objectively unreasonable* for an official to think that his action was lawful." (emphasis added)); *Walczyk v. Rio*, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, *J.*, concurring) ("[W]hether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful."). Here, because an inmate's right to be afforded an opportunity to exercise was clearly established as of the events in question, the defendants are not entitled to qualified immunity.

We have considered the parties' remaining arguments and find in them no basis for altering our decision. Accordingly, we **VACATE** the district court's judgment and **REMAND** for further proceedings.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

**All Citations**

--- Fed.Appx. ----, 2018 WL 1036730 (Mem)

**End of Document**     © 2018 Thomson Reuters. No claim to original U.S. Government Works.